UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

EASTSIDE HOLDINGS INC., Individually
and On Behalf of All Others Similarly Situated,

               Plaintiff,

   vs.

THE BEAR STEARNS COMPANIES INC.,
JAMES E. CAYNE, ALAN D. SCHWARTZ,
WARREN J. SPECTOR, SAMUEL L.
MOLINARO, JR. and ALAN C.
GREENBERG,

               Defendants.

—————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 08-cv-2793

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company") between December 14, 2006 and March 14, 2008 (the "Class Period"), against Bear Stearns and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.     Bear Stearns, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide.

3.     During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. As a result of defendants' false statements, Bear Stearns stock traded at artificially inflated prices during the Class Period, reaching a high of $159.36 per share in April 2007.

4.     In late June 2007, news about Bear Stearns' risky hedge funds began to enter the market. These funds would ultimately file bankruptcy and the scandal would lead to the ouster of one of the defendants. On August 3, 2007, Bear Stearns issued a press release in response to a recent Standard & Poor's ("S&P") decision to change the Company's outlook, stating in part:

> The Bear Stearns Companies Inc. said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns. Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns. S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these were isolated incidences and are by no means an indication of broader issues at Bear Stearns.
>
> "S&P's action highlights the concerns in the marketplace over the recent instability in the fixed income environment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Contrary to rumors in the marketplace, our franchise is profitable and healthy and our balance sheet is strong and liquid. Bear Stearns has thrived throughout both tumultuous and fortuitous markets for the past 84 years. We are experiencing another market cycle and we are confident in Bear Stearns' ability to succeed in this environment as it has in so many others."

With respect to operating performance and financial condition, the company has been solidly profitable in the first two months of the quarter, while the balance sheet, capital base and liquidity profile have never been stronger. Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled. The risk management infrastructure and processes remain conservative and consistent with past practices. This structure and strong risk management culture has allowed the firm to operate for all of its history as a public company without ever having an unprofitable quarter.

All other major rating agencies have affirmed their stable or positive outlook on Bear Stearns within the last six weeks.

5.     On this news, Bear Stearns' stock dropped to as low as $106.55 per share before closing at $108.35 per share on August 3, 2007.

6.     Subsequently, on August 5, 2007, Bear Stearns issued a press entitled "Bear Stearns Announces Management Changes." The press release stated in part:

> The Bear Stearns Companies Inc. announced today that, effective immediately, Alan D. Schwartz has been named the company's sole president, and Samuel L. Molinaro, Jr. will become chief operating officer in addition to his current duties as chief financial officer. Jeffrey Mayer, co-head of the Fixed Income Division, has been named to the Bear Stearns Executive Committee. Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

> Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure. These promotions reflect and acknowledge the depth of talent in our senior management team. Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility. Since assuming co-leadership of our fixed income business in 2002, Jeff has helped build a highly successful global fixed income franchise. They all, along with many others, play critical roles in leading Bear Stearns. I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth. Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

> Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work. Bear Stearns is a special firm that has weathered countless challenging markets in its history. For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

Alan D. Schwartz joined Bear Stearns in 1976. He became executive vice president and head of the Investment Banking Division in 1985. Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986. In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee

7.     On October 12, 2007, *BusinessWeek* published an article entitled "Bear Stearns' Bad Bet; Two Bear Stearns hedge funds soared by specializing in exotic securities and unorthodox practices. Then they imploded," which reported material information Bear Stearns had concealed. The article stated:

Ralph R. Cioffi seemed as cool and confident as ever. The market for subprime mortgages was crumbling, but the 51-year-old manager of two Bear Stearns (BSC) hedge funds offered nothing but reassurances to investors. "We're going to make money on this," he promised his wealthy patrons in February. "We don't believe what the markets are saying."

He should have known otherwise. The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south, according to a BusinessWeek analysis of confidential financial statements for both funds and interviews with forensic accounting experts, traders, and analysts.

The funds had another potentially fatal flaw: an unusual arrangement with Barclays (BCS) that gave the giant British bank the power to yank the plug – a deal that ran counter to the interests of other investors, many of whom didn't even know about it.

The documents also cast serious doubt on the funds' supposedly strong performance before their July bankruptcies. More than 60% of their net worth was tied up in exotic securities whose reported value was estimated by Cioffi's own team – something the funds' auditor, Deloitte & Touche, warned investors of in its 2006 report, released in May, 2007. What emerges from the records is a portrait of a cash-starved portfolio piled high with debt and managers all too eager to add to the heap.

Spotlight on Hedge Funds

The revelations shed new light on the murky dealings inside the booming $1.3 trillion hedge fund industry, which now accounts for up to a third of all daily trading on Wall Street. They seem to underscore critics' biggest complaint: that many hedge funds use astonishing amounts of leverage, or borrowed money, in

sometimes reckless ways. The risks of "fair value" accounting, the practice that allows money managers to estimate the values of securities for which they can't find true market prices, are thrown into sharper focus as well. Coming soon, for better or worse: louder calls in Washington for more oversight of the largely unregulated hedge fund industry.

These new details could further damage the relationships that thousands of pension funds, university endowments, and wealthy individuals have with the Wall Street chieftains they entrust to manage their money. The Bear funds weren't stand-alone portfolios like the ones that blew up on Amaranth Advisors and Sowood Capital Management in recent years – they carried the imprimatur of one of the Street's oldest and most storied firms. The funds marketed themselves with the implicit backing of Bear Stearns and played up the fact that they were run by its experts in mortgage-backed securities. Now investors are left with a troubling question: If they can't count on big, well-established firms to operate hedge funds properly, whom can they count on?

LASTING DAMAGE?

For Bear and its 72-year-old chairman and chief executive, James E. Cayne, the findings could prove troubling. Warren Spector, then-president and co-chief operating officer, has already resigned his posts in the aftermath. The scandal could do lasting damage to Bear's once-mighty, mortgage-backed bond underwriting and trading businesses, says Frank Partnoy, a former Wall Street derivatives trader turned professor at the University of San Diego Law School. "It's hard to imagine the brand recovering," he says. "It's going to be a long road to get there." The SEC, meanwhile, is looking into the hedge funds, and the U.S. Attorney's Office for the Eastern District of New York in late September launched an investigation of its own.

Now the 84-year-old investment bank, long admired for its scrappy ways in a world once dominated by white-shoe elites, may begin to distance itself from Cioffi, who remains a paid adviser there. Cioffi, meanwhile, may have to fight off accusations that he was a rogue trader. He will likely seek to prove that the valuations he oversaw were reasonable and that his comments to investors weren't intentionally misleading. Bear Stearns spokesman Russell Sherman says the firm took precautions against a market downfall, but the decline in mortgage-backed securities was unprecedented.

The quick collapse of the inelegantly named Bear Stearns High-Grade Structured Credit Strategies fund and High-Grade Structured Credit Strategies Enhanced Leverage fund conjures memories of Long-Term Capital Management, the multibillion-dollar fund that blew up in 1998. In both cases, the damage helped ignite a worldwide credit crunch that prompted intervention by central bankers. But there's an important difference: LTCM, run by some of the sharpest minds in finance, was built to do well in rising and sinking markets alike. It failed because its impossibly complex trading strategies went haywire. The Bear funds cratered because their

- 4 -

managers never came up with a Plan B to survive a downturn. Cioffi was more like a day trader chasing tech stocks in the late 1990s than the Nobel laureates at LTCM.

A Former Star

Until recently, Cioffi was a Bear Stearns star. The 1978 business administration graduate of Vermont's Saint Michael's College joined the firm in 1985 as a bond salesman and rose quickly. By 1989 he was head of the fixed-income sales group and eventually became a driving force behind Bear's move into sophisticated structured-finance products. About five years ago he considered leaving to launch his own hedge fund, people close to him say. But Bear enticed him to stay and run it out of Bear Stearns Asset Management.

Despite Cioffi's considerable expertise, however, there was surprisingly little financial artistry taking place inside the funds' Park Avenue corridors. The managers hadn't arrived at any blinding new insight into how markets work. Documents show that they were simply taking investors' money, leveraging it to the hilt, and then buying complex bonds called collateralized debt obligations, or CDOs, that were backed by subprime and other mortgages.

At the height in 2006, Cioffi was a central character in the booming mortgage CDO market, holding nearly $30 billion worth of securities. "Everybody wanted to do business with him because he was The Buyer," says a portfolio manager who was not authorized by his firm to speak for attribution. Cioffi's easygoing manner made him popular with investors, the bankers who lent his funds money, and the charities he supported.

END GAME

But his investment strategy turned into subtraction soup: The more he ate, the hungrier he got. The funds' voracious buying of lightly traded bonds drove down their yields, meaning Cioffi's team had to buy more and more of them to boost returns. That meant more borrowing. Banks such as Merrill Lynch (MER), Goldman Sachs (GS), Bank of America (BAC), and JPMorgan Chase (JPM) lent the funds at least $14 billion all told. Cioffi also used a type of short-term debt to borrow billions more; in some cases he managed to buy $60 worth of securities for every $1 of investors' money. But he made a critical trade-off: For lower interest rates, he gave lenders the right to demand immediate repayment.

For a while the strategy worked, and the fund became a hit. Cioffi started dabbling in fashionable hedge fund manager accoutrements, weighing a partnership stake in a Gulfstream jet and even getting into the movie business. In 2006, he was executive producer of the indie film Just Like My Son, starring Rosie Perez.

But when the markets turned earlier this year and the CDOs values plunged, Cioffi's lenders demanded repayment, and the borrow-and-buy game was over. Making matters worse, the funds held only about 1% of their assets in cash, much less than the 10% that many hedge funds keep on hand for emergencies. "This is not

prudent investing," says one structured-finance market veteran who asked not to be identified. "It's not rocket science to conclude that piling market-value risk on illiquid instruments is risky."

If the extreme leverage hadn't killed the funds, their Byzantine structure might have. The Enhanced fund, launched in August, 2006, gave an enormous amount of control to Barclays. The British bank provided at least $275 million in capital and in exchange was designated the sole equity investor, according to the fund's 2006 audited financials and bankruptcy filings. The other investors in the Enhanced fund merely held a stake in a complicated derivative contract that mimicked the fund's gains or losses but conferred no actual ownership rights.

The arrangement allowed Bear to get the fund up and running quickly, but it also meant that Barclays held the power to pull its stake and potentially close the fund down. Such a move could have weakened the High-Grade fund, too, because that fund was invested in similar securities. If the Enhanced fund started dumping its holdings to pay back Barclays, that could send the prices of the securities in the High-Grade fund tumbling (just as massive selling of a stock would drive down its price for other investors). A cascading event could have brought down both funds.

The final blow for the Enhanced fund came when Barclays told Bear it wanted out, according to the bankruptcy filings. The timing of the redemption notice isn't clear. Barclays declined to comment on the relationship, except to say its losses were minimal.

Hedge fund experts say the setup was unusual. It's not uncommon for investors to use derivatives to gain exposure to market indexes and indexes of broad hedge fund management strategies. But funds rarely allow them on a single portfolio fund with one equity investor. "A few hedge funds have done this kind of [deal], but it isn't terribly common," says Janet Tavakoli, a derivatives trading consultant.

Some of the details were spelled out in the abstruse language of the Enhanced fund's confidential offering memorandum. On page 50 it says Barclays' "interests in terminating the Leverage Instrument might conflict with the interest of the shareholders." But many investors now say they didn't understand the warning. A number of them had already been in the High-Grade fund, which was launched in October, 2003, and say they were encouraged by Cioffi's team to move their money to the Enhanced fund. They say they were led to believe that the newer fund would have a similar structure, except that it would use more leverage through a deal with Barclays.

*     *     *

Marketing/Memoranda Mismatch

What drove Cioffi and his team? It may have been the fees. Like most hedge funds, Cioffi's kept 20% of any profits they generated, plus 2% of the net assets under management. The High-Grade fund had become a fee engine for Bear Stearns

Asset Management, accounting for three-quarters of its revenues in 2004 and 2005, according to CDO tracker Derivative Fitch. The deal with Barclays was a way to start a new fund and prime it for returns – and more fees – quickly. And by encouraging the investors in the High-Grade fund to transfer money to the Enhanced fund, Cioffi didn't have to waste time wooing new customers; he could go to the same ones he'd already won over.

Now many of those who bought in claim they were misled. The offering memoranda for both funds contained the usual statements about how investors could lose all of their money. But some of the investors say that's not how the Bear Stearns funds were marketed by Cioffi and co-manager Matthew Tannin. They say they were told to expect small but steady gains of 1% to 2% a month, and never had to fear losing their entire investment. In a worst-case scenario – a perfect storm, they called it – the funds might lose 10% in a year.

\*        \*        \*

BRAZEN EFFORT

The managers' upbeat talk continued well into the subprime meltdown. Tannin told several investors in March that "we wouldn't have made money in February if we were long, or overexposed, to subprime," recalls one listener. Tannin went on to say he was putting more of his own money into the funds, and that "it was a very bad time to redeem."

In a brazen effort to stay afloat, Cioffi's team unveiled on May 9 a plan to bring public Everquest Financial. The company, formed in late 2006 and co-managed by Cioffi and Bear Stearns, had acquired some of the riskiest securities in the hedge funds' portfolios. A public offering could have created a rich trading vehicle to prop up the hedge funds until the storm passed. But the plan was met with a howl of protest on Wall Street and was scrapped. The reaction unnerved bankers and set in motion the process that resulted in the lenders calling their loans.

Now Cioffi, who has been named an adviser to Bear Stearns Asset Management, and Tannin, still a senior managing director there, face major legal troubles. Securities lawyers say valuation issues often pique prosecutors' interest. In 2004, managers of Beacon Hill Asset Management paid $4.4 million in penalties to the SEC to settle charges that they fudged valuations. That same year, Edward Strafaci pleaded guilty in federal court to charges that he manipulated the valuations for securities held by a fund run by former New York City Deputy Mayor Kenneth Lipper. "Valuation fraud is one of the touchstones of hedge fund fraud," says Scott Berman, a New York securities attorney who has litigated several hedge fund fraud cases. "It typically occurs when people don't start out to commit a fraud, but have losses they are trying to cover up."

The new revelations about Bear don't prove the firm intended to defraud investors, but they raise many troubling questions. Now lawyers are circling, and

Cioffi, the man once so good at convincing investors and lenders to turn over money, is facing the toughest sales job of his life.

8.　　On January 4, 2008, it was disclosed that the Bear Stearns hedge fund collapse was leading to inquiries by U.S. prosecutors.  *Reuters* reported:

Bear Stearns Cos officials are expected to meet in the middle of January with U.S. prosecutors to discuss the failure of two of its hedge funds, CNBC television said on Friday.

9.　　On this news, Bear Stearns stock dropped another 6% to close at $78.87 per share on January 4, 2008, a decline of 50% from its price earlier in the Class Period.

10.　　On March 10, 2008, information leaked into the market about Bear Stearns' liquidity problems, causing the stock to drop to as low as $60.26 per share before closing at $62.30 per share.

11.　　As *MarketWatch* reported on March 10, 2008:

Bear Stearns Cos. shares fell Monday, undercut by concerns about the brokerage firm's liquidity.

Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.

Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages.  The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.

Shares of Bear Stearns (BSC) dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session.  They stood at $64.39 during afternoon trading, down about 8%.

Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements.  It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.

The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging.  That's triggering forced selling, which makes the situation even worse, limiting liquidity.

Investment banks like Bear Stearns are at the center of this phenomenon.

"The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.

"A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.

A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS. These derivatives pay out in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.

CDS on Bear Stearns traded at 610 basis points over Treasury on Monday. A basis point is one hundredth of a percentage point.

12. On March 13, 2008, after the market closed, news that Bear Stearns was forced to seek emergency financing from the Federal Reserve and J.P. Morgan Chase hit the market. As *MarketWatch* reported on March 14, 2008:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades.

Bear said the rescue consists of getting short-term financing from the Fed, through J.P. Morgan, after its liquidity "deteriorated significantly" during the past 24 hours.

*            *            *

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.

"What is different this time is that the dominoes are falling in so many different sectors, markets, industries and countries – all at the same time and there is yet no end in sight," said Sherry Cooper, chief economist at BMO Capital Markets.

13.    On this news, Bear Stearns' stock plummeted $27 to close at $30 per share – a one-day decline of 47%, on volume over 18 times the three-month average. Yet, even this drop did not represent the true devastation to Bear Stearns' shareholders.

14.    On Sunday, March 16, 2008, it was announced that J.P. Morgan Chase was purchasing Bear Stearns for $2 per share. As *The Wall Street Journal* reported on March 17, 2008:

J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis

Ailing Firm Sold For Just $2 a Share In U.S.-Backed Deal

Pushed to the brink of collapse by the mortgage crisis, Bear Stearns Cos. agreed – after prodding by the federal government – to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2 a share in stock, or about $236 million.

Bear Stearns had a stock-market value of about $3.5 billion as of Friday – and was worth $20 billion in January 2007. But the crisis of confidence that swept the firm and fueled a customer exodus in recent days left Bear Stearns with a horrible choice: sell the firm – at any price – to a big bank willing to assume its trading obligations or file for bankruptcy.

"At the end of the day, what Bear Stearns was looking at was either taking $2 a share or going bust," said one person involved in the negotiations. "Those were the only options."

To help facilitate the deal, the Federal Reserve is taking the extraordinary step of providing as much as $30 billion in financing for Bear Stearns's less-liquid assets, such as mortgage securities that the firm has been unable to sell, in what is believed to be the largest Fed advance on record to a single company. Fed officials wouldn't describe the exact financing terms or assets involved. But if those assets decline in value, the Fed would bear any loss, not J.P. Morgan.

*    *    *

The deal already is prompting howls of protest from Bear Stearns shareholders, since the New York company last week indicated that its book value was still close to its reported level of about $84 share at the end of the fiscal year. "Why is this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked J.P. Morgan executives in a conference call last night.

*    *    *

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

"We're very comfortable with what we found [in due diligence] and what we acquired, but we needed a pretty substantial cushion" from the Fed, Bill Winters, co-head of J.P. Morgan's investment bank, said in a conference call last night.

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

15.    By midday on Monday, March 17, 2008, Bear Stearns stock had collapsed another 85% to $4.30 per share on volume of 75 million shares.

16.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company was allowing the subsidiaries and employees that managed its high-yield funds to fail to fully disclose the risks associated with the underlying investments; and

(b)    The Company's Class Period statements were materially false due to defendants' failure to inform the market of the ticking time bomb in the Company's hedge funds due to the deteriorating subprime mortgage market, which would cause Bear Stearns to have to rescue the funds, cause the Company and its officers possible criminal liability and hurt the Company's reputation.

17.    As a result of defendants' false statements, Bear Stearns' stock price traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 80% from their Class Period high.

## JURISDICTION AND VENUE

18.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

19.     (a)     Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

(b)     Bear Stearns' principal executive offices are located at 383 Madison Avenue, New York, New York.

## THE PARTIES

20.     Plaintiff Eastside Holdings Inc. purchased Bear Stearns common stock as described in the attached certification and was damaged thereby.

21.     Defendant Bear Stearns, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide.  The Company operates through three segments: Capital Markets, Global Clearing Services, and Wealth Management.  Bear Stearns is headquartered in New York, New York.

22.     Defendant James E. Cayne ("Cayne") is, and at all relevant times was, a director, Chairman of the Board and Chief Executive Officer ("CEO") of Bear Stearns.

23.     Defendant Alan D. Schwartz ("Schwartz") was, at all relevant times, Co-President and Co-Chief Operating Officer ("COO") of Bear Stearns.  He became sole President on August 5, 2007.

24.     Defendant Warren J. Spector ("Spector") was, at all relevant times, Co-President, Co-COO and a director of Bear Stearns.  On August 5, 2007 Spector resigned those positions.

25.     Defendant Samuel L. Molinaro, Jr. ("Molinaro") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Bear Stearns.  On August 5, 2007 he was also appointed COO.

26.     Defendant Alan C. Greenberg ("Greenberg") is, and at all relevant times was, Chairman of the Executive Committee of Bear Stearns.

- 12 -

27.    Defendants Cayne, Schwartz, Spector, Molinaro and Greenberg (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Bear Stearns' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein at ¶¶30-36 and 38-39.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

28.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Bear Stearns.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Bear Stearns common stock was a success, as it: (i) deceived the investing public regarding Bear Stearns' prospects and business; (ii) artificially inflated the price of Bear Stearns' common stock; and (iii) caused plaintiff and other members of the Class to purchase Bear Stearns common stock at inflated prices.

## BACKGROUND

29.    Bear Stearns is primarily a holding company that through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide.  The Company operates through three segments: Capital Markets, Global Clearing Services, and Wealth Management.  The Capital Markets segment

comprises institutional equities, fixed income, and investment banking operations.  The institutional equities operations consist of sales, trading, and research of equities, block trading, convertible bonds, over-the-counter equities, equity derivatives, and risk and convertible arbitrage.  The fixed income operations include sales, trading, origination, and research of mortgage and asset-backed securities, corporate and government bonds, municipal bonds, high yield products, foreign exchange, interest rate, and credit derivatives.  The investment banking operations comprise the provision of services in capital raising, strategic advice, mergers and acquisitions, and merchant banking.  The Global Clearing Services segment offers execution, clearing, margin lending, and securities lending to hedge funds, broker-dealers, and registered investment advisors.  The Wealth Management segment provides private client services, such as investment service, access to the Company's resources and professionals and asset management services for managing equity, fixed income, and alternative assets for corporate pension plans, public systems, endowments, foundations, multi-employer plans, insurance companies, corporations, families, and high-net-worth individuals.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

30.     On December 14, 2006, Bear Stearns reported its results for FY 2006, which included financial results for 4Q FY 2006,[1] in a release which stated in part:

> The Bear Stearns Companies Inc. today reported earnings per share (diluted) of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005. Net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005. Net revenues for the 2006 fourth quarter were $2.4 billion, up 28% from $1.9 billion for the 2005 fourth quarter. The annualized return on common stockholders' equity for the fourth quarter of 2006 was 20.5%.

---

[1]     Bear Stearns' fiscal year ends November 30.

For the fiscal year ended November 30, 2006, earnings per share (diluted) were a record $14.27, up 38% from $10.31 for fiscal 2005. Net income for the fiscal year 2006 was $2.1 billion, up 40% from the $1.5 billion earned in the twelve-month period ended November 30, 2005. Net revenues for fiscal year 2006 were $9.2 billion, an increase of 25% from $7.4 billion in the prior fiscal year. The after-tax return on common stockholders' equity was 19.1% for fiscal 2006.

"We are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share," said James E. Cayne, chairman and chief executive officer. "Our continued success is a testament to our unwavering focus on serving our clients with excellence; attracting and retaining talented professionals and profitably expanding our broad and diverse franchise. I look forward to 2007 and our continued expansion both internationally and domestically."

\*        \*        \*

**CAPITAL MARKETS**

**Fourth Quarter**

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were $1.8 billion for the fourth quarter of 2006, up 26% from $1.4 billion for the fourth quarter ended November 30, 2005.

> Institutional Equities net revenues were $397 million, up 7% from $373 million for the fourth quarter of 2005. Record results from risk arbitrage and continued strong results from equity derivatives and international sales and trading contributed to this strong performance.

> Fixed Income net revenues were $1.1 billion, up 25% from $839 million in the fourth quarter of 2005. The credit business produced record results led by the credit derivatives, distressed debt and leveraged finance areas. Mortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity.

> Investment Banking net revenues were $364 million in the fourth quarter of 2006, up 58% from the $231 million in the comparable prior year period. This increase reflects fees from higher underwriting and merger and acquisition transaction volumes.

**Full Year**

Capital Markets net revenues were a record $7.0 billion for fiscal year 2006, an increase of 25% over the previous record of $5.6 billion reported in 2005.

> Institutional Equities net revenues for the fiscal year ended November 30, 2006 were up 33% to a record $1.9 billion from $1.4 billion in

- 15 -

fiscal 2005. Equity derivatives, risk arbitrage, energy/commodity activities and international sales and trading all delivered record results.

> Fixed Income net revenues were a record $4.0 billion in 2006, up 23% from $3.3 billion in 2005. This was the sixth consecutive year of record results and was led by revenue growth in the mortgage and credit departments. In the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes from the vertical integration of the mortgage platform. In addition, collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leveraged finance and credit trading areas all produced record revenues.

> Investment Banking reported net revenues of $1.2 billion for fiscal 2006, up 19% from $980 million in the prior fiscal year. The increase in net revenues was due to greater transaction volumes in both the underwriting and advisory areas.

## GLOBAL CLEARING SERVICES

### Fourth Quarter

Fourth quarter 2006 Global Clearing Services net revenues were $281 million, up 7% from $263 million in the fourth quarter of 2005. Net interest revenues increased due to higher margin debt and customer short balances. Average customer margin debt balances for the quarter ended November 30, 2006 were $72.0 billion, up from $67.4 billion in the prior year quarter. Customer short balances averaged $90.0 billion during the fourth quarter of 2006, up from the prior year fourth quarter average of $81.2 billion.

### Full Year

Net revenues for the 2006 fiscal year in Global Clearing Services were $1.10 billion, up 3% from $1.07 billion in fiscal 2005. Net interest revenues increased due to higher levels of customer margin debt balances. Average customer margin debt balances for 2006 were $68.4 billion as compared with $64.9 billion for the year ended November 30, 2005. Customer short balances averaged $82.6 billion during the 2006 fiscal year, down from the average of $84.4 billion for 2005.

## WEALTH MANAGEMENT

### Fourth Quarter

- 16 -

In the Wealth Management segment, which includes Private Client Services and Asset Management, net revenues were $245 million for the quarter ended November 30, 2006, up 33% from $184 million in the fourth quarter of 2005.

> Private Client Services revenues were $133 million in the fourth quarter of 2006, an increase of 14% from $117 million in the 2005 quarter. Increased equity in client accounts, higher activity levels and robust growth in fee-based assets drove the quarterly revenue increase.

> Asset Management net revenues grew 66% to $112 million for the fourth quarter of 2006 from $67 million in the prior year quarter. The rise in net revenues was due to increased performance fees from hedge fund products as well as management fees from a growing base of assets under management.

**Full Year**

Wealth Management net revenues were $850 million for fiscal 2006, an increase of 25% compared with $679 million in fiscal 2005.

> Revenues from Private Client Services rose 15% to $518 million for the 2006 fiscal year from $450 million for fiscal 2005. The improvement reflects the growing contribution of revenues from fee-based assets.

> The Asset Management business reported record net revenues of $332 million for the 2006 fiscal year, up 45% from $229 million in the prior year. Growth in alternative assets under management together with increased performance fees contributed to these excellent results.

Assets under management rose to $52.5 billion as of November 30, 2006, up 25% from $41.9 billion as of November 30, 2005.

**EXPENSES**

**Fourth Quarter**

> Compensation as a percentage of net revenues was 43.6% for the fourth quarter of 2006 compared with 46.2% for the quarter ended November 30, 2005.

> Non-compensation expenses were $469 million for the quarter ended November 30, 2006, up 9% from $429 million in the 2005 quarter. The increase is primarily related to higher occupancy fees, professional fees, and communications and technology costs associated with additional headcount.

The 2006 fourth quarter pre-tax profit margin was 37.0%, as compared with 31.1% for the prior year quarter.

**Full Year**

> For the twelve-months ended November 30, 2006, compensation as a percentage of net revenues was 47.1% as compared with 47.9% for the 2005 fiscal year.

> Non-compensation expenses for the fiscal year 2006 were $1.74 billion, 5% higher than the $1.65 billion reported in 2005. The increase is primarily related to increased occupancy expenses, professional fees, and communications and technology costs associated with an expanding workforce.

For fiscal year 2006 the pre-tax margin was 34.1% versus 29.8% in fiscal year 2005.

As of November 30, 2006, total capital, including stockholders' equity and long-term borrowings, was $66.7 billion. Book value on November 30, 2006 was $86.39 per share, based on 145.7 million shares outstanding. The company repurchased approximately 10.6 million shares of its common stock during fiscal 2006.

31.    On February 13, 2007, Bear Stearns filed its Form 10-K for FY 2006, which included financial results reported on December 14, 2006 . The Form 10-K also included a certification by Cayne, which stated:

I, James E. Cayne, certify that:

1.    I have reviewed this Annual Report on Form 10-K  of The Bear Stearns Companies Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial

- 18 -

reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

32.    Defendant Molinaro signed a nearly identical certification included in the Form 10-K.

33.    On April 9, 2007, Bear Stearns filed its Form 10-Q for 1Q FY 2007, which stated in part:

The Wealth Management segment is composed of the PCS and asset management areas. PCS provides high-net-worth individuals with an institutional level of investment service, including access to the Company's resources and professionals. At February 28, 2007, PCS has approximately 500 account executives in its principal office, six regional offices and two international offices. Asset management manages equity, fixed income and alternative assets for corporate pension plans, public systems, endowments, foundations, multi-employer plans, insurance companies, corporations, families and high-net-worth individuals in the United States and abroad.

Net revenues for Wealth Management increased 13.6% to $255.3 million for the 2007 quarter from $224.7 million for the 2006 quarter. PCS revenues increased 5.0% to $136.2 million for the 2007 quarter from $129.6 million for the 2006 quarter reflecting higher levels of fee-based income. Asset management revenues increased 25.3% to $119.2 million for the 2007 quarter from $95.1 million for the 2006 quarter. This increase reflects increased performance fees and growth in management fees on traditional and alternative assets under management. Pre-tax income for Wealth Management increased 37.6% to $43.8 million in the 2007 quarter from $31.8 million for the 2006 quarter.

Assets under management were $54.1 billion at February 28, 2007, reflecting a 19.2% increase from $45.4 billion in assets under management at February 28, 2006. The increase in assets under management is due to the growth in traditional equity assets and hedge funds. Assets under management at February 28, 2007 includes $8.7 billion of assets from alternative investment products, an increase from $7.0 billion at February 28, 2006.

*      *      *

The Company's total assets at February 28, 2007 increased to $394.5 billion from $350.4 billion at November 30, 2006. The increase was primarily attributable to increases in financial instruments owned, assets of variable interest entities and mortgage loan special purpose entities, securities borrowed, and customer receivables partially offset by a decrease in securities purchased under agreements to resell. The Company's total capital base, which consists of long-term debt, preferred equity issued by subsidiaries and total stockholders' equity, increased to $71.8 billion at February 28, 2007 from $66.7 billion at November 30, 2006. This change was primarily due to a net increase in long-term debt and an increase in stockholders' equity primarily due to earnings in the February 2007 quarter as well as income tax benefits attributable to the distribution of common stock under the Company's deferred compensation plans.

34.     On July 10, 2007, Bear Stearns filed its Form 10-Q for 2Q FY 2007, which included

the financial results reported on April 9, 2007. The Form 10-Q contained virtually identical

certifications by Cayne and Molinaro as contained in Bear Stearns' Form 10-K for FY 2006 and 4Q FY 2006, as cited above in ¶31.

35.    On June 14, 2007, the Company issued a press release entitled "Bear Stearns Reports 2007 Second Quarter Results – Posts Record Quarterly Net Revenues of $2.5 Billion; Global Clearing Services, Asset Management and Private Client Services Divisions All Report Record Quarterly Net Revenues."  The press release stated in part:

> The Bear Stearns Companies Inc. today reported earnings per share (diluted), after a non-cash charge, of $2.52 for the second quarter ended May 31, 2007, down 32% from $3.72 per share for the second quarter of 2006. Second quarter results include the effect of a $227 million or $0.88 per share (diluted) non-cash charge related to the write-down of intangible assets, representing goodwill and specialist rights of Bear Wagner Specialists. Earnings per share (diluted) excluding this charge would have been $3.40 for the 2007 second quarter. Net income for the second quarter of 2007, after the non-cash charge, was $362 million. Net income excluding the non-cash charge would have been $486 million, down 10% from $539 million for the second quarter of 2006. Net revenues for the 2007 second quarter were a record $2.512 billion, up from the previous record of $2.499 billion reported for the 2006 second quarter. The annualized return on common stockholders' equity for the second quarter of 2007 was 11.6%, and 16.4% for the trailing 12-month period ended May 31, 2007. Excluding the non-cash charge, annualized return on common stockholders' equity for the second quarter of 2007 would have been 15.6%, and 17.5% for the trailing 12-month period ended May 31, 2007.

> "The diversity of our franchise is clearly demonstrated in the record net revenues generated this quarter," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "The Global Clearing Services and Wealth Management segments reported record performance while results were also very strong from debt and equity underwriting, equity derivatives and leveraged finance. Internationally, we continue to grow aggressively, hiring talented people, broadening our product platform and reaching new clients in multiple geographies."

> *       *       *

> WEALTH MANAGEMENT

> Wealth Management net revenues for the quarter ended May 31, 2007 reached a record $341 million, up 123% from $153 million in the second quarter of 2006.

> > Private Client Services net revenues were a record $157 million, an increase of 21% from $130 million in the 2006 second quarter. The

strong results were driven by higher management and performance fees from an increase in fee-based assets and favorable market conditions.

> Asset Management net revenues were also a record for the second quarter of 2007 and reached $184 million. These results show a significant increase from the $23 million posted in the 2006 second quarter. The increase was due to higher management and performance fees and favorable investment performance. Assets under management rose 25% to $60 billion on May 31, 2007, up from $48 billion on May 31, 2006.

EXPENSES

> Compensation as a percentage of net revenues was 49.0% in the second quarter of 2007 as compared with 48.8% for the second quarter of 2006. For the first six months of fiscal 2007 compensation to net revenues was 48.8%, compared with 48.4% for the six months ended May 31, 2006.

> Non-compensation expenses were $727 million for the quarter ended May 31, 2007, up 63% from $445 million in the 2006 second quarter. The increase in non-compensation related expenses was largely due to the $227 million non-cash charge related to the write-down of intangible assets, representing goodwill and specialist rights, of Bear Wagner Specialists. Excluding this non-cash charge, non-compensation expenses would have been $509 million, up 14% from $445 million in the May 2006 quarter. Increased transactional costs related to higher business volumes as well as occupancy, communications and technology costs associated with rise in employee headcount were the primary drivers of the increase in expenses.

> The increase in the income tax rate from the first quarter of 2007 was largely due to a charge of approximately $20 million as a result of a remeasurement of deferred tax assets due to an enacted reduction in state and local taxes in future years.

The pre-tax profit margin for the quarter ended May 31, 2007 was 22.0% as compared with 33.4% for the quarter ended May 31, 2006. Excluding the write-down for impairment, the pre-tax profit margin would have been 30.7%.

As of May 31, 2007, total capital, including stockholders' equity and long-term borrowings, was approximately $75.1 billion. Book value as of May 31, 2007 was $92.50 per share, based on 144.7 million shares outstanding.

36.    On July 10, 2007, Bear Stearns filed its Form 10-Q for 2Q FY 2007, which included the financial results reported on June 14, 2007.  The Form 10-Q contained virtually identical certifications by Cayne and Molinaro as contained in Bear Stearns' Form 10-K for FY 2006 and 4Q FY 2006, as cited above in ¶31.

37.    On August 3, 2007, S&P cut the Company's credit rating outlook to negative, causing Bear Stearns' stock to dramatically drop to $108.35 per share.

38.    In response, on August 3, 2007, Bear Stearns issued a press release entitled "Bear Stearns Responds to S&P Action," stating in part:

> The Bear Stearns Companies Inc. said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns. Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns. S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these were isolated incidences and are by no means an indication of broader issues at Bear Stearns.
>
> "S&P's action highlights the concerns in the marketplace over the recent instability in the fixed income environment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Contrary to rumors in the marketplace, our franchise is profitable and healthy and our balance sheet is strong and liquid. Bear Stearns has thrived throughout both tumultuous and fortuitous markets for the past 84 years. We are experiencing another market cycle and we are confident in Bear Stearns' ability to succeed in this environment as it has in so many others."
>
> With respect to operating performance and financial condition, the company has been solidly profitable in the first two months of the quarter, while the balance sheet, capital base and liquidity profile have never been stronger. Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled. The risk management infrastructure and processes remain conservative and consistent with past practices. This structure and strong risk management culture has allowed the firm to operate for all of its history as a public company without ever having an unprofitable quarter.
>
> All other major rating agencies have affirmed their stable or positive outlook on Bear Stearns within the last six weeks.

39.    Subsequently, on August 5, 2007, Bear Stearns issued a press entitled "Bear Stearns Announces Management Changes."  The press release stated in part:

- 23 -

The Bear Stearns Companies Inc. announced today that, effective immediately, Alan D. Schwartz has been named the company's sole president, and Samuel L. Molinaro, Jr. will become chief operating officer in addition to his current duties as chief financial officer. Jeffrey Mayer, co-head of the Fixed Income Division, has been named to the Bear Stearns Executive Committee. Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure. These promotions reflect and acknowledge the depth of talent in our senior management team. Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility. Since assuming co-leadership of our fixed income business in 2002, Jeff has helped build a highly successful global fixed income franchise. They all, along with many others, play critical roles in leading Bear Stearns. I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth. Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work. Bear Stearns is a special firm that has weathered countless challenging markets in its history. For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

Alan D. Schwartz joined Bear Stearns in 1976. He became executive vice president and head of the Investment Banking Division in 1985. Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986. In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee

40.     Later, on October 12, 2007, *BusinessWeek* published an article entitled "Bear Stearns' Bad Bet; Two Bear Stearns hedge funds soared by specializing in exotic securities and unorthodox practices.  Then they imploded," which reported material information Bear Stearns had concealed. The article stated:

Ralph R. Cioffi seemed as cool and confident as ever. The market for subprime mortgages was crumbling, but the 51-year-old manager of two Bear

Stearns (BSC) hedge funds offered nothing but reassurances to investors. "We're going to make money on this," he promised his wealthy patrons in February. "We don't believe what the markets are saying."

He should have known otherwise. The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south, according to a BusinessWeek analysis of confidential financial statements for both funds and interviews with forensic accounting experts, traders, and analysts.

The funds had another potentially fatal flaw: an unusual arrangement with Barclays (BCS) that gave the giant British bank the power to yank the plug – a deal that ran counter to the interests of other investors, many of whom didn't even know about it.

The documents also cast serious doubt on the funds' supposedly strong performance before their July bankruptcies. More than 60% of their net worth was tied up in exotic securities whose reported value was estimated by Cioffi's own team – something the funds' auditor, Deloitte & Touche, warned investors of in its 2006 report, released in May, 2007. What emerges from the records is a portrait of a cash-starved portfolio piled high with debt and managers all too eager to add to the heap.

Spotlight on Hedge Funds

The revelations shed new light on the murky dealings inside the booming $1.3 trillion hedge fund industry, which now accounts for up to a third of all daily trading on Wall Street. They seem to underscore critics' biggest complaint: that many hedge funds use astonishing amounts of leverage, or borrowed money, in sometimes reckless ways. The risks of "fair value" accounting, the practice that allows money managers to estimate the values of securities for which they can't find true market prices, are thrown into sharper focus as well. Coming soon, for better or worse: louder calls in Washington for more oversight of the largely unregulated hedge fund industry.

These new details could further damage the relationships that thousands of pension funds, university endowments, and wealthy individuals have with the Wall Street chieftains they entrust to manage their money. The Bear funds weren't stand-alone portfolios like the ones that blew up on Amaranth Advisors and Sowood Capital Management in recent years – they carried the imprimatur of one of the Street's oldest and most storied firms. The funds marketed themselves with the implicit backing of Bear Stearns and played up the fact that they were run by its experts in mortgage-backed securities. Now investors are left with a troubling question: If they can't count on big, well-established firms to operate hedge funds properly, whom can they count on?

LASTING DAMAGE?

For Bear and its 72-year-old chairman and chief executive, James E. Cayne, the findings could prove troubling. Warren Spector, then-president and co-chief

operating officer, has already resigned his posts in the aftermath. The scandal could do lasting damage to Bear's once-mighty, mortgage-backed bond underwriting and trading businesses, says Frank Partnoy, a former Wall Street derivatives trader turned professor at the University of San Diego Law School. "It's hard to imagine the brand recovering," he says. "It's going to be a long road to get there." The SEC, meanwhile, is looking into the hedge funds, and the U.S. Attorney's Office for the Eastern District of New York in late September launched an investigation of its own.

Now the 84-year-old investment bank, long admired for its scrappy ways in a world once dominated by white-shoe elites, may begin to distance itself from Cioffi, who remains a paid adviser there. Cioffi, meanwhile, may have to fight off accusations that he was a rogue trader. He will likely seek to prove that the valuations he oversaw were reasonable and that his comments to investors weren't intentionally misleading. Bear Stearns spokesman Russell Sherman says the firm took precautions against a market downfall, but the decline in mortgage-backed securities was unprecedented.

The quick collapse of the inelegantly named Bear Stearns High-Grade Structured Credit Strategies fund and High-Grade Structured Credit Strategies Enhanced Leverage fund conjures memories of Long-Term Capital Management, the multibillion-dollar fund that blew up in 1998. In both cases, the damage helped ignite a worldwide credit crunch that prompted intervention by central bankers. But there's an important difference: LTCM, run by some of the sharpest minds in finance, was built to do well in rising and sinking markets alike. It failed because its impossibly complex trading strategies went haywire. The Bear funds cratered because their managers never came up with a Plan B to survive a downturn. Cioffi was more like a day trader chasing tech stocks in the late 1990s than the Nobel laureates at LTCM.

A Former Star

Until recently, Cioffi was a Bear Stearns star. The 1978 business administration graduate of Vermont's Saint Michael's College joined the firm in 1985 as a bond salesman and rose quickly. By 1989 he was head of the fixed-income sales group and eventually became a driving force behind Bear's move into sophisticated structured-finance products. About five years ago he considered leaving to launch his own hedge fund, people close to him say. But Bear enticed him to stay and run it out of Bear Stearns Asset Management.

Despite Cioffi's considerable expertise, however, there was surprisingly little financial artistry taking place inside the funds' Park Avenue corridors. The managers hadn't arrived at any blinding new insight into how markets work. Documents show that they were simply taking investors' money, leveraging it to the hilt, and then buying complex bonds called collateralized debt obligations, or CDOs, that were backed by subprime and other mortgages.

At the height in 2006, Cioffi was a central character in the booming mortgage CDO market, holding nearly $30 billion worth of securities. "Everybody wanted to

do business with him because he was The Buyer," says a portfolio manager who was not authorized by his firm to speak for attribution. Cioffi's easygoing manner made him popular with investors, the bankers who lent his funds money, and the charities he supported.

END GAME

But his investment strategy turned into subtraction soup: The more he ate, the hungrier he got. The funds' voracious buying of lightly traded bonds drove down their yields, meaning Cioffi's team had to buy more and more of them to boost returns. That meant more borrowing. Banks such as Merrill Lynch (MER), Goldman Sachs (GS), Bank of America (BAC), and JPMorgan Chase (JPM) lent the funds at least $14 billion all told. Cioffi also used a type of short-term debt to borrow billions more; in some cases he managed to buy $60 worth of securities for every $1 of investors' money. But he made a critical trade-off: For lower interest rates, he gave lenders the right to demand immediate repayment.

For a while the strategy worked, and the fund became a hit. Cioffi started dabbling in fashionable hedge fund manager accoutrements, weighing a partnership stake in a Gulfstream jet and even getting into the movie business. In 2006, he was executive producer of the indie film Just Like My Son, starring Rosie Perez.

But when the markets turned earlier this year and the CDOs values plunged, Cioffi's lenders demanded repayment, and the borrow-and-buy game was over. Making matters worse, the funds held only about 1% of their assets in cash, much less than the 10% that many hedge funds keep on hand for emergencies. "This is not prudent investing," says one structured-finance market veteran who asked not to be identified. "It's not rocket science to conclude that piling market-value risk on illiquid instruments is risky."

If the extreme leverage hadn't killed the funds, their Byzantine structure might have. The Enhanced fund, launched in August, 2006, gave an enormous amount of control to Barclays. The British bank provided at least $275 million in capital and in exchange was designated the sole equity investor, according to the fund's 2006 audited financials and bankruptcy filings. The other investors in the Enhanced fund merely held a stake in a complicated derivative contract that mimicked the fund's gains or losses but conferred no actual ownership rights.

The arrangement allowed Bear to get the fund up and running quickly, but it also meant that Barclays held the power to pull its stake and potentially close the fund down. Such a move could have weakened the High-Grade fund, too, because that fund was invested in similar securities. If the Enhanced fund started dumping its holdings to pay back Barclays, that could send the prices of the securities in the High-Grade fund tumbling (just as massive selling of a stock would drive down its price for other investors). A cascading event could have brought down both funds.

The final blow for the Enhanced fund came when Barclays told Bear it wanted out, according to the bankruptcy filings. The timing of the redemption notice isn't clear. Barclays declined to comment on the relationship, except to say its losses were minimal.

Hedge fund experts say the setup was unusual. It's not uncommon for investors to use derivatives to gain exposure to market indexes and indexes of broad hedge fund management strategies. But funds rarely allow them on a single portfolio fund with one equity investor. "A few hedge funds have done this kind of [deal], but it isn't terribly common," says Janet Tavakoli, a derivatives trading consultant.

Some of the details were spelled out in the abstruse language of the Enhanced fund's confidential offering memorandum. On page 50 it says Barclays' "interests in terminating the Leverage Instrument might conflict with the interest of the shareholders." But many investors now say they didn't understand the warning. A number of them had already been in the High-Grade fund, which was launched in October, 2003, and say they were encouraged by Cioffi's team to move their money to the Enhanced fund. They say they were led to believe that the newer fund would have a similar structure, except that it would use more leverage through a deal with Barclays.

*       *       *

Marketing/Memoranda Mismatch

What drove Cioffi and his team? It may have been the fees. Like most hedge funds, Cioffi's kept 20% of any profits they generated, plus 2% of the net assets under management. The High-Grade fund had become a fee engine for Bear Stearns Asset Management, accounting for three-quarters of its revenues in 2004 and 2005, according to CDO tracker Derivative Fitch. The deal with Barclays was a way to start a new fund and prime it for returns – and more fees – quickly. And by encouraging the investors in the High-Grade fund to transfer money to the Enhanced fund, Cioffi didn't have to waste time wooing new customers; he could go to the same ones he'd already won over.

Now many of those who bought in claim they were misled. The offering memoranda for both funds contained the usual statements about how investors could lose all of their money. But some of the investors say that's not how the Bear Stearns funds were marketed by Cioffi and co-manager Matthew Tannin. They say they were told to expect small but steady gains of 1% to 2% a month, and never had to fear losing their entire investment. In a worst-case scenario – a perfect storm, they called it – the funds might lose 10% in a year.

*       *       *

BRAZEN EFFORT

The managers' upbeat talk continued well into the subprime meltdown. Tannin told several investors in March that "we wouldn't have made money in February if we were long, or overexposed, to subprime," recalls one listener. Tannin went on to say he was putting more of his own money into the funds, and that "it was a very bad time to redeem."

In a brazen effort to stay afloat, Cioffi's team unveiled on May 9 a plan to bring public Everquest Financial. The company, formed in late 2006 and co-managed by Cioffi and Bear Stearns, had acquired some of the riskiest securities in the hedge funds' portfolios. A public offering could have created a rich trading vehicle to prop up the hedge funds until the storm passed. But the plan was met with a howl of protest on Wall Street and was scrapped. The reaction unnerved bankers and set in motion the process that resulted in the lenders calling their loans.

Now Cioffi, who has been named an adviser to Bear Stearns Asset Management, and Tannin, still a senior managing director there, face major legal troubles. Securities lawyers say valuation issues often pique prosecutors' interest. In 2004, managers of Beacon Hill Asset Management paid $4.4 million in penalties to the SEC to settle charges that they fudged valuations. That same year, Edward Strafaci pleaded guilty in federal court to charges that he manipulated the valuations for securities held by a fund run by former New York City Deputy Mayor Kenneth Lipper. "Valuation fraud is one of the touchstones of hedge fund fraud," says Scott Berman, a New York securities attorney who has litigated several hedge fund fraud cases. "It typically occurs when people don't start out to commit a fraud, but have losses they are trying to cover up."

The new revelations about Bear don't prove the firm intended to defraud investors, but they raise many troubling questions. Now lawyers are circling, and Cioffi, the man once so good at convincing investors and lenders to turn over money, is facing the toughest sales job of his life.

41.    On January 4, 2008, it was disclosed that the Bear Stearns hedge fund collapse was leading to inquiries by U.S. prosecutors. *Reuters* reported:

Bear Stearns Cos officials are expected to meet in the middle of January with U.S. prosecutors to discuss the failure of two of its hedge funds, CNBC television said on Friday.

42.    On this news, Bear Stearns stock dropped another 6% to close at $78.87 per share on January 4, 2008, a decline of 50% from its price earlier in the Class Period.

43.    On March 10, 2008, information leaked into the market about Bear Stearns' liquidity problems, causing the stock to drop to as low as $60.26 per share before closing at $62.30 per share.

44.    As *MarketWatch* reported on March 10, 2008:

Bear Stearns Cos. shares fell Monday, undercut by concerns about the brokerage firm's liquidity.

Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.

Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages. The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.

Shares of Bear Stearns (BSC) dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session. They stood at $64.39 during afternoon trading, down about 8%.

Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements. It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.

The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging. That's triggering forced selling, which makes the situation even worse, limiting liquidity.

Investment banks like Bear Stearns are at the center of this phenomenon.

"The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.

"A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.

A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS. These derivatives pay out in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.

CDS on Bear Stearns traded at 610 basis points over Treasury on Monday. A basis point is one hundredth of a percentage point.

45.    As the *tigersharktrading* web site described the situation:

Five Cents on the Dollar

I think it will be instructive to look at the two Bear Stearns funds which have blown up, in the way that looking at a movie on lung cancer is instructive about the problems with cigarettes. (Thanks to Gary Shilling for the details. www.agaryshilling.com)

There were two funds, with the names High Grade Structured Credit Strategies Fund and High Grade Structured Credit Enhanced Leverage Fund. The first was three years old and had 40 straight months without a loss, and the second was started last August. The first used its $925 million in capital to bet $9.7 billion on the bull side and $4 billion on the bear side of the subprime mortgage market for about a six times leverage.

The "Enhanced Leverage" (what a seductive term) "had $638 million in investor capital on March 31 and borrowed at least $6 billion to make $11.5 billion in bullish bets and $4.5 billion in bearish wagers." That is ten times leverage if your shorts and longs were truly opposite each other, and a lot more if they were not.

Let's look at the implications of ten-to-one leverage. Say you are borrowing at LIBOR (which today is 5.36%) plus 25 basis points, for a total of 5.61%. If you can average 8% on supposedly investment-grade paper after costs, with ten times leverage you make about 23%, before fees.

And as long as the collateral is solid, you print money. But what happens if the total collateral drops just 2%? You are now down 20% because of the leverage. Ouch. And if the asset drops 40%, as the BBB paper has done, you can get wiped out if there was only 25% of your fund in BBB paper.

From January through April, the Enhanced Leverage Fund (which could also be called the Enhanced Loss Fund) was down 23%. The gentle margin clerks at Merrill Lynch decided they wanted some of their collateral back to sell on the market when Bear Stearns refused to pay off the loans. Where was Bear going to go to raise capital? Sell what? And to whom? Better to stall and bluff.

So Merrill tried to sell $850 million in collateral. Except there was a problem. The best stuff was getting bids of only 85 cents or so on the dollar, and others were getting bids as low as 30%. Let's review the math above. At a 15% discount of the assets, the fund would be more than bankrupt, and the lending institutions would be losing money they had lent at very low rates and very high margin on what they thought was investment-grade debt.

As I understand it, Bear has not actually made, as of yet, a loan to the Enhanced Leverage fund. That is probably because there is no actual collateral for them to make a loan on. Better to save your money to deal with the lawsuits.

And here's a side point in the banks' favor, from a culpability standpoint. All these banks were creating the CDOs and knew what was in them. Either someone forgot to tell the loan department, or they all drank the Kool-Aid and believed in the ratings.

- 31 -

(Historical note: we use the term "drank the Kool-Aid" because the followers of Jim Jones were all true believers and drank a flavored drink containing poison in a mass suicide. However, it was not Kool-Aid they drank, but some other similar drink. But poor Kool-Aid, a very noble potion much enjoyed in my youth, gets the bad press.)

Some investors in the Enhanced Fund have offered to sell their positions for 11 cents on the dollar. The offer is 5 cents. They should take it. And I will make you a leveraged bet that the offer comes from very litigious fund managers that are betting they can get Bear Stearns to pony up a lot more than 5 cents in settlement.

Bear does have other problems. They were planning on doing an IPO of the fund management group, which was going to be owned 25% by the manager of the two busted funds. The offering memorandum said very nice things about the talents of the manager and the risks of the funds. Enter lawyers, stage right.

46.    Then, on March 13, 2008, after the market closed, news that Bear Stearns was forced

to seek emergency financing from the Federal Reserve and J.P. Morgan Chase hit the market.  As

*MarketWatch* reported on March 14, 2008:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades.

Bear said the rescue consists of getting short-term financing from the Fed, through J.P. Morgan, after its liquidity "deteriorated significantly" during the past 24 hours.

*                *                *

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.

"What is different this time is that the dominoes are falling in so many different sectors, markets, industries and countries – all at the same time and there is yet no end in sight," said Sherry Cooper, chief economist at BMO Capital Markets.

47.    On this news, Bear Stearns' stock plummeted $27 to close at $30 per share – a one-day decline of 47%, on volume over 18 times the three-month average.   Yet, even this drop did not represent the true devastation to Bear Stearns' shareholders.

48.    On Sunday, March 16, 2008, it was announced that J.P. Morgan Chase was purchasing Bear Stearns for $2 per share.  As *The Wall Street Journal* reported on March 17, 2008:

J.P. Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis

Ailing Firm Sold For Just $2 a Share In U.S.-Backed Deal

Pushed to the brink of collapse by the mortgage crisis, Bear Stearns Cos. agreed – after prodding by the federal government – to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2 a share in stock, or about $236 million.

Bear Stearns had a stock-market value of about $3.5 billion as of Friday – and was worth $20 billion in January 2007.  But the crisis of confidence that swept the firm and fueled a customer exodus in recent days left Bear Stearns with a horrible choice: sell the firm – at any price – to a big bank willing to assume its trading obligations or file for bankruptcy.

"At the end of the day, what Bear Stearns was looking at was either taking $2 a share or going bust," said one person involved in the negotiations. " Those were the only options."

To help facilitate the deal, the Federal Reserve is taking the extraordinary step of providing as much as $30 billion in financing for Bear Stearns's less-liquid assets, such as mortgage securities that the firm has been unable to sell, in what is believed to be the largest Fed advance on record to a single company.  Fed officials wouldn't describe the exact financing terms or assets involved.  But if those assets decline in value, the Fed would bear any loss, not J.P. Morgan.

\*        \*        \*

The deal already is prompting howls of protest from Bear Stearns shareholders, since the New York company last week indicated that its book value was still close to its reported level of about $84 share at the end of the fiscal year. "Why is this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked J.P. Morgan executives in a conference call last night.

\*        \*        \*

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

"We're very comfortable with what we found [in due diligence] and what we acquired, but we needed a pretty substantial cushion" from the Fed, Bill Winters, co-head of J.P. Morgan's investment bank, said in a conference call last night.

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

49.    By midday on Monday, March 17, 2008, Bear Stearns stock had collapsed another 85% to $4.30 per share on volume of 75 million shares.

50.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)    The Company was allowing the subsidiaries and employees that managed its high-yield funds to fail to fully disclose the risks associated with the underlying investments; and

(b)    The Company's Class Period statements were materially false due to defendants' failure to inform the market of the ticking time bomb in the Company's hedge funds due to the deteriorating subprime mortgage market, which would cause Bear Stearns to have to rescue the funds, cause the Company and its officers possible criminal liability and hurt the Company's reputation.

51.    As a result of defendants' false statements, Bear Stearns' stock price traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 80% from their Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

52.    By misrepresenting Bear Stearns' business, the defendants presented a misleading picture of the Company's business and prospects.  Thus, instead of truthfully disclosing during the

Class Period that Bear Stearns' business was not as healthy as represented, Bear Stearns falsely concealed the problems with its hedge funds.

53.    These omissions caused and maintained the artificial inflation in Bear Stearns' stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

54.    Defendants' false and misleading statements had the intended effect and caused Bear Stearns stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $159.36 per share.

55.    On August 3, 2007, defendants were forced to publicly disclose the extent of problems with the hedge funds, causing its stock to drop to $108.55 per share on August 3, 2007. Later, as more information came out about Bear Stearns' exposure from its subprime-related actions and potential criminal investigations of such actions, the Company's stock declined to as low as $62.30 per share, 60% below the Class Period high.

56.    On March 13, 2008, after the market closed, news of Bear Stearns' deteriorating liquidity was revealed, causing the Company's stock to plunge 47% on March 14, 2008.

57.    Then, on March 16, 2008, the J.P. Morgan purchase of Bear Stearns for $2 per share was announced causing the stock to drop another 85% on extremely high volume.

58.    As a direct result of defendants' admissions and the public revelations regarding the truth about Bear Stearns' exposure to mortgage-related  liability, its profitability and its actual business prospects going forward, Bear Stearns' stock price plummeted 97%, falling from $159 per share in April 2007 to $4.30 per share in March 2008, a decline of $154 per share.  This drop removed the inflation from Bear Stearns' stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

59.    Plaintiff incorporates ¶¶1-58 by reference.

60.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Bear Stearns common stock during the Class Period.

62.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bear Stearns common stock.  Plaintiff and the Class would not have purchased Bear Stearns common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

63.    Plaintiff incorporates ¶¶1-62 by reference.

64.    The Individual Defendants acted as controlling persons of Bear Stearns within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Bear Stearns stock, the Individual Defendants had the power and authority to cause Bear Stearns to engage in the wrongful conduct complained of herein.  Bear Stearns controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

65.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Bear Stearns common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

66.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Bear Stearns has over 136 million shares of stock outstanding, owned by hundreds if not thousands of persons.

67.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Bear Stearns' common stock was artificially inflated; and

- 37 -

(f)      the extent of damage sustained by Class members and the appropriate measure of damages.

68.      Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

69.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

70.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff's reasonable costs and attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 17, 2008                    COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD


                                          _____
                                                /S/ David A. Rosenfeld
                                          DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF EASTSIDE HOLDINGS INC.
## IN SUPPORT OF CLASS ACTION COMPLAINT

Eastside Holdings Inc. ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    On March 14, 2008, during the proposed Class Period, plaintiff purchased 100 shares of Bear Stearns stock at $36.84 per share.

5.    In the past three years, plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

Dated:    March 17, 2008.

_____
Eastside Holdings Inc.