UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

EASTSIDE HOLDINGS INC., Individually and   :
on Behalf of All Others Similarly Situated,   :
  :
  :
                Plaintiff,   :
  : Civil Action No.: 1:08-cv-02793 (RWS)
           v.   :
  :
THE BEAR STEARNS COMPANIES INC.,   :
JAMES E. CAYNE, ALAN D. SCHWARTZ,   :
WARREN J. SPECTOR, SAMUEL L.   :
MOLINARO, JR. and ALAN C. GREENBERG,   :
  :
            Defendants.   :
  :

------------------------------------------------------------------x

(*Caption continued on following pages*)


## DECLARATION OF GREGORY MARK NESPOLE
## IN OPPOSITION TO THE MOTION TO CONSOLIDATE

```
------------------------------------------------------------x
RAZILL C. BECHER, Individually and on Behalf    :
of All Others Similarly Situated,               :
                                                :
                    Plaintiff,                  :
                                                : Civil Action No.: 1:08-cv-02866 (RWS)
              v.                                 :
                                                :
THE BEAR STEARNS COMPANIES INC.,                :
JAMES E. CAYNE, ALAN D. SCHWARTZ,               :
WARREN J. SPECTOR, SAMUEL L.                    :
MOLINARO, JR. and ALAN C. GREENBERG,            :
                                                :
                    Defendants.                  :
------------------------------------------------------------x
GREEK ORTHODOX ARCHDIOCESE                      :
FOUNDATION, by and through, GEORGE              :
KERITSIS, TRUSTEE, Individually and on          :
Behalf of All Others Similarly Situated,        :
                                                :
                    Plaintiff,                  :
                                                : Civil Action No.: 1:08-cv-03013 (RWS)
              v.                                 :
                                                :
THE BEAR STEARNS COMPANIES INC.,                :
JAMES E. CAYNE, ALAN D. SCHWARTZ,               :
WARREN J. SPECTOR, and SAMUEL L.                :
MOLINARO, JR. and ALAN C. GREENBERG,            :
                                                :
                    Defendants.                  :
------------------------------------------------------------x
FREDERICK S. SCHWARTZ, Individually and         :
on Behalf of All Others Similarly Situated      :
Persons,                                        :
                                                :
                                                :
                    Plaintiff,                  :
                                                : Civil Action No.: 1:08-cv-04972 (RWS)
              v.                                 :
                                                :
THE BEAR STEARNS COMPANIES, JAMES               :
E. CAYNE, ALAN D. SCHWARTZ and                  :
SAMUEL L. MOLINARO, JR.,                        :
                                                :
                    Defendants.                  :
------------------------------------------------------------x
```

```
--------------------------------------------------------------x
GILLES BRANSBOURG, Individually and           :
on Behalf of All Others Similarly Situated,    :
                                               :
                         Plaintiff,            :
                                               :  Civil Action No.: 1:08-cv-05054 (RWS)
             vi.                               :
THE BEAR STEARNS COMPANIES INC.,               :
JAMES E. CAYNE, ALAN D. SCHWARTZ,              :
WARREN J. SPECTOR, SAMUEL L.                   :
MOLINARO, JR. and ALAN C. GREENBERG,           :
                                               :
                         Defendants.           :
                                               :
--------------------------------------------------------------x
```

Gregory M. Nespole declares under penalty of perjury as follows:

1.    I am a member of the law firm of Wolf Haldenstein Adler Freeman & Herz LLP, counsel for Gilles Bransbourg. I submit this declaration in opposition to the motion of the State of Michigan Retirement Systems ("SMRS") for consolidation of the action captioned *Bransbourg v. The Bear Stearns Companies, et al.,* Civil Action No. 1:08-cv-05054 (the "Bransbourg Action") with the above-captioned actions, pursuant to Federal Rule of Civil Procedure 42(a).

2.    Annexed hereto as Exhibit A is a true and correct copy of the complaint filed in the Bransbourg Action.

3.    Annexed hereto as Exhibit B is a true and correct copy of The Bear Stearns Companies Inc. Restricted Stock Unit Plan, as amended (the "RSU Plan").

4.    Annexed hereto as Exhibit C is a true and correct copy of The Bear Stearns Companies Inc. Capital Accumulation Plan for Senior Managing Directors (the "CAP Plan").

5.    Annexed hereto as Exhibit D is a true and correct copy of a May 19, 2008 letter ("Letter") and an agreement and release ("Release") which have purportedly been delivered by

1

The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company") to, *inter alia*, members of the putative class as defined in the Bransbourg Action.[1]  The Letter purports to describe the process by which Bear Stearns' "CAP & RSU Plan Participants – Former Employees", whose Restricted Stock Units and/or CAP Units are to be converted (pursuant to a stated exchange ratio) to JPMorgan Chase & Co. ("JPMorgan") share units upon the effective date of the merger of Bears Stearns and JPMorgan, may obtain an accelerated vesting and/or distribution of their outstanding unit awards by executing the Release in favor of Bear Stearns and JPMorgan. Individuals that execute the Release thereby relieve Bear Stearns and JPMorgan "from all liability for any claims or potential claims" related to their employment with the Company, and agree not to participate or opt in any class or collective action against the Company that such individual could be a participant.

6.    Annexed hereto as Exhibit E is a true and correct copy of the June 20, 2008 notice published in connection with the Bransbourg Action.

---

[1] The Class is defined as "all current and former employees of Bear Stearns [(excluding defendants)] whose compensation, in part, was in the form of restricted stock units ("Restricted Stock Units") and/or capital accumulation plan units ("CAP Units"), issued to the current and former Bear Stearns employees pursuant to the Company's Restricted Stock Unit Plan (the "RSU Plan") and Capital Accumulation Plan (the "CAP Plan"), and whose rights to either Restricted Stock Units and/or CAP Units were vested, thus providing them a present entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common stock ("Bear Stearns Stock" or "Company Stock") upon settlement at the end of a deferral period.

7.     I hereby declare penalty of perjury that the foregoing is true and correct to the

best of my knowledge, information and belief.

Dated: New York, NY
       July 18, 2008

GREGORY MARK NESPOLE (GN 6820)

/515322

3

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



GILLES BRANSBOURG, Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

THE BEAR STEARNS COMPANIES INC.,
JAMES E. CAYNE, ALAN D. SCHWARTZ,
WARREN J. SPECTOR, SAMUEL L.
MOLINARO, JR. and ALAN C. GREENBERG,

Defendants.

Civil Action No.



CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff Gilles Bransbourg, on behalf of himself and all others similarly situated, by his

attorneys, alleges upon personal knowledge as to his own acts and upon information and belief as

to all other matters based upon the investigation conducted by counsel which included, *inter alia*,

a review of United States Securities and Exchange Commission ("SEC") filings, news reports,

analyst reports, press releases, and other publicly available documents, as follows:

## SUMMARY OF THE ACTION

1.    This is a securities class action on behalf of all current and former employees of

The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), other than the defendants

defined below, whose compensation, in part, was in the form of restricted stock units

("Restricted Stock Units") and/or capital accumulation plan units ("CAP Units"), issued to the

current and former Bear Stearns employees pursuant to the Company's Restricted Stock Unit

Plan (the "RSU Plan") and Capital Accumulation Plan (the "CAP Plan"), and whose rights to

either Restricted Stock Units and/or CAP Units were vested, thus providing them a present

entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common

stock ("Bear Stearns Stock" or "Company Stock") upon settlement at the end of a deferral

period.

2.    Plaintiff held fully vested CAP Units during the Class Period (December 14, 2006

through March 14, 2008). Plaintiff also held shares of Bear Stearns Stock, which he received as

a participant in the RSU Plan during the Class Period. Moreover, Plaintiff purchased additional

shares of Bear Stearns Stock during the Class Period.

3.    This action is brought against Bear Stearns and certain of its officers and/or

directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

4.    Bear Stearns, through its broker-dealer and international bank subsidiaries,

provides investment banking, securities and derivatives trading, clearance and brokerage services

worldwide.

5.    Bear Stearns proudly promoted a culture of circled wagons – an us against them

camaraderie ingrained in the belief that Bear Stearns employees' success was not based on their

birthright or pedigree, but a superior work ethic. As part of the effort to unify the employees and

mold a particular culture, the Company paid a significant portion of its employees' compensation

in Company Stock. Some estimates indicate that nearly one-third of the firm was employee

owned (as of March 17, 2008). These same employees suffered at least a $5 billion loss over the

last year as the Company's stock plunged and then was acquired by JP Morgan Chase at the rock

bottom price of $10 per share.

6.    Throughout the Class Period, defendants issued numerous positive, but false or

misleading press releases, statements and financial reports filed with the SEC that purported to

describe Bear Stearns' financial performance and results. These statements were materially false

2

and misleading and, as a result, Bear Stearns stock traded at artificially inflated prices during the

Class Period, reaching a high of $171.51 per share in January 2007.

7.      Beginning in late June 2007, however, Bear Stearns' efforts to deceive the

investing public began to unravel. In late June, the *Wall Street Journal* reported that the SEC

commenced an inquiry into a Bear Stearns operated hedge fund that invested in credit

instruments. That fund, as well as another, ultimately filed for bankruptcy protection.

8.      Bear Stearns nevertheless continued to misrepresent and downplay the

seriousness of its problems. On August 3, 2007, the Company issued a press release that tried to

put a positive spin on Standard & Poor's ("S&P") decision to change the Company's outlook

premised upon concerns with the Company's "BSAM" hedge funds. The press release provided,

in relevant part:

> The Bear Stearns Companies Inc. said today that it is disappointed
> with S&P's decision to change its outlook on Bear Stearns. Most
> of the themes highlighted in its report are common to the industry
> and are not likely to have a disproportional impact on Bear Stearns.
> *S&P's specific concerns over issues relating to certain hedge*
> *funds managed by BSAM are unwarranted as these were isolated*
> *incidences and are by no means an indication of broader issues at*
> *Bear Stearns.*

> "S&P's action highlights the concerns in the marketplace over the
> recent instability in the fixed income environment," said James E.
> Cayne, chairman and chief executive officer of The Bear Stearns
> Companies Inc. "*Contrary to rumors in the marketplace, our*
> *franchise is profitable and healthy and our balance sheet is strong*
> *and liquid. Bear Stearns has thrived throughout both tumultuous*
> *and fortuitous markets for the past 84 years. We are experiencing*
> *another market cycle and we are confident in Bear Stearns' ability*
> *to succeed in this environment as it has in so many others.*"

> *With respect to operating performance and financial condition, the*
> *company has been solidly profitable in the first two months of the*
> *quarter, while the balance sheet, capital base and liquidity profile*
> *have never been stronger.* Bear Stearns' risk exposures to high
> profile sectors are moderate and well-controlled. The risk
> management infrastructure and processes remain conservative and

3

consistent with past practices. This structure and strong risk management culture has allowed the firm to operate for all of its history as a public company without ever having an unprofitable quarter.

(Emphasis added.)

9.  The same day, Bear Stearns Stock declined $6.30 and closed at $108.35 per share.

10.  On August 5, 2007, the Company announced a management shake-up that included the ouster of defendant Warren Spector:

> The Bear Stearns Companies Inc. announced today that, effective immediately, Alan D. Schwartz has been named the company's sole president, and Samuel L. Molinaro, Jr. will become chief operating officer in addition to his current duties as chief financial officer. ... Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

> Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure. These promotions reflect and acknowledge the depth of talent in our senior management team. Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility. ... They all, along with many others, play critical roles in leading Bear Stearns. I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth. Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

> Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work. Bear Stearns is a special firm that has weathered countless challenging markets in its history. For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

> Alan D. Schwartz joined Bear Stearns in 1976. He became executive vice president and head of the Investment Banking

4

Division in 1985.  Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986.  In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee.

11.     On October 12, 2007, *BusinessWeek* published "Bear Stearns' Bad Bet", an article detailing the demise of the two Bear Stearns' hedge funds.  The article, among other things, detailed how the funds' investments were problematic and illiquid:

> … The hedge funds were built so they were virtually guaranteed to implode if market conditions turned south, according to a BusinessWeek analysis of confidential financial statements for both funds and interviews with forensic accounting experts, traders, and analysts.
>
> The funds had another potentially fatal flaw: an unusual arrangement with Barclays that gave the giant British bank the power to yank the plug – a deal that ran counter to the interests of other investors, many of whom didn't even know about it.
>
> The documents also cast serious doubt on the funds' supposedly strong performance before their July bankruptcies.  More than 60% of their net worth was tied up in exotic securities whose reported value was estimated by Cioffi's own team – something the funds' auditor, Deloitte & Touche, warned investors of in its 2006 report, released in May, 2007.  What emerges from the records is a portrait of a cash-starved portfolio piled high with debt and managers all too eager to add to the heap.

12.     On January 4, 2008, *Reuters* reported that the U.S. Attorney's Office for the Eastern District of New York was interviewing investors in the two failed Bear Stearns' hedge funds.  On this news, Bear Stearns Stock declined $2.58, to close at $78.87 per share.

13.     On March 10, 2008, information began to leak into the market about Bear Stearns' liquidity problems, causing Bear Stearns Stock to drop an additional $7.98, to close at $62.30 per share.

14.    On the same day, *MarketWatch* reported on how Bear Stearns' executives began to "spin" the Company's crisis into a non-event that they could control absent extraordinary measures. For example, *MarketWatch* reported:

> Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.

15.    Despite defendant Greenberg's efforts, the article went on to discuss how ratings agencies were viewing the situation and how the Company's liquidity position was under pressure:

> Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages. The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.
>
> Shares of Bear Stearns (BSC) dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session. They stood at $64.39 during afternoon trading, down about 8%.
>
> Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements. It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.
>
> The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging. That's triggering forced selling, which makes the situation even worse, limiting liquidity.
>
> Investment banks like Bear Stearns are at the center of this phenomenon.
>
> "The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.
>
> "A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.
>
> A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS. These derivatives pay out

6

in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.

CDS on Bear Stearns traded at 610 basis points over Treasury on Monday. A basis point is one hundredth of a percentage point.

16. On March 12, 2008, Bear Stearns' President Alan Schwartz reaffirmed Bear Stearns' financial position and liquidity, stating that Bear Stearns has more than $17 billion in excess cash on its balance sheet. He also affirmed Bear Stearns' book value of $80 per share and further indicated that analysts' estimates of substantial profits for the most recently ended quarter were accurate.

17. On the same day, *Reuters* reported defendant Schwartz's positive but false statements, in relevant part, as follows:

> Bear Stearns Cos (BSC.N) Chief Executive Alan Schwartz on Wednesday dismissed recurring speculation that the investment bank faces a cash crunch, saying it has hefty cash reserves that have remained little changed this year.
>
> Schwartz, in a televised interview on CNBC, also said he is comfortable with the range of analysts' earnings estimates for the fiscal first quarter ended February 29. Results for the quarter are due next week.
>
> *"We don't see any pressure on our liquidity, let alone a liquidity crisis," he said.*
>
> *Bear finished fiscal 2007 with $17 billion of cash sitting at the parent company level as a "liquidity cushion," he said.*
>
> *"That cushion has been virtually unchanged. We have $17 billion or so excess cash on the balance sheet," he said.*
>
> Schwartz denied speculation that other brokers were turning down Bear's credit on trades for fear of counter-party risk.
>
> . . .
>
> As one of the largest players in mortgage-backed bond markets, investors have assumed Bear's exposure would lead to crippling losses.

"*None of that speculation is true*," Schwartz said. When speculation starts in a market, one that has a lot of emotion in it and people concerned with volatility, "they will sell first and ask questions later," he said. "That creates its own momentum."

Schwartz said the first quarter was a "difficult" period, but he said he was comfortable with analysts' earnings estimates.

Wall Street forecasts range from 46 cents to $2.34 per share, according to Reuters Estimates. The average forecast is $1.07 a share, down 72 percent from a year earlier.

Bear shares were up $1.95 to $64.92 in morning trade on the New York Stock Exchange after rising as high as $67.82 earlier in the session.

(Emphasis added.)

18.    On March 13, 2008, however, after the market closed news broke that Bear

Stearns was forced to seek emergency financing from the Federal Reserve and J.P. Morgan

Chase.

19.    On March 14, 2008, *MarketWatch* reported the following:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades.

Bear said the rescue consists of getting short-term financing from the Fed, through J.P. Morgan, after its liquidity "deteriorated significantly" during the past 24 hours.

...

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.

"What is different this time is that the dominoes are falling in so many different sectors, markets, industries and countries – all at the same time and there is yet no end in sight," said Sherry Cooper, chief economist at BMO Capital Markets.

20.    On this news, Bear Stearns' Stock nose-dived to a $30 per share close, giving the

Company a market value of more than $3.5 billion. Two days later, on Sunday, March 16, 2008,

J.P. Morgan announced that it reached an agreement to purchase Bear Stearns for $2 per share,

or about $236 million.

21.    On March 17, 2008, the *Wall Street Journal* reported in an article titled "J.P.

Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis", the following:

Pushed to the brink of collapse by the mortgage crisis, Bear Stearns Cos. agreed – after prodding by the federal government – to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2 a share in stock, or about $236 million.

Bear Stearns had a stock-market value of about $3.5 billion as of Friday – and was worth $20 billion in January 2007. But the crisis of confidence that swept the firm and fueled a customer exodus in recent days left Bear Stearns with a horrible choice: sell the firm – at any price – to a big bank willing to assume its trading obligations or file for bankruptcy.

"At the end of the day, what Bear Stearns was looking at was either taking $2 a share or going bust," said one person involved in the negotiations. "Those were the only options."

To help facilitate the deal, the Federal Reserve is taking the extraordinary step of providing as much as $30 billion in financing for Bear Stearns's less-liquid assets, such as mortgage securities that the firm has been unable to sell, in what is believed to be the largest Fed advance on record to a single company. Fed officials wouldn't describe the exact financing terms or assets involved. But if those assets decline in value, the Fed would bear any loss, not J.P. Morgan.

9

...

The deal already is prompting howls of protest from Bear Stearns shareholders, since the New York company last week indicated that its book value was still close to its reported level of about $84 share at the end of the fiscal year. "Why is this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked J.P. Morgan executives in a conference call last night.

...

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

...

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

Late yesterday, *some Bear Stearns employees and shareholders were grumbling about the deal.* ...

"I've got to think we can get more in a liquidation, I'm not selling my shares, *this price is dramatically less than the book value Alan Schwartz told us the company is worth,*" said a midlevel Bear Stearns executive. ...

(Emphasis added.)

22.    On the same day, the *New York Times* reported in an article entitled "JP Morgan Pays $2 a Share for Bear Stearns", the dire terms of the deal, and its consequences for the Company's employees.

## JURISDICTION AND VENUE

23.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act.

25.    Venue is proper in this District pursuant to Section 27 of the 1934 Act, and 28 U.S.C. § 1391. Many of the acts and practices complained of herein were made in or issued from this District and Bear Stearns' principal executive offices are located within this District.

## THE PARTIES

26.    Plaintiff Gilles Bransbourg ("Plaintiff"), a former Senior Managing Director of Bear Stearns, received Bear Stearns Stock and fully vested CAP Plan Units entitling him to an equivalent number of shares of Bear Stearns Stock upon settlement at the end of a deferral period, as a part of his compensation as an employee with the Company and participation in its RSU Plan and the CAP Plan, as described in the attached certification, and was damaged thereby.

27.    Defendant Bear Stearns is a corporation organized and existing under the laws of the State of Delaware and maintains its principal executive office at 383 Madison Avenue, New York, New York. Bear Stearns is a holding company that, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide. The Company operates through three segments: Capital Markets, Global Clearing Services and Wealth Management. Bear Stearns common stock trades on the New York Stock Exchange ("NYSE") under the symbol "BSC".

28.    Defendant James E. Cayne ("Cayne"), at all relevant times, was Chairman of the Board and Chief Executive Officer ("CEO") of Bear Stearns.

11

29.    Defendant Alan D. Schwartz ("Schwartz"), at all relevant times, was Co-President and Co-Chief Operating Officer ("COO") of Bear Stearns. Schwartz became sole President on August 5, 2007.

30.    Defendant Warren J. Spector ("Spector"), at all relevant times, was Co-President, Co-COO and a director of Bear Stearns. On August 5, 2007, Spector resigned those positions.

31.    Defendant Samuel L. Molinaro, Jr. ("Molinaro"), at all relevant times, was Chief Financial Officer ("CFO") and Executive Vice President of Bear Stearns. On August 5, 2007, Molinaro was appointed COO.

32.    Defendant Alan C. Greenberg ("Greenberg") is, and at all relevant times was, Chairman of the Executive Committee of Bear Stearns.

33.    Defendants Cayne, Schwartz, Spector, Molinaro and Greenberg (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Bear Stearns' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

34.    Defendants are liable for:

    a.    Making false statements; and/or

    b.    Failing to disclose adverse facts known to them about Bear Stearns.

35.    Defendants' fraudulent scheme and course of business that operated as a fraud or

deceit on purchasers of Bear Stearns Stock was a success, as it:

    a.    Deceived the investing public regarding Bear Stearns' prospects and

business;

    b.    Artificially inflated the price of Bear Stearns' common stock; and

    c.    Caused Plaintiff and other members of the Class to receive, as participants

in the RSU Plan and the CAP Plan, Bear Stearns Stock at artificially inflated prices.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

36.    On December 14, 2006, Bear Stearns issued a press release regarding its fourth

quarter and fiscal year end results for 2006. The press release provided, in relevant part, the

following:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported
> earnings per share (diluted) of $4.00 for the fourth quarter ended
> November 30, 2006, up 38% from $2.90 per share for the fourth
> quarter of 2005. Net income for the fourth quarter of 2006 was
> $563 million, up 38% from $407 million for the fourth quarter of
> 2005. Net revenues for the 2006 fourth quarter were $2.4 billion,
> up 28% from $1.9 billion for the 2005 fourth quarter. The
> annualized return on common stockholders' equity for the fourth
> quarter of 2006 was 20.5%.
>
> For the fiscal year ended November 30, 2006, earnings per share
> (diluted) were a record $14.27, up 38% from $10.31 for fiscal
> 2005. Net income for the fiscal year 2006 was $2.1 billion, up 40%
> from the $1.5 billion earned in the twelve-month period ended
> November 30, 2005. Net revenues for fiscal year 2006 were $9.2
> billion, an increase of 25% from $7.4 billion in the prior fiscal

13

year. The after-tax return on common stockholders' equity was 19.1% for fiscal 2006.

*"We are pleased to announce Bear Stearns' fifth consecutive year of record net income and earnings per share,"* said James E. Cayne, chairman and chief executive officer. *"Our continued success is a testament to our unwavering focus on serving our clients with excellence; attracting and retaining talented professionals and profitably expanding our broad and diverse franchise. I look forward to 2007 and our continued expansion both internationally and domestically."*

## CAPITAL MARKETS

### Fourth Quarter

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were $1.8 billion for the fourth quarter of 2006, up 26% from $1.4 billion for the fourth quarter ended November 30, 2005.

> Institutional Equities net revenues were $397 million, up 7% from $373 million for the fourth quarter of 2005. Record results from risk arbitrage and continued strong results from equity derivatives and international sales and trading contributed to this strong performance.

> *Fixed Income net revenues were $1.1 billion, up 25% from $839 million in the fourth quarter of 2005. The credit business produced record results led by the credit derivatives, distressed debt and leveraged finance areas.* Mortgage revenues increased reflecting higher volumes and increased commercial-mortgage securitization activity.

> Investment Banking net revenues were $364 million in the fourth quarter of 2006, up 58% from the $231 million in the comparable prior year period. This increase reflects fees from higher underwriting and merger and acquisition transaction volumes.

### Full Year

Capital Markets net revenues were a record $7.0 billion for fiscal year 2006, an increase of 25% over the previous record of $5.6 billion reported in 2005.

14

Institutional Equities net revenues for the fiscal year ended November 30, 2006 were up 33% to a record $1.9 billion from $1.4 billion in fiscal 2005. Equity derivatives, risk arbitrage, energy/commodity activities and international sales and trading all delivered record results.

*Fixed Income net revenues were a record $4.0 billion in 2006, up 23% from $3.3 billion in 2005. This was the sixth consecutive year of record results and was led by revenue growth in the mortgage and credit departments. In the mortgage business, the record results were driven by market share gains in commercial mortgage-backed securities and the growth in captive origination volumes from the vertical integration of the mortgage platform. In addition, collateralized loan and debt origination activities increased substantially. The credit franchise delivered its best results ever as the high yield, leveraged finance and credit trading areas all produced record revenues.*

Investment Banking reported net revenues of $1.2 billion for fiscal 2006, up 19% from $980 million in the prior fiscal year. The increase in net revenues was due to greater transaction volumes in both the underwriting and advisory areas.

...

## WEALTH MANAGEMENT

### Fourth Quarter

In the Wealth Management segment, which includes Private Client Services and Asset Management, net revenues were $245 million for the quarter ended November 30, 2006, up 33% from $184 million in the fourth quarter of 2005.

Private Client Services revenues were $133 million in the fourth quarter of 2006, an increase of 14% from $117 million in the 2005 quarter. Increased equity in client accounts, higher activity levels and robust growth in fee-based assets drove the quarterly revenue increase.

*Asset Management net revenues grew 66% to $112 million for the fourth quarter of 2006 from $67*

> *million in the prior year quarter. The rise in net revenues was due to increased performance fees from hedge fund products as well as management fees from a growing base of assets under management.*

## Full Year

Wealth Management net revenues were $850 million for fiscal 2006, an increase of 25% compared with $679 million in fiscal 2005.

> Revenues from Private Client Services rose 15% to $518 million for the 2006 fiscal year from $450 million for fiscal 2005. The improvement reflects the growing contribution of revenues from fee-based assets.
>
> *The Asset Management business reported record net revenues of $332 million for the 2006 fiscal year, up 45% from $229 million in the prior year. Growth in alternative assets under management together with increased performance fees contributed to these excellent results.*

Assets under management rose to $52.5 billion as of November 30, 2006, up 25% from $41.9 billion as of November 30, 2005.

## EXPENSES

### Fourth Quarter

> Compensation as a percentage of net revenues was 43.6% for the fourth quarter of 2006 compared with 46.2% for the quarter ended November 30, 2005.
>
> Non-compensation expenses were $469 million for the quarter ended November 30, 2006, up 9% from $429 million in the 2005 quarter. The increase is primarily related to higher occupancy fees, professional fees, and communications and technology costs associated with additional headcount.

The 2006 fourth quarter pre-tax profit margin was 37.0%, as compared with 31.1% for the prior year quarter.

16

**Full Year**

> For the twelve-months ended November 30, 2006, compensation as a percentage of net revenues was 47.1% as compared with 47.9% for the 2005 fiscal year.
>
> Non-compensation expenses for the fiscal year 2006 were $1.74 billion, 5% higher than the $1.65 billion reported in 2005. The increase is primarily related to increased occupancy expenses, professional fees, and communications and technology costs associated with an expanding workforce.
>
> For fiscal year 2006 the pre-tax margin was 34.1% versus 29.8% in fiscal year 2005.
>
> As of November 30, 2006, total capital, including stockholders' equity and long-term borrowings, was $66.7 billion. Book value on November 30, 2006 was $86.39 per share, based on 145.7 million shares outstanding. The company repurchased approximately 10.6 million shares of its common stock during fiscal 2006.

(Emphasis added.)

37.    Statements in the press release, however, were false and misleading because the press release omitted material information concerning the Company's growing exposure to complicated credit arrangements and that the mortgage market was beginning to show signs of stress and deterioration. Accordingly, the "credit franchise" required more substantial oversight and hedging – a fact defendants omitted.

38.    On February 13, 2007, Bear Stearns filed its Form 10-K for fourth quarter and fiscal year 2006. Defendant Cayne executed a certification, annexed as an exhibit to the Form 10-K filing, that set forth as follows:

> I, James E. Cayne, certify that:
>
> 1.    I have reviewed this Annual Report on Form 10-K of The Bear Stearns Companies Inc.;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

17

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

39.    Defendant Molinaro executed a similar certification also annexed as an exhibit to the Form 10-K filing.

40.    The statements in the annual report were false and misleading for the reasons stated at paragraph 37.

41.    On March 15, 2007, Bear Stearns issued a press release regarding its first quarter 2007 results. The press release provided, in relevant part, the following:

The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006. Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006. Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter. The annualized return on common stockholders' equity was 18.3% for the first quarter of 2007 and 18.6% for the trailing 12-month period ended February 28, 2007.

"We are pleased with this excellent performance, revenues for the first quarter were up for every business segment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Growing the company remains a core focus as we continue to invest in the clearing, mortgage, international and asset management franchises with successful results."

**CAPITAL MARKETS**

19

Capital Markets net revenues for the first quarter of 2007 were $2.0 billion, up 15% from $1.7 billion in the first quarter of 2006.

Institutional Equities net revenues were $513 million, up 3% from $500 million for the first quarter of 2006. Equity derivatives delivered a record quarter with improved market conditions leading to increased customer activity. International sales and trading revenues increased in the first quarter compared with the year-ago quarter, and risk arbitrage net revenues rose reflecting a high level of activity in announced merger and acquisition transactions.

*Fixed Income net revenues were $1.1 billion, up 27% from $907 million in the year-ago quarter. The credit business produced record results led by the credit derivatives and distressed debt areas.* The interest rate area also produced strong results reflecting increased volatility and higher customer volume. Residential mortgage-related revenues decreased from the prior year period, reflecting weakness in the U.S. residential mortgage-backed securities market.

Investment Banking net revenues were $303 million in the first quarter of 2007, up 3% from $296 million in the comparable prior-year period. Equity underwriting and merger and acquisition activity remained strong in the first quarter of 2007. However, merchant banking revenues were lower than in the prior year quarter. Excluding merchant banking revenues, Investment Banking net revenues increased 20% compared with the first quarter of 2006.

...

## WEALTH MANAGEMENT

Wealth Management net revenues for the first quarter of 2007 were $255 million, an increase of 14% from $225 million in the first quarter of 2006. Net revenue continued to grow with higher levels of assets under management.

Private Client Services net revenues were $136 million in the first quarter of 2007, an increase of

20

5% from $130 million in the 2006 first quarter. The increase was mainly attributable to revenues associated with the continued growth of fee-based assets.

Asset Management net revenues grew 25% to $119 million for the first quarter of 2007 from $95 million in the prior year's quarter. The increase was primarily due to higher management fees and investment performance. Assets under management rose 19% to $54.1 billion as of February 28, 2007, compared with $45.4 billion as of February 28, 2006.

## EXPENSES

...

The pre-tax profit margin in the first quarter of 2007 was 33.7% as compared with 34.4% in the quarter ended February 28, 2006.

As of February 28, 2007 total capital, including stockholders' equity and long-term borrowings, was approximately $71.8 billion. Book value as of February 28, 2007 was $90.57, per share, base on 145.1 million shares outstanding.

(Emphasis added.)

42.    On April 9, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended February 28, 2007, which included the financial results reported on March 15, 2007. The filing also provided, in relevant part:

The Capital Markets segment comprises the institutional equities, fixed income and investment banking areas. The Capital Markets segment operates as a single integrated unit that provides the sales, trading and origination effort for various fixed income, equity and advisory products and services. Each of the three businesses work in tandem to deliver these services to institutional and corporate clients.

Institutional equities consists of sales, trading and research, in areas such as domestic and international equities, block trading, over-the-counter equities, equity derivatives, energy and

commodity activities, risk and convertible arbitrage and, through a majority-owned joint venture, specialist activities on the NYSE, American Stock Exchange ("AMEX") and International Securities Exchange ("ISE"). Fixed income includes sales, trading, origination and research provided to institutional clients across a variety of products such as mortgage- and asset-backed securities, corporate and government bonds, municipal bonds, high yield products, including bank and bridge loans, foreign exchange and interest rate and credit derivatives. Investment banking provides services in capital raising, strategic advice, mergers and acquisitions and merchant banking. Capital raising encompasses the Company's underwriting of equity, investment grade, municipal and high yield debt products.

Net revenues for Capital Markets increased 15.4% to $1.97 billion for the 2007 quarter compared with $1.70 billion for the 2006 quarter. Pre-tax income for Capital Markets increased 12.9% to $736.3 million for the 2007 quarter from $652.3 million for the comparable prior year quarter. Pre-tax profit margin was 37.5% for the 2007 quarter compared with 38.3% for the 2006 quarter.

. . .

Fixed income net revenues increased 26.7% to $1.15 billion for the 2007 quarter from $907.1 million for the comparable prior year quarter. Net revenues from credit derivatives and distressed trading reached record levels during the 2007 quarter as corporate credit spreads tightened and customer activity levels remained robust. Interest rate derivatives also increased in the 2007 quarter compared with the 2006 quarter, primarily attributable to higher interest rate volatility and increased customer volumes. Despite strong trading volumes during the 2007 quarter the challenging market conditions in the subprime mortgage sector resulted in a decrease in mortgage-backed securities revenues when compared to the 2006 quarter. While subprime activities have historically represented only a small portion of the Company's mortgage activities, investor concerns over the direction of the delinquencies served to temporarily reduce liquidity in other sectors of the MBS market.

. . .

The Wealth Management segment is composed of the PCS and asset management areas. PCS provides high-net-worth individuals with an institutional level of investment service, including access to the Company's resources and professionals. At February 28, 2007, PCS has approximately 500 account executives in its

principal office, six regional offices and two international offices. Asset management manages equity, fixed income and alternative assets for corporate pension plans, public systems, endowments, foundations, multi-employer plans, insurance companies, corporations, families and high-net-worth individuals in the United States and abroad.

Net revenues for Wealth Management increased 13.6% to $255.3 million for the 2007 quarter from $224.7 million for the 2006 quarter. PCS revenues increased 5.0% to $136.2 million for the 2007 quarter from $129.6 million for the 2006 quarter reflecting higher levels of fee-based income. Asset management revenues increased 25.3% to $119.2 million for the 2007 quarter from $95.1 million for the 2006 quarter. This increase reflects increased performance fees and growth in management fees on traditional and alternative assets under management. Pre-tax income for Wealth Management increased 37.6% to $43.8 million in the 2007 quarter from $31.8 million for the 2006 quarter.

Assets under management were $54.1 billion at February 28, 2007, reflecting a 19.2% increase from $45.4 billion in assets under management at February 28, 2006. The increase in assets under management is due to the growth in traditional equity assets and hedge funds. Assets under management at February 28, 2007 include $8.7 billion of assets from alternative investment products, an increase from $7.0 billion at February 28, 2006.

...

The Company's total assets at February 28, 2007 increased to $394.5 billion from $350.4 billion at November 30, 2006. The increase was primarily attributable to increases in financial instruments owned, assets of variable interest entities and mortgage loan special purpose entities, securities borrowed, and customer receivables partially offset by a decrease in securities purchased under agreements to resell. The Company's total capital base, which consists of long-term debt, preferred equity issued by subsidiaries and total stockholders' equity, increased to $71.8 billion at February 28, 2007 from $66.7 billion at November 30, 2006. This change was primarily due to a net increase in long-term debt and an increase in stockholders' equity primarily due to earnings in the February 2007 quarter as well as income tax benefits attributable to the distribution of common stock under the Company's deferred compensation plans.

23

43.    The Company's Form 10-Q for the quarterly period ended February 28, 2007

contained virtually identical certifications by Defendants Cayne and Molinaro that were included

with Bear Stearns' Form 10-K for fourth quarter and fiscal year 2006.

44.    The statements contained in the earnings press release and quarterly report were

false and misleading for the reasons detailed at paragraph 37.

45.    On June 14, 2007, Bear Stearns issued a press release regarding its second quarter

2007 results. The press release provided, in relevant part, the following:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported
> earnings per share (diluted), after a non-cash charge, of $2.52 for
> the second quarter ended May 31, 2007, down 32% from $3.72 per
> share for the second quarter of 2006. Second quarter results
> include the effect of a $227 million or $0.88 per share (diluted)
> non-cash charge related to the write-down of intangible assets,
> representing goodwill and specialist rights of Bear Wagner
> Specialists. Earnings per share (diluted) excluding this charge
> would have been $3.40 for the 2007 second quarter. Net income
> for the second quarter of 2007, after the non-cash charge, was $362
> million. Net income excluding the non-cash charge would have
> been $486 million, down 10% from $539 million for the second
> quarter of 2006. Net revenues for the 2007 second quarter were a
> record $2.512 billion, up from the previous record of $2.499
> billion reported for the 2006 second quarter. The annualized return
> on common stockholders' equity for the second quarter of 2007
> was 11.6%, and 16.4% for the trailing 12-month period ended May
> 31, 2007. Excluding the non-cash charge, annualized return on
> common stockholders' equity for the second quarter of 2007 would
> have been 15.6%, and 17.5% for the trailing 12-month period
> ended May 31, 2007.
>
> "The diversity of our franchise is clearly demonstrated in the
> record net revenues generated this quarter," said James E. Cayne,
> chairman and chief executive officer of The Bear Stearns
> Companies Inc. "The Global Clearing Services and Wealth
> Management segments reported record performance while results
> were also very strong from debt and equity underwriting, equity
> derivatives and leveraged finance. Internationally, we continue to
> grow aggressively, hiring talented people, broadening our product
> platform and reaching new clients in multiple geographies."
>
> **CAPITAL MARKETS**

24

Capital Markets net revenues for the second quarter of 2007 were $1.9 billion, down 10% from a record high of $2.1 billion for the quarter ended May 31, 2006.

> Institutional Equities net revenues were $543 million, a slight decline from $560 million for the second quarter of 2006.  Record revenues in equity derivatives and risk arbitrage, as well as continued strong results from international sales and trading, drove second quarter 2007 performance.  The 2006 second quarter included gains recognized from the initial public offering of NYSE Group, without these gains net revenues for the 2007 quarter would have increased significantly as compared with the prior year period.

> Fixed Income net revenues were $962 million for the 2007 second quarter, down 21% from record revenues of $1.2 billion recorded in the second quarter of 2006.  Credit trading results were strong and record net revenues were reported in leveraged finance.  The credit business produced strong results led by credit derivatives and leveraged finance.  Mortgage-related revenues reflected both industry-wide declines in residential mortgage origination and securitization volumes and challenging market conditions in the sub-prime and Alt-A mortgage sectors.

> Investment Banking net revenues were $357 million, up 28% from the $278 million in the 2006 second quarter.  Underwriting net revenues increased, driven by active corporate and financial sponsor clients.  Merger and acquisition advisory fees were strong, reflecting continued robust market conditions and the completion of a number of marquee transactions.

. . .

## WEALTH MANAGEMENT

Wealth Management net revenues for the quarter ended May 31, 2007 reached a record $341 million, up 123% from $153 million in the second quarter of 2006.

> Private Client Services net revenues were a record $157 million, an increase of 21% from $130 million in the 2006 second quarter. The strong results were driven by higher management and performance fees from an increase in fee-based assets and favorable market conditions.
>
> Asset Management net revenues were also a record for the second quarter of 2007 and reached $184 million. These results show a significant increase from the $23 million posted in the 2006 second quarter. The increase was due to higher management and performance fees and favorable investment performance. Assets under management rose 25% to $60 billion on May 31, 2007, up from $48 billion on May 31, 2006.

## EXPENSES

...

The pre-tax profit margin for the quarter ended May 31, 2007 was 22.0% as compared with 33.4 for the quarter ended May 31, 2006. Excluding the write-down for impairment, the pre-tax profit margin would have been 30.7%.

As of May 31, 2007, total capital, including stockholders' equity and long-term borrowings, was approximately $75.1 billion. Book value as of May 31, 2007 was $92.50 per share, based on 144.7 million shares outstanding.

46.    On July 10, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended

May 31, 2007, which included the financial results reported on June 14, 2007. The filing also

provided, in relevant part:

Asset Management

On June 7, 2007, Bear Stearns Asset Management ("BSAM"), the investment manager of the Bear Stearns High-Grade Structured Credit Strategies Fund (the "High-Grade Fund") and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund (the "Enhanced Fund") (collectively the "Funds")

26

announced to investors that there would be a suspension of investor redemptions in the Enhanced Fund. Subsequent to the announcement, the Funds were not capable of raising additional liquidity necessary to meet margin calls made by secured financing counterparties. As a result, various counterparties moved to seize collateral or otherwise terminate financing arrangements by arranging to acquire the relevant collateral at negotiated prices. During June, the Funds experienced significant declines in the value of their assets resulting in losses in net asset value. As of April 30, 2007, the last reported valuation date, the Funds had net assets of approximately $1.6 billion.

On June 22, 2007, the Company entered into a $1.6 billion secured financing agreement (the "Facility") with the High-Grade Fund. The Facility, which is in the form of collateralized repurchase agreements, enabled the High-Grade Fund to replace existing secured financing, thereby improving the High-Grade Fund's liquidity and allowing an orderly de-leveraging of the High-Grade Fund in the marketplace. Currently, we believe the High-Grade Fund has sufficient assets available to fully collateralize the Facility.

The Company continues to work with the creditors and counterparties of the Enhanced Fund to facilitate an orderly de-leveraging of the Enhanced Fund.

Currently, outstanding repurchase agreement balances in the Enhanced Fund are approximately $600 million. The Company has not provided financing to the Enhanced Fund.

At May 31, 2007, the Company had a direct investment in the Enhanced Fund of approximately $34 million and had unsecured receivables of approximately $43 million from the Funds.

On June 29, 2007, the Company announced the hiring of Jeffrey Lane as Chairman and CEO of BSAM. The difficulties surrounding the two BSAM managed funds could negatively impact BSAM's ability to sustain existing assets under management, attract new investors or otherwise impair other aspects of the Company's asset management business. While we believe the Company's businesses remain strong, the Company is unable to determine what impact, if any, these developments may have on its business.

In June 2007, the four major rating agencies (S&P, Moody's, Fitch, and DBRS) affirmed the ratings of The Bear Stearns Companies Inc. in individual press releases. In addition to

affirming the Company's ratings, DBRS also confirmed the Positive trend on the ratings. Citing the recent difficulties faced by two hedge funds managed by BSAM, the four rating agencies stated that the Company has the financial capacity and ample liquidity to provide support for the High-Grade Fund, while continuing to work with creditors and counterparties of the Enhanced Fund to reduce leverage and improve liquidity.

...

Net revenues for Capital Markets decreased 9.7% to $1.86 billion for the 2007 quarter compared with $2.06 billion for the 2006 quarter. Pre-tax income in the 2007 quarter reflects a $227.5 million impairment charge to goodwill and specialist rights associated with NYSE specialist activities.

...

Fixed income net revenues decreased 21.3% to $962.3 million for the 2007 quarter from $1.22 billion for the comparable prior year quarter primarily due to a decrease in mortgage-related revenues. Secondary trading revenues decreased in the 2007 quarter compared with the 2006 quarter, particularly on-agency fixed rate whole loans and Adjustable-Rate Mortgages ("ARMs"), reflecting the challenges associated with the sub-prime mortgage sector. Partially offsetting these decreases were increases in primary revenues from commercial mortgage-backed securities and non-agency fixed rate whole loans. In addition, interest rate derivatives and foreign exchange revenues decreased, reflecting reduced global volatility and lower customer volumes. Distressed trading revenues also decreased due to less favorable market conditions. Partially offsetting these decreases were strong results from structured credit trading and leveraged finance, as acquisition related finance activity increased and customer activity levels remained high.

...

Fixed income net revenues decreased 0.8% to $2.11 billion for the 2007 period from $2.13 billion for the comparable prior year period. Mortgage-backed securities revenues decreased in the 2007 period, when compared to the prior year period due to weaker U.S. mortgage markets and challenges associated with the sub-prime mortgage sector. Secondary trading revenues, particularly non-agency fixed rate whole loans and ARMs decreased significantly in the 2007 period compared with the 2006 period. Primary revenues from commercial mortgage-backed securities,

28

collateralized mortgage obligations ("CMOs"), and non-agency
fixed rate whole loans increased during the 2007 period.
Substantially offsetting the decrease in mortgage-related revenues
were increases in the Company's credit businesses, particularly
credit derivatives, distressed trading and leveraged finance, which
increases were due to increased customer activity and favorable
market conditions.

...

Net revenues for Wealth Management increased 123.0% to $341.4
million for the 2007 quarter from $153.1 million for the 2006
quarter and increased 58.0% to $596.7 million for the six months
ended May 31, 2007 from $377.7 million for the 2006 period.
Asset management revenues increased 700.5% to $184.1 million
for the 2007 quarter from $23.0 million for the 2006 quarter and
increased 156.8% to $303.3 million for the six months ended May
31, 2007 from $118.1 million for the 2006 period, primarily
reflecting growth in performance fees on proprietary hedge fund
products as well as improved investment returns on proprietary
investments and growth in management fees on higher levels of
traditional and alternative assets under management. PCS net
revenues increased 20.9% to $157.3 million for the 2007 quarter
from $130.1 million for the 2006 quarter and increased 13.0% to
$293.4 million for the six months ended May 31, 2007 from
$259.7 million for the 2006 period, reflecting higher levels of fee-
based income attributable to the Company's private client advisory
services products.

47.     The Company's Form 10-Q for the quarterly period ended May 31, 2007

contained virtually identical certifications by Defendants Cayne and Molinaro that were included

with Bear Stearns' Form 10-K for fourth quarter and fiscal year 2006.

48.     The statements contained in the press release and quarterly report were false and

misleading because defendants knew that the Company faced systemic problems premised on the

performance and looming failure of its two credit investment hedge funds.

49.     On August 3, 2007, S&P cut the Company's credit rating outlook to negative,

causing Bear Stearns Stock to decline $6.30 to $108.35 per share. Also, on August 3, 2007, Bear

Stearns executives hosted a conference call. During the call, defendant Cayne touted the firm's

29

liquidity position and new long term borrowing commitments, according to a *Wall Street Journal*

report published on May 27, 2008.

    50.    Bear Stearns also issued a press release responding to S&P's decision to change

the Company's outlook. The press release provided, in relevant part:

> The Bear Stearns Companies Inc. said today that it is disappointed
> with S&P's decision to change its outlook on Bear Stearns. Most
> of the themes highlighted in its report are common to the industry
> and are not likely to have a disproportional impact on Bear Stearns.
> S&P's specific concerns over issues relating to certain hedge funds
> managed by BSAM are unwarranted as these were isolated
> incidences and are by no means an indication of broader issues at
> Bear Stearns.
>
> "S&P's action highlights the concerns in the marketplace over the
> recent instability in the fixed income environment," said James E.
> Cayne, chairman and chief executive officer of The Bear Stearns
> Companies Inc. "Contrary to rumors in the marketplace, our
> franchise is profitable and healthy and our balance sheet is strong
> and liquid. Bear Stearns has thrived throughout both tumultuous
> and fortuitous markets for the past 84 years. We are experiencing
> another market cycle and we are confident in Bear Stearns' ability
> to succeed in this environment as it has in so many others."
>
> With respect to operating performance and financial condition, the
> company has been solidly profitable in the first two months of the
> quarter, while the balance sheet, capital base and liquidity profile
> have never been stronger. Bear Stearns' risk exposures to high
> profile sectors are moderate and well-controlled. The risk
> management infrastructure and processes remain conservative and
> consistent with past practices. This structure and strong risk
> management culture has allowed the firm to operate for all of its
> history as a public company without ever having an unprofitable
> quarter.

    51.    Then, on August 5, 2007, Bear Stearns announced a management shake-up that

included the ouster of Defendant Spector:

> The Bear Stearns Companies Inc. (NYSE:BSC) announced today
> that, effective immediately, Alan D. Schwartz has been named the
> company's sole president, and Samuel L. Molinaro, Jr. will
> become chief operating officer in addition to his current duties as
> chief financial officer. Jeffrey Mayer, co-head of the Fixed

Income Division, has been named to the Bear Stearns Executive Committee.  Warren J. Spector has resigned his positions of president and co-chief operating officer, member of the Executive Committee and member of the Board of Directors of Bear Stearns.

Commenting on the management changes, James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc., said, "In light of the recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure.  These promotions reflect and acknowledge the depth of talent in our senior management team.  Alan and Sam have demonstrated outstanding judgment and leadership skills during their long tenures at Bear Stearns, have made tremendous contributions to building the firm, and are well prepared to assume greater responsibility. Since assuming co-leadership of our fixed income business in 2002, Jeff has helped build a highly successful global fixed income franchise.  They all, along with many others, play critical roles in leading Bear Stearns. I have every confidence in this team to continue Bear Stearns' 84-year legacy of success and profitable growth.  Finally, I particularly want to thank Warren Spector for his significant contributions to Bear Stearns."

Mr. Spector said, "I am leaving with nothing but the highest respect and regard for Bear Stearns and all the talented professionals with whom I have been privileged to work.  Bear Stearns is a special firm that has weathered countless challenging markets in its history.  For that reason, I intend to remain a significant shareholder and will follow the firm's future success with great pride."

Alan D. Schwartz joined Bear Stearns in 1976. He became executive vice president and head of the Investment Banking Division in 1985. Mr. Schwartz was named president and co-chief operating officer in June 2001.

Samuel L. Molinaro Jr., executive vice president and chief financial officer, joined the company in 1986. In 1996, Mr. Molinaro was promoted to the position of chief financial officer and in 2002 was named a member of the company's Executive Committee.

52.    The above statements were false and misleading because by August 5, 2007, the SEC was on Bear Stearns' premises scrutinizing the Company's $400 billion balance sheet and had demanded daily briefings until the SEC became comfortable with the Company's position.

31

53.    Moreover, the statements detailed above were false and misleading because the

Company was actually in desperate need of capital. In fact, by August 5, 2007, representatives

of Kohlberg Kravis Roberts & Co. were combing through the Company's books to assess

whether KKR wanted to buy at least 20% of Bear Stearns.

54.    Further, the Company's exposure to risky credit bets was so substantial that it

initiated a hedging strategy called "the chaos trade." The bet, initiated during the summer of

2007, hoped that a family of indexes made up of securities backed by subprime mortgages would

fail. The Company also bet that major financial companies with exposure to subprime

mortgages would decrease.

55.    During September 2007, the Company negotiated with Allianz SE's Pacific

Investment Management Co. to take a non equity stake as much as 100% in the Company. The

negotiations failed because Allianz was concerned with the quality of the Company's credit

portfolio.

56.    On October 12, 2007, *Business Week* published "Bear Stearns' Bad Bet", an article

detailing the demise of the two Bear Stearns' hedge funds. The article, among other things,

detailed how:

> ... The hedge funds were built so they were virtually guaranteed
> to implode if market conditions turned south, according to a
> BusinessWeek analysis of confidential financial statements for
> both funds and interviews with forensic accounting experts,
> traders, and analysts.
>
> The funds had another potentially fatal flaw: an unusual
> arrangement with Barclays that gave the giant British bank the
> power to yank the plug – a deal that ran counter to the interests of
> other investors, many of whom didn't even know about it.
>
> The documents also cast serious doubt on the funds' supposedly
> strong performance before their July bankruptcies. More than 60%
> of their net worth was tied up in exotic securities whose reported
> value was estimated by Cioffi's own team – something the funds'

32

auditor, Deloitte & Touche, warned investors of in its 2006 report, released in May, 2007. What emerges from the records is a portrait of a cash-starved portfolio piled high with debt and managers all too eager to add to the heap.

57.    On December 21, 2007, PIMCO told the Company via email that it wanted to immediately unwind several billions of dollars of trades with Bear Stearns because it was uneasy with the financial sector. PIMCO ultimately agreed to wait until January before unwinding the trades but PIMCO managing director William H. Gross (a Bear Stearns alumnus) demanded that Bear Stearns raise capital immediately or face dire consequences.

58.    On January 4, 2008, *Reuters* reported that the U.S. Attorney's Office for the Eastern District of New York was interviewing investors in the two failed Bear Stearns' hedge funds. On this news, Bear Stearns Stock declined $2.58, to close at $78.87 per share.

59.    On January 8, 2008, Bear Stearns announced another management shake-up at the Company:

> The Bear Stearns Companies Inc. (NYSE:BSC) announced today that James E. Cayne has informed the board of directors of his desire to step down as chief executive officer, effective immediately. While Mr. Cayne will retire from the firm, he will stay on as chairman of the board of directors and will be succeeded as chief executive officer by Bear Stearns president Alan D. Schwartz.
>
> "Jimmy has much to be proud of -- under his leadership Bear Stearns has grown substantially over the past 15 years, with revenues increasing to $7 billion from $2 billion and the number of our employees more than doubling to 14,000," said Vincent Tese, Bear Stearns lead independent director. "This was his decision, and we are very pleased that he has agreed to stay actively involved in the business as chairman of the board."
>
> "The company's talent pool is particularly deep and the board is fortunate to have someone of Alan's caliber and experience ready to step in to lead the company," Tese added. "Alan has spent more than 30 years at Bear Stearns; he deeply understands our business and culture, and he is a strong leader and manager who is admired and respected throughout the organization."

33

Mr. Cayne, who served as CEO of Bear Stearns since 1993 and as chairman and CEO since 2001 commented, "I am gratified that the board has continued confidence in me, but I believe this is the right time to implement our succession plan. We are beginning a new year and are at a pivotal point in the development of our business at a time of rapid change on Wall Street," he said. "Leading Bear Stearns and its wonderfully talented people has been one of the great joys in my life for nearly 15 years. These are people who know how to create value, who know how to serve clients well and who I am confident will continue to do so for many years in the future."

"Alan is a good friend and one of the most capable executives on Wall Street. He is a great choice to lead the company in this new era and I am delighted to be in a position to help," Cayne added. "I have great confidence in him and in the seamlessness of this transition. I look forward to my new role, where I feel I can use my institutional knowledge of Bear Stearns and Wall Street to maximum advantage for the firm in the years ahead."

"I am honored to have the opportunity to lead one of Wall Street's great franchises," said Alan D. Schwartz, president of Bear Stearns. "Bear Stearns has a bright future. Our franchise is rock solid thanks to Jimmy's leadership; investors, customers and employees should not expect any abrupt changes in the period ahead. We have a strong capital position, a unique culture and great talent throughout the organization. Although the operating environment has been difficult, we are off to a good start in 2008. We remain excited about our core equity, banking and fixed income businesses, our international expansion initiatives, and the further development of our energy and wealth management platforms."

60.    On March 10, 2008, information began to leak into the market about Bear

Stearns' liquidity problems, causing Bear Stearns Stock to drop $7.98, to close at $62.30 per

share.

61.    On the same day, *MarketWatch* reported on how Bear Stearns' executives began

to "spin" the Company's crisis into a non-event that would be handled absent extraordinary

measures. For example, *MarketWatch* reported:

34

> Alan "Ace" Greenberg, chairman of the New York-based company's executive committee, denied any liquidity problems, according to CNBC.

62.    Despite Defendant Greenberg's efforts, the article went on to discuss how ratings agencies were viewing the situation and how the Company's liquidity was under pressure:

> Meanwhile, Moody's Investors Service downgraded 163 bits of securities issued by Bear that are backed by so-called Alt-A mortgages.    The cuts came as delinquencies and foreclosures climbed higher than expected, the ratings agency said.
>
> Shares of Bear Stearns (BSC) dropped as much as 14% in setting a 52-week low at $60.26 earlier in the session. They stood at $64.39 during afternoon trading, down about 8%.
>
> Liquidity is the ability to borrow new money or raise it some other way to meet upcoming obligations and spending requirements. It also refers to the ability of brokerage firms and other market players to quickly sell assets without those holdings losing value.
>
> The mortgage crisis has sparked a broader credit crunch in which hedge funds, brokerage firms and others are being forced to cut borrowing, also known as de-leveraging. That's triggering forced selling, which makes the situation even worse, limiting liquidity.
>
> Investment banks like Bear Stearns are at the center of this phenomenon.
>
> "The company's shares are down again today, this time because of concerns about liquidity [banks are insisting on higher-margin levels]," said Egan-Jones Ratings.
>
> "A core issue is whether Bear Stearns will be able raise capital and deal with the increased funding costs," the ratings agency, paid by investors rather than issuers, wrote in a Monday note to clients.
>
> A gauge of a company's borrowing costs can be gleaned from the market in credit-default swaps, or CDS. These derivatives pay out in the event of default, and so they appreciate in value when the perceived creditworthiness of a borrower declines.
>
> CDS on Bear Stearns traded at 610 basis points over Treasury on Monday. A basis point is one hundredth of a percentage point.

63.     On March 12, 2008, Bear Stearns' President Alan Schwartz reaffirmed Bear

Stearns' financial position and liquidity, stating that Bear Stearns has more than $17 billion in

excess cash on its balance sheet. He also affirmed Bear Stearns' book value of $80 per share and

further indicated that analysts' estimates of substantial profits for the most recently ended quarter

were accurate.

64.     On the same day, *Reuters* reported Defendant Schwartz's positive but false

statements, in relevant part, as follows:

> Bear Stearns Cos (BSC.N) Chief Executive Alan Schwartz on
> Wednesday dismissed recurring speculation that the investment
> bank faces a cash crunch, saying it has hefty cash reserves that
> have remained little changed this year.
>
> Schwartz, in a televised interview on CNBC, also said he is
> comfortable with the range of analysts' earnings estimates for the
> fiscal first quarter ended February 29. Results for the quarter are
> due next week.
>
> *"We don't see any pressure on our liquidity, let alone a liquidity
> crisis," he said.*
>
> *Bear finished fiscal 2007 with $17 billion of cash sitting at the
> parent company level as a "liquidity cushion," he said.*
>
> *"That cushion has been virtually unchanged. We have $17 billion
> or so excess cash on the balance sheet," he said.*
>
> Schwartz denied speculation that other brokers were turning down
> Bear's credit on trades for fear of counter-party risk.
>
> ...
>
> As one of the largest players in mortgage-backed bond markets,
> investors have assumed Bear's exposure would lead to crippling
> losses.
>
> *"None of that speculation is true,"* Schwartz said. When
> speculation starts in a market, one that has a lot of emotion in it
> and people concerned with volatility, "they will sell first and ask
> questions later," he said. "That creates its own momentum."

Schwartz said the first quarter was a "difficult" period, but he said he was comfortable with analysts' earnings estimates.

Wall Street forecasts range from 46 cents to $2.34 per share, according to Reuters Estimates. The average forecast is $1.07 a share, down 72 percent from a year earlier.

Bear shares were up $1.95 to $64.92 in morning trade on the New York Stock Exchange after rising as high as $67.82 earlier in the session.

(Emphasis added.)

65.    On March 13, 2008, however, after the market closed, news that Bear Stearns was forced to seek emergency financing from the Federal Reserve and J.P. Morgan Chase hit the market.

66.    On March 14, 2008, *MarketWatch* reported the following:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades.

Bear said the rescue consists of getting short-term financing from the Fed, through J.P. Morgan, after its liquidity "deteriorated significantly" during the past 24 hours.

...

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.

37

> "What is different this time is that the dominoes are falling in so
> many different sectors, markets, industries and countries – all at
> the same time and there is yet no end in sight," said Sherry Cooper,
> chief economist at BMO Capital Markets.

67.    On this news, Bear Stearns' Stock plummeted to a $30 per share close, giving the

Company a market value of more than $3.5 billion. Two days later, on Sunday, March 16, 2008,

J.P. Morgan Chase announced that it reached an agreement to purchase Bear Stearns for $2 per

share, or about $236 million.

68.    On March 17, 2008, the *Wall Street Journal* reported in an article titled "J.P.

Morgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis", the following:

> Pushed to the brink of collapse by the mortgage crisis, Bear
> Stearns Cos. agreed – after prodding by the federal government –
> to be sold to J.P. Morgan Chase & Co. for the fire-sale price of $2
> a share in stock, or about $236 million.
>
> Bear Stearns had a stock-market value of about $3.5 billion as of
> Friday – and was worth $20 billion in January 2007. But the crisis
> of confidence that swept the firm and fueled a customer exodus in
> recent days left Bear Stearns with a horrible choice: sell the firm –
> at any price – to a big bank willing to assume its trading
> obligations or file for bankruptcy.
>
> "At the end of the day, what Bear Stearns was looking at was
> either taking $2 a share or going bust," said one person involved in
> the negotiations. "Those were the only options."
>
> To help facilitate the deal, the Federal Reserve is taking the
> extraordinary step of providing as much as $30 billion in financing
> for Bear Stearns's less-liquid assets, such as mortgage securities
> that the firm has been unable to sell, in what is believed to be the
> largest Fed advance on record to a single company. Fed officials
> wouldn't describe the exact financing terms or assets involved.
> But if those assets decline in value, the Fed would bear any loss,
> not J.P. Morgan.
>
> ...
>
> The deal already is prompting howls of protest from Bear Stearns
> shareholders, since the New York company last week indicated
> that its book value was still close to its reported level of about $84

share at the end of the fiscal year. "Why is this better for
shareholders of Bear Stearns than a Chapter 11 filing?" one Bear
shareholder asked J.P. Morgan executives in a conference call last
night.

...

James Cayne, Bear Stearns's chairman, who had been participating
in a bridge tournament when the crisis unfolded, returned to New
York on Saturday and participated in the negotiations, said one
person familiar with the discussions.

...

The deal is expected to close by the end of June, an unusually
quick time frame. Federal regulators already have signed off on
the deal, which will require a vote of Bear Stearns shareholders.

Late yesterday, *some Bear Stearns employees and shareholders
were grumbling about the deal. ...*

"I've got to think we can get more in a liquidation, I'm not selling
my shares, *this price is dramatically less than the book value Alan
Schwartz told us the company is worth*," said a midlevel Bear
Stearns executive. ...

(Emphasis added.)

69.    On the same day, the *New York Times* reported in an article titled "JP Morgan

Pays $2 a Share for Bear Stearns", the dire terms of the deal and its consequences for the

Company's employees:

In a shocking deal reached on Sunday to save Bear Stearns,
JPMorgan Chase agreed to pay a mere $2 a share to buy all of Bear
– less than one-tenth the firm's market price on Friday.

As part of the watershed deal, JPMorgan and the Federal Reserve
will guarantee the huge trading obligations of the troubled firm,
which was driven to the brink of bankruptcy by what amounted to
a run on the bank.

Reflecting Bear's dire straits, JPMorgan agreed to pay only about
$270 million in stock for the firm, which had run up big losses on
investments linked to mortgages.

*JPMorgan is buying Bear, which has 14,000 employees, for a third the price at which the smaller firm went public in 1985.* Only a year ago, Bear's shares sold for $170. The sale price includes Bear Stearns's soaring Madison Avenue headquarters.

. . .

Wall Street was stunned by the news on Sunday night. "This is like waking up in summer with snow on the ground," said Ron Geffner, a partner Sadis & Goldberg and a former enforcement lawyer for the Securities and Exchange Commission. "The price is indicative that there were bigger problems at Bear than clients and the public realized."

. . .

*It is unclear how many of Bear Stearns's employees, who together own a third of the company, will remain after the combination.* People involved in the talks suggested that as much as a third of the staff could lose their jobs. The deal also raises the prospect that some employees at JPMorgan, which was already considering cutbacks, may face the prospect of additional layoffs as the two firms merge their operations.

. . .

Not all investors are expected to be pleased with the deal. A conference call with investors and analysts on Sunday night was broken up when a Bear Stearns shareholder sought an explanation of why he would be better off approving this transaction rather than seeing Bear Stearns file for a Chapter 11 bankruptcy.

The JPMorgan executives demurred, instead referring the investor to Bear Stearns executives for an explanation. The shareholder declared that he would vote against the deal.

(Emphasis added.)

70.    Defendants' Class Period statements were false and misleading because they:

(a)    Failed to disclose Bear Stearns true risk exposure in connection with the credit derivative portfolios managed by its hedge funds;

(b)    Failed to properly value and account for Company assets severely impaired by the credit crisis and meltdown in the residential mortgage sector;

40

(c)     Misrepresented the concomitant consequences that Bear Stearns' over-leveraged position with respect to the same posed to the Company's overall liquidity, business reputation and financial viability;

(d)     Misrepresented Bear Stearns' liquidity position and that the Company's assets were over-leveraged relative to the assets' value once they were marked to market;

(e)     Misrepresented that the Company employed effective models and stress tests designed to calculate the Company's liquidity position premised on various scenarios;

(f)     Misrepresented the actual value of the Company's assets pledged as collateral securing the Company's access to cash;

(g)     Falsely stated the Company was complying with all applicable laws and compliance requirements when, in fact, its hedge funds' managers were concealing the funds' true financial position;

(h)     Failed to disclose that Bear Stearns traders, including Mr. Greenberg, urged Messrs. Schwartz and Cayne to unload the Company's risky mortgage portfolio months before the Company was sold;

(i)     Failed to disclose that regulators demanded daily briefings concerning the Company's balance sheet;

(j)     Failed to disclose that the Company's debt portfolios were so risky and unbalanced that the Company's mortgage team initiated a hedging strategy called "the chaos trade" - a deeply pessimistic bet that a family of indexes comprised of securities backed by subprime mortgages would fail. Thus, defendants failed to disclose that while the Company held billions of dollars worth of mortgage backed securities on its balance sheet, management and

41

traders believe these securities were likely to collapse thereby justifying a huge bet against their viability;

      (k)     Failed to disclose that the Company was seeking strategic partners on an expedited basis to provide much needed capital and liquidity in order to satisfy ratings agencies and counterparties; and

      (l)     Falsely stated the Company had access to ample financial sources though defendants knew the assets pledged in support of the credit lines were either impaired or so illiquid that the creditors would demand ever increasing collateral.

71.    As a result of defendants' false statements, Bear Stearns' stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 80% from their Class Period high.

<b>LOSS CAUSATION/ECONOMIC LOSS</b>

72.    By misrepresenting Bear Stearns' business, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Bear Stearns' business was not as healthy as represented, Bear Stearns falsely concealed its liquidity crisis.

73.    These omissions caused and maintained the artificial inflation in Bear Stearns' stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

74.    Defendants' false and misleading statements had the intended effect and caused Bear Stearns stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $171.51 per share.

42

75.    On August 3, 2007, defendants were forced to publicly disclose the extent of problems with the hedge funds, causing its stock to drop to $108.55 per share. Later, as more information came out about Bear Stearns' derivative portfolio exposures and investigations of its credit investment hedge funds, the Company Stock declined to as low as $62.30 per share.

76.    After the market closed on March 13, 2008 and news of its deteriorating liquidity was revealed, the next day Bear Stearns Stock plunged 47%.

77.    On March 16, 2008, upon the announcement that J.P. Morgan would purchase Bear Stearns for $2 per share, the Company Stock dropped another 85%.

78.    As a direct result of defendants' admissions and the public revelations regarding the truth about Bear Stearns' derivative portfolio exposures, its profitability and its actual business prospects going forward, Bear Stearns' stock price plummeted 97%, falling from $171.51 per share in January 2007 to $4.81 per share in March 2008, a decline of $166.70 per share. This drop removed the inflation from Bear Stearns' stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

### COUNT I
#### For Violation of § 10(b) of the 1934 Act and Rule 10b-5
#### Against All Defendants

79.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

80.    During the Class Period, defendants disseminated or approved the false statements above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.    Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

43

      a.     Employed devices, schemes and artifices to defraud;

      b.     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Bear Stearns common stock during the Class Period.

82.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bear Stearns common stock. Plaintiff and the Class would not have purchased Bear Stearns common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

### COUNT II
### For Violation of § 20(a) of the 1934 Act
### Against All Defendants

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

84.     The Individual Defendants acted as controlling persons of Bear Stearns within the meaning of § 20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Bear Stearns stock, the Individual Defendants had the power and authority to cause Bear Stearns to engage in the wrongful conduct complained of herein. Bear Stearns controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to § 20(a) of the 1934 Act.

44

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action as a class action, pursuant to Rule 23 of the Federal
Rules of Civil Procedure, on behalf of all current and former employees of Bear Stearns whose
compensation from the Company was, in part, in the form of Restricted Stock Units or CAP
Units, and whose rights to either the Restricted Stock Units and/or CAP Units were vested, thus
providing them with a present entitlement to be paid or credited an equivalent number of shares
of Bear Stearns Stock upon settlement at the end of a deferral period (the "Class"). Excluded
from the Class are defendants.

86.     The members of the Class number in the hundreds, if not thousands, and are
located all over the world. Thus, joinder of all members is impracticable. The disposition of
their claims in a class action will provide substantial benefits to the parties and the Court.

87.     There is a well-defined community of interest in the questions of law and fact
involved in this case. Questions of law and fact common to the members of the Class which
predominate over questions which may affect individual Class members include whether:

       a.      The Exchange Act was violated by defendants;

       b.      Defendants omitted and/or misrepresented material facts;

       c.      Defendants' statements omitted material facts necessary to make the
statements made, in light of the circumstances under which they were made, not misleading;

       d.      Defendants knew or deliberately disregarded that their statements were
false and misleading;

       e.      The price of Bear Stearns' common stock was artificially inflated; and

       f.      The extent of damage sustained by members of the Class and the
appropriate measure of damages.

45

88.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

89.     Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

90.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff's reasonable costs and attorneys' fees; and

46

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
       May 28, 2008

                         WOLF HALDENSTEIN ADLER
                         FREEMAN & HERZ LLP

            By:    _____
                   Daniel W. Krasner (DK 6381)
                   Gregory M. Nespole (GN 6820)
                   Malcolm T. Brown (MB 3272)
                   270 Madison Avenue
                   New York, New York 10016
                   (212) 545-4600

                   *Attorneys for Plaintiffs*

/509980

47

## PLAINTIFF'S CERTIFICATION

Gilles Bransbourg ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of an action on his behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's compensation from The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), in part, was received in the form of restricted stock units ("Restricted Stock Units") and capital accumulation plan units ("CAP Units"), pursuant to the Company's Restricted Stock Unit Plan and Capital Accumulation Plan. During the Class Period, Plaintiff's rights to both Restricted Stock Units and/or CAP Units were vested, thus providing him a present entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common stock upon settlement at the end of a deferral period.

5.    Plaintiff held fully vested CAP Units and shares of Bear Stearns Stock which he received as a participant in the RSU Plan during the Class Period specified in the Complaint. Plaintiff's transactions in Bear Stearns securities during the Class Period are as follows:

| Date | # of Shares Received | # of Shares Sold | Price |
|------|----------------------|-------------------|-------|
| 11/01/07 | 2312 (vested CAP Plan Units) | | Units Not Settled |
| 12/27/07 | 2096 | | 89.4664 |
| 1/25/08 | | 500 | 91.15 |

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable

costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of May, 2008.

GILLES BRANSBOURG

EXHIBIT B

EX-99.G 10 exhibit99-g.htm RESTRICTED STOCK UNIT PLAN, AS AMENDED

## EXHIBIT G

### THE BEAR STEARNS COMPANIES INC.
### RESTRICTED STOCK UNIT PLAN, AS AMENDED
(Amended and Restated as of March 31, 2004)

1. **Purpose**. The purpose of The Bear Stearns Companies Inc. Restricted Stock Unit Plan (the "Plan") is to secure for The Bear Stearns Companies Inc. and its successors and assigns (the "Company") and its stockholders the benefits of the additional incentive inherent in the ownership of the Company's common stock, par value $1.00 per share (the "Common Stock"), by selected employees of the Company and its subsidiaries who are important to the success and growth of the business of the Company and its subsidiaries and to help the Company and its subsidiaries secure and retain the services of such persons. The Plan provides for discretionary grants of stock units ("Restricted Stock Units") to or for the benefit of participating employees of the Company and its subsidiaries, which grants shall be subject to the terms and conditions set forth in the Plan and in the agreement evidencing such Award. Such units can be granted by the Committee, as hereinafter defined, based upon both future and past services.

2. **Committee**.

2.1 *Administration*. The Plan shall be administered by the Compensation Committee (the "Committee") of the Board of Directors of the Company (the Board of Directors). Any vacancy on the Committee, whether due to action of the Board of Directors or due to any other cause, may be filled by resolution adopted by the Board of Directors. The full Board of Directors may perform any function of the Committee hereunder, in which case the term "Committee" shall refer to the Board. The express grant of any specific power to the Committee, and the taking of any action by the Committee, shall not be construed as limiting any power or authority of the Committee. The Committee may delegate to officers or managers of the Company or any subsidiary or affiliate, or committees thereof, authority, other than authority to make grants under the Plan, to perform such functions as the Committee may determine, including administrative functions, subject to such terms as the Committee shall determine.

2.2 *Interpretation*. The Committee shall have full power and authority to interpret the provisions of the Plan and any agreement evidencing or relating to an award of Restricted Stock Units ("Award") under the Plan, and to determine any and all questions arising under the Plan, and its decisions shall be final and binding on all participants in the Plan.

3. **Shares Subject to Grants**.

3.1 *Number of Shares*. Subject to the adjustment of provisions of Section 3.3, the number of shares of Common Stock that may be issued or delivered in connection with awards of Restricted Stock Units under the Plan shall not exceed 15,000,000 shares. The Committee may adopt reasonable counting procedures to ensure appropriate counting, avoid double counting and make adjustments if the number of shares actually delivered differs from the number of shares previously counted in connection with an Award. Shares subject to an Award that is canceled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant will again be available for Awards, and shares withheld or surrendered in payment of the taxes relating to an award shall be deemed to constitute shares not delivered to the participant and shall be deemed again to be available for Awards under the Plan.

3.2 *Character of Shares; Reservation of Shares*. Shares of Common Stock delivered under the Plan shall be issued Common Stock held in the Company's treasury. At all times, there shall be reserved for award under the Plan a number of shares of Common Stock equal to the maximum number of shares set forth in Section 3.1, reduced by such number of shares that have been previously issued or delivered as a result of this Plan.

3.3 *Adjustments*. In the event that any large, special and non-recurring dividend or other distribution (whether in the form of cash or property other than Common Stock), recapitalization, forward or reverse split, stock dividend, reorganization, merger, consolidation, spin-off, combination, repurchase, share exchange, liquidation, dissolution or other similar corporate transaction or event affects the Common Stock such that an adjustment is determined by the Committee to be appropriate under the Plan, then the Committee shall, in such manner as it may deem equitable, adjust any or all of the number and kind of shares reserved and available for Awards under the Plan and the number and kind of shares subject to outstanding

Restricted Stock Units.

G-1

---

4. **Employees Eligible**. Awards may be granted to or for the benefit of any employee who holds the position of a managing director or below, whom the Committee selects for participation for a given performance year. Employees who hold the position of senior managing director or above shall not be eligible to be granted Awards under the Plan. An individual receiving any Award under the Plan is referred to herein as a "participant". Any reference herein to the employment of a participant by the Company shall include his or her employment by the Company or any of its subsidiaries.

5. **Restricted Stock Units**.

5.1 *In General*. For the fiscal 2000 performance year and each performance year thereafter during which the Plan remains in effect (each, a "Performance Year"), each eligible employee selected to participate shall be granted an award of Restricted Stock Units. Each Award shall be evidenced by an agreement which shall set forth the terms and conditions of such Award, including without limitation, the date or dates upon which such Award shall vest and the circumstances (including, without limitation, Termination of Employment, as defined in Section 6.2, or failure to satisfy one or more restrictive covenants or other ongoing obligations) under which such Award shall not vest. The Award shall also be subject to such other terms and conditions not inconsistent herewith as the Committee shall determine.

5.2 *Nature of Restricted Stock Units; Accounts*. Each Restricted Stock Unit represents a right for one share of Common Stock to be delivered upon settlement at the end of the Deferral Period (as defined below), subject to a risk of cancellation and to the other terms and conditions set forth in the Plan, the agreement evidencing the Award and any additional terms and conditions set by the Committee. The Company shall establish and maintain an account for the participant to record Restricted Stock Units and transactions and events affecting such units. Restricted Stock Units and other items reflected in the account will represent only bookkeeping entries by the Company to evidence unfunded obligations of the Company.

5.3 *Deferral Period and Settlement Date*. Except as otherwise provided in this Section 5.3, Section 6 or Section 7, Restricted Stock Units (if not previously cancelled) will be automatically settled on or about the date or dates set forth in the agreement evidencing the Awards. The period from the date of the Award through the date of settlement is referred to as the "Deferral Period". The Committee may permit the participant to elect to further defer settlement (thereby extending the Deferral Period), subject to such terms and conditions as the Committee may specify. In addition, unless otherwise determined by the Committee, if the Committee reasonably determines that any settlement of Restricted Stock Units would result in payment of compensation to a participant which is not deductible by the Company under Code Section 162(m), such settlement shall be automatically deferred to the extent necessary to avoid payment of such non-deductible compensation, with this automatic deferral of each Restricted Stock Unit continuing only until such date as settlement can be effected without loss of deductibility by the Company under Section 162(m).

5.4 *Vesting of Restricted Stock Units*. Unless otherwise determined by the Committee or unless otherwise provided in the agreement evidencing the Award, in the event of the participant's Termination of Employment (as defined in Section 6.2), the participant's Restricted Stock Units which are not vested as of the date of such Termination of Employment, shall not vest and shall be immediately cancelled for no value.

5.5 *Dividend Equivalents*. Restricted Stock Units granted to a participant shall be credited with dividend equivalent as provided in this Section 5.5. Dividend equivalents shall be subject to the terms and conditions set forth in the agreement evidencing the Award.

(i) *Cash Dividends*. If the Company declares and pays a cash dividend on Common Stock, then a number of additional Restricted Stock Units shall be credited to the participant as of the payment date for such dividend equal to (A) the number of Restricted Stock Units credited to the participant as of the record date for such dividend, multiplied by (B) the amount of cash actually paid as a dividend on each share at such payment date, divided by (C) the Fair Market Value of a share of Common Stock at the ex-dividend date.

(ii) *Non-Stock Dividends*. If the Company declares and pays a dividend on Common Stock in the form of property other than shares of Common Stock, then a number of additional Restricted Stock Units shall be credited to the participant as of the payment date for such dividend equal to (A) the number of

G-2

Restricted Stock Units credited to the participant as of the record date for such dividend, multiplied by (B) the fair market value of any property other than shares actually paid as a dividend on each share at such payment date, divided by (C) the Fair Market Value of a share of Common Stock at the ex-dividend date.

(iii) *Modifications to Dividend Equivalents Policy*. Other provisions of this Section 5.5 notwithstanding, the Committee may modify the manner of payment or crediting of dividend equivalents hereunder, in order to coordinate the value of a participant's accounts with any trust holding shares established under Section 5.10, for administrative convenience, or for any other reason.

5.6 *Vesting, Settlement and Other Terms Applicable to Restricted Stock Units Resulting from Dividends*. Additional Restricted Stock Units credited under Section 5.5 will be subject to the same terms, including terms governing vesting, cancellation and Deferral Periods, as the underlying Restricted Stock Units.

5.7 *Restriction on Transferability During Deferral Period*. During the Deferral Period, the participant shall not be permitted to sell, transfer, pledge, or otherwise encumber the Restricted Stock Units or the shares issuable in settlement thereof, except to the extent specifically approved by the Committee or as provided in the agreement evidencing the Award.

5.8 *Delivery of Shares in Settlement of Restricted Stock Units; Fractional Shares*. The Company may make delivery of shares hereunder in settlement of Restricted Stock Units by either delivering one or more certificates representing such shares to the participant, registered in the name of the participant (and any joint name, if so directed by the participant), by depositing such shares into an account maintained for the participant (or of which the participant is a joint owner, with the consent of the participant) by a broker-dealer affiliated with the Company or any such account established in connection with any Company plan or arrangement providing for investment in Common Stock and under which the participant's rights are similar in nature to those under a stock brokerage account or by delivering such shares to the Trustee ("Trustee") of a pension plan of which the participant is a member. If the Committee determines to settle Restricted Stock Units by making a deposit of shares into such an account, the Company may settle any fractional Restricted Stock Unit by means of such deposit. In other circumstances or if so determined by the Committee, the Company shall instead pay cash in lieu of fractional shares, on such basis as the Committee may determine. In no event will the Company in fact issue fractional shares. The Committee may determine whether, prior to settlement, Restricted Stock Units will be reflected as whole units only or include fractional units, and related terms.

5.9 *Definition of "Fair Market Value"*. Unless otherwise determined by the Committee, "Fair Market Value" of a share of Common Stock on any date means (i) if the Common Stock is listed on a national securities exchange or quotation system reporting last-sale information, the closing sales price on such exchange or quotation system on such date or, in the absence of reported sales on such date, the closing sales price on the immediately preceding date on which sales were reported; or (ii) if the Common Stock is not listed on a national securities exchange or quotation system providing last-sale information, the fair value as determined by such other method as the Committee determines in good faith to be reasonable.

5.10 *Trusts*. The Committee may, in its discretion, establish one or more trusts and deposit therein amounts of cash, Common Stock, or other property not exceeding the amount of the Company's anticipated obligations with respect to a participant's account established under this Section 5. In such case, the amounts of hypothetical income and appreciation and depreciation in value of such account shall be equal to the actual income on, and appreciation and depreciation of, the assets in such trust(s). Other provisions of the Plan notwithstanding, the timing of allocations and other events relating to assets in such account may be varied to reflect the timing of allocations and events relating to actual investments of the assets of such trust(s).

6. **Certain Termination Provisions**. In the event of a participant's Termination of Employment by reason of death, the following provisions shall apply. The consequences of a participant's Termination of Employment for any other reason shall be as set forth in the agreement evidencing the Award.

6.1 *Death.* In the event of a participant's Termination of Employment due to death Restricted Stock Units shall become fully vested at the date of such Termination of Employment, and the Deferral Period applicable to such Restricted Stock Units shall end and such units shall be settled in full by delivery of shares as promptly as practicable following such Termination of Employment.

G-3

6.2 For purposes of this Plan: "Termination of Employment" means the event by which participant ceases to be employed by the Company or any subsidiary of the Company and, immediately thereafter, is not employed by or providing substantial services to any of the Company or a subsidiary of the Company. Neither (i) a transfer of an employee from the Company to a subsidiary or other affiliate of the Company to another, nor (ii) a duly authorized leave of absence, shall be deemed a Termination of Employment.

7. **Change in Control.**

7.1 *Effect of a Change in Control.* In the event of a Change in Control of the Company, as defined below, the Committee may, in its sole discretion, provide that any of the following actions shall be taken as a result, or in anticipation, of any such event to assure fair and equitable treatment of participants:

(i) acceleration of vesting of the Restricted Stock Units and/or acceleration of the termination of the Deferral Period and settlement of Restricted Stock Units under the Plan;

(ii) offer to purchase any outstanding Restricted Stock Units under the Plan from the participant or the Trustee for the award's equivalent cash value, as determined by the Committee, as of the date of the Change in Control or another specified date; or

(iii) make adjustments or modifications, such as providing for the assumption of the Restricted Stock Units by an acquirer and conversion of the underlying Common Stock to securities of the acquirer, as the Committee deems appropriate to maintain and protect the rights and interests of the participants following such Change in Control.

Any such action approved by the Committee shall be conclusive and binding on the Company, its subsidiaries and all participants.

7.2 *Definitions Relating to Change in Control.* To the extent not otherwise defined in this Plan, the following terms used in this Section 7 shall have the following meanings:

"Affiliate" of a Person means any other person or entity which controls, is controlled by, or under common control with, the Person.

"Associate" of a Person means (a) any corporation or organization of which such Person is an officer or partner or is, directly or indirectly, the Beneficial Owner of 10% or more of any class of equity securities, (b) any trust or other estate in which such Person has a substantial beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity and (c) any relative or spouse of such Person, or any relative of such spouse, who has the same home as such Person or who is a director or officer of such Person or any of its parents or subsidiaries.

"Beneficial Owner" has the meaning ascribed thereto in Rule 13d-3 under the Exchange Act, except that, in any case, a Person shall be deemed the Beneficial Owner of any securities owned, directly or indirectly, by the Affiliates and Associates of such Person.

"Change in Control" means (a) a majority of the Board of Directors ceases to consist of Continuing Directors; (b) any Person is or becomes the Beneficial Owner of 50% or more of the outstanding voting power of the Company unless such acquisition is approved by a majority of the Continuing Directors; (c) there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or

consolidation with respect to which requirements of clauses (A) and (B) below are satisfied: (A) the voting securities of the Company outstanding immediately prior to such merger or consolidation continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof (as the case may be) outstanding immediately after such merger or consolidation and (B) individuals who constitute the Board of Directors immediately prior to the execution of the definitive agreement pertaining to such merger or consolidation continue immediately following such merger or consolidation to represent at least a majority of the membership of the Board of Directors of the Company or such surviving entity or any parent thereof (as the case may be); (d) the stockholders of the Company approve an agreement to dispose of all or substantially all of the assets of the Company, unless such disposition is approved by a majority of the Continuing Directors.

G-4

"Continuing Director" means any member of the Board of Directors who is a member on the effective date of the Plan or who is elected to the Board of Directors after such date upon the recommendation or with the approval of a majority of the Continuing Directors at the time of such recommendation or approval.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Person" means an individual, a corporation, a partnership, an association, a joint stock company, a trust, any unincorporated organization or a government or a political subdivision thereof.

8. **General Provisions**.

8.1 *Limitation on Rights Conferred Under Plan*. Neither the Plan nor any action taken hereunder shall be construed as (i) giving any eligible employee or participant the right to continue in the employ or service of the Company or a subsidiary or affiliate, (ii) interfering in any way with the right of the Company or a subsidiary or affiliate to terminate such eligible employee's or participant's employment or service at any time, (iii) giving an eligible employee or participant any claim to be granted any award under the Plan or to be treated uniformly with other participants and employees, or (iv) conferring on a participant any of the rights of a stockholder of the Company unless and until the participant is duly issued or transferred shares of Common Stock in accordance with the terms of an award. Except as expressly provided in the Plan and an Award agreement, neither the Plan nor any Award agreement shall confer on any person other than the Company and the participant any rights or remedies thereunder.

8.2 *Committee May impose Conditions; Right of Setoff*. The Company or any subsidiary may, to the extent permitted by applicable law, deduct from and set off against any amounts the Company or a subsidiary or affiliate may owe to a participant from time to time pursuant to any Award under the Plan, any amounts owed by the participant to the Company or any subsidiary or affiliate, although participant shall remain liable for any part of participant's payment obligation not satisfied through such deduction and setoff.

8.3 *Tax Withholding Obligation*. Whenever under the Plan a participant or a Trustee incurs federal income tax liability, obligations with respect to Social Security and Medicare taxes, or other tax obligations in connection with an Award, whether at the time of grant, vesting or settlement of Restricted Stock Units, the Company shall be entitled to require, as a condition of grant, vesting, or settlement of the award, that the participant remit or, in appropriate cases, agree to remit when due an amount sufficient to satisfy all federal, state and local withholding tax requirements relating thereto. At the election of the Company, such mandatory withholding amounts may be remitted by check payable to the Company, in shares of Common Stock, by the Company's withholding of shares of Common Stock issuable or deliverable hereunder, or any combination thereof; provided, however, that in no event may shares be withheld to satisfy a tax obligation of participant in excess of the mandatory tax withholding obligations arising in connection with the participant's award. If so determined by the Committee, a participant may be permitted to elect from among alternative methods of satisfying withholding obligations.

8.4 *Governing Law*. The validity, construction, and effect of the Plan, any rules and regulations relating to the Plan and any award agreement shall be determined in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws, and applicable provisions of federal law.

8.5 *Nonexclusivity of the Plan.* The adoption of the Plan by the Board of Directors shall not be construed as creating any limitations on the power of the Board of Directors or a committee thereof to adopt such other incentive arrangements, apart from the Plan, as it may deem desirable, and such other arrangements may be either applicable generally or only in specific cases.

8.6 *Changes to the Plan and Awards.* The Board of Directors may amend, suspend or terminate the Plan or the Committee's authority to grant Awards under the Plan without the consent of participants; provided, however, that, without the consent of an affected participant, no such Board action may materially and adversely affect the rights of such participant under any outstanding Award. The Committee may amend any outstanding Award without the consent of the affected participant; provided, however, that, without such consent, no such action may materially and adversely affect the rights of such participant under any outstanding Award. For purposes of this Section 8.6, accelerated settlement of an Award shall not be considered a materially adverse affect on the rights of a participant, regardless of the tax consequences to such participant.

G-5

8.7 *Compliance with Legal and Other Requirements.* The Company may, to the extent deemed necessary or advisable by the Committee, postpone the issuance or delivery of shares or payment of other benefits under any Award until completion of registration or qualification of the Common Stock or other required action under any federal or state law, rule or regulation, listing or other required action with respect to any stock exchange or automated quotation system upon which the Common Stock or other securities of the Company are listed or quoted, or compliance with any other obligation of the Company, as the Committee may consider appropriate, and may require any participant to make such representations, furnish such information and comply with or be subject to such other conditions as it may consider appropriate in connection with the issuance or delivery of shares or payment of other benefits in compliance with applicable laws, rules, and regulations, listing requirements, or other obligations.

9. **Plan Effective Date and Termination**. The Plan became effective on November 29, 2000. Unless earlier terminated by action of the Board of Directors, the Plan will remain in effect until such time as no shares of Common Stock remain available for delivery under the Plan and the Company has no further rights or obligations with respect to outstanding Awards under the Plan.

G-6

EXHIBIT C

EX-99.H 11 exhibit99-h.htm CAPITAL ACCUMULATION PLAN FOR SENIOR MANAGING

**EXHIBIT H**

**THE BEAR STEARNS COMPANIES INC.**
**CAPITAL ACCUMULATION PLAN FOR**
**SENIOR MANAGING DIRECTORS**
*(Amended and Restated November 29, 2000*
*for Plan Years beginning on or after July 1,1999,*
*and Further Amended as of March 31, 2004 February 8, 2006 and February 28, 2006)*

SECTION 1

Purpose and Restatement Date

The purpose of the Plan is to promote the interests of the Company and its stockholders by providing long-term incentives for the benefit of certain key executives of the Company, Bear Stearns and any of the Company's subsidiaries who contribute significantly to the long-term performance and growth of the Company. This restatement of the Plan is adopted November 29, 2000, and provides for two versions of the Plan. This version of the Plan applies with respect to Plan Years (as defined below) beginning on or after July 1, 1999; deferrals made with respect to Plan Years beginning prior to that date remain subject to the terms of the Plan as in effect on June 30, 1999. This version of the Plan for Plan Years beginning on or after July 1, 1999 and the version of the Plan for Plan Years beginning prior to that date shall constitute a single Plan. All deferrals made with respect to Plan Years beginning on or after July 1, 1999 are cancelled by action of the Board Committee as hereinafter defined in adopting this version of the Plan, and the terms of the Plan, as set forth in this restatement and as may subsequently be amended from time to time, shall apply with respect to such Plan Year.

SECTION 2

Definitions

2.1    *Terms Defined.* When used herein, the following terms shall have the following meanings:

"*Account*" means a Capital Accumulation Account, as the context may require.

"*Adjusted Earnings Per Share*" means, for any Fiscal Year, (a) the Company's consolidated net income or loss for such Fiscal Year, less the amount of the Preferred Stock Dividend Requirement for such Fiscal Year, plus the product of (a) the Earnings Adjustment multiplied by (b) the Average Cost Per Share for such Fiscal Year by the fraction which is 1 minus the Marginal Tax Rate, divided by (b) the sum of (i) the number of shares of Common Stock outstanding during such Fiscal Year, computed on a weighted average basis based on the number of days outstanding during such Fiscal Year, (ii) the aggregate number of CAP Units credited to the Accounts of all Participants computed on a weighted average basis based on the number of days outstanding during such Fiscal Year but not including in such computation the day that CAP Units are credited, increased or decreased pursuant to Section 5.1 or 5.2 of the Plan, and (iii) the aggregate number of Restricted Stock Units included in the Company's calculation of Earnings Per Share as reported in the Annual Report.

"*Adjusted Preferred Stock Dividend Requirement*" means, for any Fiscal Year, the quotient obtained by dividing (i) the aggregate amount of all dividends actually declared by the Company on, or, if no such dividends are actually declared, required to be declared by the Company in accordance with the terms of, any Preferred Stock, in such Fiscal Year, by (ii) the fraction which is one minus the Marginal Tax Rate for such Fiscal Year.

"*Affiliate*" means (a) Bear Stearns, (b) any other subsidiary of the Company and (c) any other corporation or other entity which is controlled, directly or indirectly, by, or under common control with, the Company and which the Board Committee designates as an "Affiliate" for purposes of the Plan.

H-1

"*Aggregate Imputed Cost*" means, with respect to any Fiscal Year, the sum of (a) the aggregate of the Cost of Carry for such Fiscal Year for all Participants in the Plan plus (b) the Capital Reduction Charge for such Fiscal Year plus (c) the product of (i) the sum of the Earnings Adjustments for such Fiscal Year for all Participants in the Plan multiplied by (ii) the Average Cost Per Share for such Fiscal Year, <u>minus</u> (d) the Dividend Savings for such Fiscal Year.

"*Appropriate Committee*" means the Management and Compensation Committee or, in the case of Participants who are Reporting Persons, the Board Committee.

"*Associate*" of a Person means (a) any corporation or organization of which such Person is an officer or partner or is, directly or indirectly, the Beneficial Owner of 10% or more of any class of equity securities, (b) any trust or other estate in which such Person has a substantial beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity and (c) any relative or spouse of such Person, or any relative of such spouse, who has the same home as such Person or who is a director or officer of such Person or any of its parents or subsidiaries.

"*Available Shares*" means, with respect to any Fiscal Year or portion thereof, the sum of (a) the number of shares of Common Stock purchased by the Company in the open market or in private transactions or otherwise during such period that have not been previously allocated under the Plan and designated by the Board Committee at the time of purchase as having been purchased for issuance under the Plan with respect to the Fiscal Year or portion thereof specified by the Board Committee and (b) shares of Common Stock purchased prior to such Fiscal Year that were designated as Available Shares but were not allocated under the Plan which the Company makes available to the Plan subsequent to the period in which such shares were purchased and the Board Committee thereafter designates as Available Shares for issuance under the Plan with respect to the Fiscal Year or portion thereof specified by the Board Committee.

"*Average Cost Per Share*" means, with respect to any period, the weighted average of the sum of (a) the average price paid (including commissions) by the Company in respect of Available Shares purchased by the Company during such Fiscal Year and (b) in respect of Available Shares purchased by the Company prior to such Fiscal Year that the Company makes available to the Plan and that are accepted by the Board Committee, the Fair Market Value as of the last trading day of such period.

"*Average Federal Funds Rate*" means, with respect to any Fiscal Year, the percentage (expressed as a decimal fraction) obtained by taking the sum of the Federal Funds Rates for each day during the Fiscal Year and dividing such amount by the number of days in such Fiscal Year.

"*Award*" shall mean an award of CAP Units granted by the Board Committee, in its sole discretion.

"*Bear Stearns*" means Bear, Stearns & Co. Inc., a Delaware corporation, and its successors and assigns.

"*Beneficial Owner*" has the meaning ascribed thereto in Rule 13d-3 under the Exchange Act, except that, in any case, a Person shall be deemed the Beneficial Owner of any securities owned, directly or indirectly, by the Affiliates and Associates of such Person.

"*Beneficiary*" of a Participant means the beneficiary or beneficiaries designated by such Participant in accordance with Section 10 to receive the amount, if any, payable hereunder upon the death of such Participant.

"*Board Committee*" means the Compensation Committee of the Board of Directors or another committee of the Board of Directors designated by the Board of Directors to perform the functions of the Board Committee hereunder. To the extent required by Rule 16b-3, the Board Committee shall be composed solely of directors who are not Participants in the Plan and are in other respects "Non-Employee Directors" within the meaning of Rule 16b-3.

"*Board of Directors*" means the Board of Directors of the Company.

"*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or permitted by law to be closed.

"*CAP Units*" mean the units, each such unit corresponding to one share of Common Stock, credited to a Participant's Capital Accumulation Account pursuant to Section 5. All calculations and determinations of the number of CAP Units hereunder shall be made in whole and fractional units, with such fractional units rounded to the nearest one-thousandth of a unit.

"*Capital Accumulation Account*" has the meaning assigned to such term in Section 5.1.

"*Capital Reduction Charge*" means the product of (a) the sum of (i) the amount determined by multiplying the Aggregate Imputed Cost for the Fiscal Year preceding the year for which the determination is being made by the fraction which is one minus the Marginal Tax Rate for such preceding Fiscal Year (the "Tax-Effected Aggregate Imputed Cost" for such Fiscal Year), plus (ii) the aggregate Tax-Effected Aggregate Imputed Cost of the Plan for all preceding Fiscal Years, other than the Fiscal Year immediately preceding the year for which the determination is being made, plus (iii) the sum of the respective amounts obtained by multiplying the Capital Reduction Charge for each preceding Fiscal Year by the fraction which is one minus the Marginal Tax Rate for the corresponding Fiscal Year, less (iv) the aggregate amount of all cash dividends that would have been paid by the Company on the aggregate number of shares of Common Stock purchased by the Company for purposes of the Plan and taken into account pursuant to Section 5.1 or 5.2 prior to the end of the Fiscal Year preceding the year for which the determination is being made, measured from the date the corresponding CAP Units were first credited to such Accounts, if all such shares had remained outstanding and (b) the Average Federal Funds Rate for such Fiscal Year.

"*Change in Control*" means (a) a majority of the Board of Directors ceases to consist of Continuing Directors; (b) any Person becomes the Beneficial Owner of 50% or more of the outstanding voting power of the Company unless such acquisition is approved by a majority of the Continuing Directors; (c) there is consummated a merger or consolidation of the Company or any direct or indirect subsidiary of the Company with any other corporation, other than a merger or consolidation with respect to which the requirements of clauses (i) and (ii) below are satisfied: (i) the voting securities of the Company outstanding immediately prior to such merger or consolidation continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) more than 50% of the combined voting power of the securities of the Company or such surviving entity or any parent thereof (as the case may be) outstanding immediately after such merger or consolidation; and (ii) individuals who constitute the Board of Directors immediately prior to the execution of the definitive agreement pertaining to such merger or consolidation continue immediately following such merger or consolidation to represent at least a majority of the membership of the board of directors of the Company or such surviving entity or any parent thereof as the case may be; or (d) the stockholders of the Company approve an agreement to dispose of all or substantially all of the assets of the Company, unless such disposition is approved by a majority of the Continuing Directors.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute or statutes.

"*Committee*" means each of the Board Committee and the Management and Compensation Committee.

"*Common Stock*" means the common stock, par value $1.00 per share, of the Company.

"*Company*" means The Bear Stearns Companies Inc., a Delaware corporation, and its successors and assigns.

"*Consolidated Common Stockholders' Equity*" means, as of any date of determination, the consolidated stockholders' equity of the Company and its subsidiaries applicable to Common Stock.

"*Continuing Director*" means any member of the Board of Directors who is a member on the Effective Date or who is elected to the Board of Directors after the Effective Date upon the recommendation or with the approval of a majority of the Continuing Directors at the time of such recommendation or approval.

"*Cost of Carry*" means, with respect to a Participant, the sum of (a) the amount obtained by multiplying the Deferred Tax Benefit for each Plan Year by the Average Federal Funds Rate in the Fiscal Year for which the determination is being made, and (b) the amounts obtained by compounding the amounts so obtained for each preceding Fiscal Year for which a Cost of Carry was calculated less the tax benefits associated with the amounts so determined, calculated on the basis of the Marginal Tax Rate in each such Fiscal Year, on an annual basis, at the Average Federal Funds Rate in effect during each succeeding Fiscal Year; and, with respect to the Plan as a whole, means the aggregate Cost of Carry of all Participants in any Fiscal Year.

"*Deferral Period*" means the period of five Fiscal Years commencing on the first day of the Fiscal Year following the Plan Year for which an Award was granted or such greater or lesser number of whole Fiscal Years as the Appropriate Committee may approve pursuant to Section 4.2.

"*Deferral Year*" means any Fiscal Year during a Deferral Period.

"*Deferred Tax Benefit*" means, for each Plan Year, with respect to a Participant, the sum of (a) the amounts obtained by multiplying the value of such Participant's Award as of the end of the Plan Year for which such Award was granted for such Plan Year by the Marginal Tax Rate for such Plan Year and (b) the respective amounts obtained by multiplying the dollar amount of all Earnings Adjustments made with respect to the sub account of such Participant's Capital Accumulation Account corresponding to such Plan Year by the respective Marginal Tax Rates for each Deferral Year for which such adjustments are made. The Deferred Tax Benefit shall be computed and recorded separately for each Plan Year.

"*Disability*" means the complete and permanent inability of an individual to perform his duties due to his physical or mental incapacity, all as determined by the Appropriate Committee upon the basis of such evidence, including independent medical reports and data, as the Appropriate Committee deems necessary or appropriate.

"*Dividend Savings*" means the amount obtained by first (i) multiplying the sum of (A) all CAP Units credited to the Capital Accumulation Accounts of all Participants pursuant to Section 5.1 in respect of all preceding Fiscal Years of the Plan and all CAP Units credited to such Accounts pursuant to Section 5.2 in respect of Earnings Adjustments, if any, for such Fiscal Years by (B) the weighted average per share amount of all cash dividends paid by the Company on its Common Stock in the Fiscal Year for which the determination is being made (such weighted average amount to be determined by multiplying the amount of each such dividend by the number of days in the Fiscal Year on and after the date on which such dividend is paid, adding all the amounts so obtained and dividing the total by the number of days in such Fiscal Year), (ii) calculating the amount of cash dividends that would have been paid by the Company in all preceding Fiscal Years on the aggregate number of shares of Common Stock purchased by the Company and taken into account for purposes of this Plan pursuant to Section 5.1 or 5.2, measured from the date on which the corresponding CAP Units were credited to Participants' Accounts, if all such shares had remained outstanding and (iii) multiplying the respective Dividend Savings determined as provided herein for each preceding Fiscal Year by the fraction which is one minus the Marginal Tax Rate for the corresponding preceding Fiscal Year;

"Dividends Per Share" means the annual dividend rate as determined by the Board of Directors.

"*Earnings Adjustment*" has the meaning assigned to such term in Section 5.2.

"*Effective Date*" of this Amended and Restated Plan means July 1, 1999.

"*Eligible Employee*" means any individual who is employed by the Company or any of its subsidiaries and affiliates as a Senior Managing Director or its equivalent title as determined by the Appropriate Committee.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended from time to time, or any successor statute or statutes.

"*Executive Committee*" means the Executive Committee of the Board of Directors.

"*Fair Market Value*" of a share of Common Stock as of any date means the closing sales price of a share of Common Stock on the composite tape for New York Stock Exchange listed securities on such date or, if the Common Stock is not quoted on the composite tape or is not listed on the New York Stock Exchange, on the principal United States securities exchange registered under the Exchange Act on which the Common Stock is listed or, if the Common Stock is not listed on

any such exchange, on the National Association of Securities Dealers, Inc. Automated Quotation National Market System ("NASDAQ-NMS") or, if the Common Stock is not quoted on NASDAQ-NMS,

H-4

the average closing bid quotation of a share on the National Association of Securities Dealers, Inc. Automated Quotation System or any similar system then in use or, if the Common Stock is not listed or quoted, the fair value thereof as of such date as determined by the Appropriate Committee.

"*Federal Funds Rate*" means, for any day which is a Business Day, the rate for U.S. dollar funds settled through the Federal Reserve System or other immediately available U.S. dollar funds, as quoted by an independent broker of such funds selected by the Company, for the last transaction completed prior to 9:30 A.M. (Eastern time) on the Business Day on which such rate is determined, rounded up or down on a daily alternating basis to the nearest whole multiple of one-eighth of one percent, and for any day which is not a Business Day means such rate as determined for the next preceding day which was a Business Day.

"*Fiscal Year*" means the fiscal year of the Company beginning December 1 and ending on the succeeding November 30 (or, as the context, requires, any Fiscal Year of the Company commencing prior to July 1, 1999). If the Company shall change its Fiscal Year so as to end on a date other than November 30 ("Year End Date") then, if such new Year End Date falls after November 30 and on or prior to April 30, the Fiscal Year in which such change occurs shall be deemed to consist, for purposes of this Plan, of the period of not more than 18 months beginning on the December 1 following the last Fiscal Year preceding such change and ending such new Year End Date or, if such new Year End Date falls on or after May 1 and prior to November 30, the Fiscal Year in which such change occurs shall be deemed to consist, for purposes of this Plan, of the period of less than 12 months beginning on the first day of the Fiscal Year in which such change occurs and ending on such new Year End Date.

"*Full Year Units*" has the meaning assigned to such term in Section 5.2.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time.

"*Income Per Share*" for any Fiscal Year means the remainder of (a) consolidated income or loss before income taxes of the Company and its subsidiaries, and less (b) the annual net income amount as reported in the Company's Annual Report as adjusted for the effect of any charge or credit to income by reason of the Earnings Adjustment pursuant to Section 5.2 divided by the sum of (c) the number of shares of Common Stock outstanding during such Fiscal Year, computed on a weighted average basis based on the number of days outstanding during such Fiscal Year, (d) the number of CAP Units credited to the Capital Accumulation Accounts of all Participants computed on a weighted average basis based on the number of days outstanding during such Fiscal Year but not including in such computation the day that CAP Units are credited, increased or decreased pursuant to Section 5.1 or 5.2 of the Plan, and (e) the aggregate number of Restricted Stock Units included in the computation of Earnings Per Share as reported by the Company in its Annual Report. For purposes of this Plan, consolidated income or loss before income taxes of the Company and its subsidiaries (i) shall be determined prior to any charge or credit to income required in such Fiscal Year by reason of Earnings Adjustments pursuant to Section 5.2, (ii) shall include the amounts of any pre-tax earnings or loss attributable to discontinued operations or extraordinary items and (iii) shall be reduced by the Adjusted Preferred Stock Dividend Requirement during such Fiscal Year, and may be decreased, but not increased, by such amount determined by the Board Committee in its sole discretion as appropriate to carry out the purposes of the Plan.

"*Management and Compensation Committee*" means the Management and Compensation Committee of the Company or another committee of the Company or the Board of Directors designated by the Board of Directors to perform the functions of the Management and Compensation Committee hereunder.

"*Marginal Tax Rate*" means the maximum combined marginal rate of tax expressed as a fraction to which the Company is subject for the applicable Fiscal Year, including Federal, New York State and New York City income taxes (including any minimum or alternative tax), net of any tax benefit resulting from the deductibility of state and local taxes for federal income tax purposes.

"*Participant*" means any Eligible Employee (including a Performance Plan Participant) on whose behalf an Award is made hereunder for a Plan Year.

"*Person*" means an individual, a corporation, a partnership, an association, a joint stock company, a trust, any unincorporated organization or a government or a political subdivision thereof.

H-5

---

"*Personal Leave of Absence*" means the absence from the Company by a Participant, with the consent of the Company, for an extended period of time without salary under circumstances in which a return to full-time employment by the Participant is contemplated.

"*Plan*" means The Bear Stearns Companies Inc. Capital Accumulation Plan for Senior Managing Directors as set forth herein (including the version applicable to Plan Years commencing prior to July 1, 1999) and as amended and restated from time to time.

"*Plan Year*" means the period beginning July 1, 1999 and ending November 30, 2000, and each Fiscal Year thereafter.

"*Preferred Stock*" means any capital stock of the Company that has a right to dividends or distributions in liquidation (or both) prior to the holders of the Common Stock.

"*Preferred Stock Dividend Requirement*" means, for any Fiscal Year, the amount of all dividends actually declared by the Company on, or required to be declared by the Company in accordance with the terms of, any Preferred Stock, in such Fiscal Year.

"*Pre-Plan Earnings Per Share*" means, for any Fiscal Year, (a) the sum of (i) the Company's consolidated net income or loss for such Fiscal Year less (ii) the amount of the Preferred Stock Dividend Requirement for such Fiscal Year, plus (iii) the amount obtained by multiplying the Aggregate Imputed Cost deducted in the calculation of consolidated net income or loss for such Fiscal Year by the fraction which is one minus the Marginal Tax Rate for such Fiscal Year, divided by (b) the sum of (x) the number of shares of Common Stock outstanding during such Fiscal Year, computed on a weighted average basis based on the number of days outstanding during such Fiscal Year, (y) the aggregate number of CAP Units credited to the Accounts of all Participants computed on a weighted average basis based on the number of days outstanding during such Fiscal Year but not including in such computation the day that CAP Units are credited, increased or decreased pursuant to Section 5.1 or 5.2 of the Plan, and (z) the aggregate amount of Restricted Stock Units included in the computation of Earnings Per Share as reported in the Company's Annual Report.

"*Registration Statement*" has the meaning assigned to such term in Section 6.7.

"*Reporting Person*" means a director or officer of the Company who is subject to the reporting requirements of Section 16(a) of the Exchange Act.

"*Retirement*" means termination of a Participant's employment with the Company and its Affiliates, provided that the sum of the Participant's attained age (in whole years) plus completed years of service to the Company and its Affiliates equals 45 or more with at least 10 years of service.

"*Rule 16b-3*" means Rule 16b-3 of the Securities and Exchange Commission promulgated under the Exchange Act, as the same may be modified or amended from time to time, and any successor rule.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time, or any successor statute or statutes.

"*Termination Date*" means the last day of any Deferral Period.

"*Total CAP Units*" means the aggregate number of CAP Units, adjusted through any date of determination thereof, theretofore credited to a Participant's Capital Accumulation Account.

"*Trustee*" means the Trustee of any pension plan of which a participant is a member.

2.2    *Accounting Terms.* Whenever any accounting term is used herein, or the character or amount of any asset or liability or item of income or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purposes of this Plan, such accounting term shall have the meaning assigned to such term or such determination or computation shall be made (as the case may be), to the extent applicable and except as otherwise specified herein, in accordance with GAAP.

H-6

SECTION 3

Eligibility

3.1    Eligible Employees shall be eligible to receive Awards hereunder, at the discretion of the Board Committee. Subject to the provisions of the Plan, the Board Committee shall have the complete discretion to determine the number of CAP Units to which an Award relates.

3.2    Notwithstanding Section 3.1, no individual shall participate in the Plan unless such individual agrees to execute such documents or agrees to such restrictions, as the Appropriate Committee in its sole discretion may require.

SECTION 4

Awards

4.1    *General.* With respect to each Plan Year beginning on or after December 1, 2000, each Eligible Employee shall be eligible to be granted an Award in the discretion of the Board Committee.

4.2    *Terms and Conditions.* (a) Each Award shall be evidenced by an agreement which shall set forth the terms and conditions of the Award, including without limitation, the date or dates upon which and/or the other conditions upon satisfaction of which such Award shall vest and the circumstances under which such Award shall be cancelled in whole or part (b) Any credit made to the Participant's Account pursuant to Section 5 hereof in respect of a previously granted Award shall, unless otherwise provided in the agreement evidencing the Award, be subject to the same terms and conditions (including, but not limited to, conditions for vesting and cancellation) as the underlying Award.

SECTION 5

Capital Accumulation Accounts

5.1    *Annual Credits to Capital Accumulation Accounts.* For each Plan Year, the Company shall credit to each Participant, as of the last day of such Plan Year, by means of a bookkeeping entry established and maintained by the Company for each such Participant (a "Capital Accumulation Account"), that number of CAP Units equal to the quotient obtained by dividing (i) An amount determined by the Board Committee with respect to such Participant, by (ii) the Fair Market Value on the date of the grant action by the Board Committee granting the Award. The Company shall record CAP Units credited in respect of each Plan Year in a separate sub account of each Participant's Capital Accumulation Account and any credits or adjustments hereunder to such CAP Units shall be made separately with respect to the CAP Units credited to each such sub account.

5.2    *Earnings Adjustments.* The Earnings Adjustment shall be calculated with respect to each Deferral Year as follows:

(a)    first, the Company shall determine a dollar amount to be credited to each Participant in respect of CAP Units

credited to such Participant's Capital Accumulation Account as of the first day of the Deferral Year and at all times throughout such Deferral Year ("Full Year Units") by multiplying such number of Full Year Units by the Income Per Share for the Deferral Year; *provided, however*, that the amount to be credited or debited pursuant to this clause (a) to a Participant whose employment with the Company and its Affiliates was terminated during such Deferral Year shall be the amount determined as aforesaid multiplied by a fraction, the numerator of which shall be the number of whole months in such Deferral Year prior to the month in which his employment terminated and the denominator of which shall be 12;

(b)    the Company then shall calculate a dollar amount to be credited to each Participant in respect of Full Year Units credited to such Participant's Account by multiplying such Full Year Units by Dividends Per Share for the Deferral Year. In addition, the amount to be credited pursuant to this clause (b) to a Participant whose employment was terminated during such Deferral Year shall also be derived by taking the number of CAP Units held at fiscal year end and multiplying such CAP Units by the Dividends Per Share;

H-7

(c)    finally, (i) if the sum of the amounts determined for a Participant in subparagraph (a) and (b) above is a positive number then the Earnings Adjustment shall equal the sum of the amounts as determined under this Section 5.2 (a) and (b). The Company shall then credit the Account of each Participant with an additional number of CAP Units equal to the quotient of (i) the Earnings Adjustment as determined in this Section 5.2, divided by the Average Cost Per Share.

5.3    *Overall Cost Limitation.* Notwithstanding the provisions of Section 5.2, if the operation of the Plan (without giving effect to this Section 5.3) would result in Adjusted Earnings Per Share for any Fiscal Year being less than 98.5% of Pre-Plan Earnings Per Share for such Fiscal Year, then, (a) the Earnings Adjustments required by Section 5.2 shall be reduced or eliminated, so that to the extent possible, after giving effect to all such reductions and eliminations, Adjusted Earnings Per Share for such Fiscal Year will be 98.5% of Pre-Plan Earnings Per Share.

5.4    *Antidilution Adjustments.* In the event of a stock split or if the Company makes any distribution (other than a cash dividend) with respect to Common Stock after the date CAP Units initially are credited to a Participant's Account in accordance with this Section 5, the number of CAP Units held in each Participant's Account shall be equitably adjusted (as determined by the Appropriate Committee in its sole discretion) to reflect such event. If there shall be any other change in the number or kind of outstanding shares of Common Stock as a result of a recapitalization, combination of shares, merger, consolidation or otherwise, the number of CAP Units credited to each Participant's Account shall be equitably adjusted (as determined by the Appropriate Committee in its sole discretion) to reflect such event.

5.5    *Apportionment of Credits.* Whenever CAP Units are credited to a Participant's Account pursuant to Section 5.2 in respect of any Deferral Year, they shall be apportioned among the CAP Units originally credited to such Account in respect of each Plan Year on a *pro rata* basis, based on the respective number of the CAP Units originally credited in respect of each such Plan Year, and such additional CAP Units shall have the same Termination Date as the original CAP Units to which they are so apportioned.

5.6    *Amounts Vested.* A Participant shall become vested in the CAP Units credited to his Account in accordance with the vesting schedule and other conditions prescribed by the Appropriate Committee and reflected in the agreement evidencing the Award. If a Participant's employment with the Company and its Affiliates terminates prior to the time an Award has become fully vested, then unless otherwise provided in the Agreement evidencing the Award, the CAP Units credited to the Participant's Accounts and attributable to such Award shall, to the extent not then vested, be cancelled. The establishment and maintenance of, or credits to, such Account shall not vest in any Participant Trustee or his Beneficiary any right, title or interest in or to any specific asset of the Company.

5.7    *Certification of the Board Committee.* As a condition to the right of any Participant, Beneficiary or Trustee to receive any shares payable in respect of CAP Units credited to such Participant's Account or cash in respect of fractional CAP Units credited to such Participant's Account or payable pursuant to Section 6.6, prior to the time CAP Units or cash is credited to the appropriate Accounts of such Participant or a Participant, Beneficiary or Trustee receives cash pursuant to Section 6.6, the Board Committee shall be required to certify, by resolution of the Board Committee or other appropriate action, that the amounts to which such Participant, Beneficiary or Trustee is entitled have been accurately determined in accordance with the provisions of the Plan. The Board Committee has the right to make adjustments to any component of the Earnings Adjustment calculation in order for the amount to meet the purposes of the Plan; however such adjustment may not have the effect of

increasing the amount calculated in Section 5.2.

SECTION 6

Payment of Benefits

6.1    *Distributions.* As soon as practicable following each Termination Date, there shall be paid, in respect of the Award for the related Plan Year, a number of shares of Common Stock equal to the number of CAP Units credited to the Account in respect of such Plan Year determined as of such Termination Date, to the extent that such CAP Units have not been cancelled pursuant to the agreement evidencing the Award.

H-8

6.2    *Accelerated Distributions.* Notwithstanding the provisions of Section 6.1 and in lieu of any distribution on a Termination Date, a distribution may be paid prior to a Termination Date as follows:

(a)    If a Participant shall die during any Fiscal Year prior to the end of all of his Deferral Periods, the Participant's estate (or his Beneficiary) or at the discretion of the Company the Trustee shall be entitled to receive from the Company, as soon as practicable after the end of the Fiscal Year in which such Participant's death occurs, a number of shares of Common Stock equal to the CAP Units credited to the Account, as adjusted pursuant to Sections 5.4 and 5.2, as of the end of the Fiscal Year in which such Participant's death occurs.

(b)    If a Participant's employment with the Company and its Affiliates shall be terminated for any reason prior to the end of all of his Deferral Periods (other than by reason of death), or if such Participant shall suffer a Disability or shall become a Managing Director Emeritus of Bear Stearns, then such Participant (or his Beneficiary) or the Trustee shall, unless otherwise determined by the Appropriate Committee as hereinafter provided, continue to be bound by, and to be subject to, all the terms and provisions of this Plan.

Notwithstanding the foregoing:

(i)    the Appropriate Committee shall have the right in its sole discretion (A) to treat a Participant who has suffered a Disability or who has become a Managing Director Emeritus of Bear Stearns as a Participant (1) in all respects under this Plan, (2) to whom the provisions of Section 5.2 but not the provisions of Section 4.1 shall apply or (3) whose employment with the Company and its Affiliates has terminated and to whom the foregoing provisions of this paragraph (b) shall apply, and (B) at any time or from time to time, to change any such treatment with respect to any such Participant to any other such treatment;

(ii)    the Appropriate Committee shall have the right in its sole discretion to accelerate any Termination Date with respect to any Plan Year (with or without accelerating the vesting of the Participant's Total CAP Units) of a Participant whose employment with the Company and its Affiliates terminates to the last day of the Fiscal Year in which such employment terminates or to the last day of any subsequent Fiscal Year, in which case the date so determined by the Appropriate Committee with respect to each such Plan Year shall be the Participant's Termination Date for all purposes of this Plan with respect to each such Plan Year. The Appropriate Committee shall give notice of any such determination to the Participant at least ten days prior to the earliest of such accelerated Termination Dates. In addition, if a Participant whose employment with the Company has terminated shall request the Appropriate Committee to accelerate the Termination Date with respect to any Plan Year of such Participant to the last day of the Fiscal Year immediately preceding the Fiscal Year in which such Participant's employment terminates, the Appropriate Committee may in its sole discretion so accelerate the Termination Date (with or without accelerating vesting) with respect to any such Plan Year of such Participant. If the Appropriate Committee takes such action, the distribution from the Plan in respect of the Participant for any Plan Year the Termination Date of which is so accelerated shall be based on all or a portion of the Total CAP Units at the end of such prior Fiscal Year for each such Plan Year, without giving effect to any adjustments otherwise required to be made during the Fiscal Year in which his employment terminates, including, without limitation, for Earnings Adjustments, dividends on the Common Stock, or interest, and the distributions called for in Section 6.1 of the Plan shall be made as soon as practicable after such action is taken by the Appropriate Committee;

(iii)    Notwithstanding clause (ii) above, the Appropriate Committee shall have the right in its sole discretion to determine that, regardless of the Termination Date with respect to any other Plan Year or Plan Years, the Termination Date with respect to the Plan Year in which the employment of the Participant with the Company and its Affiliates terminates, and the Plan Year immediately preceding such Plan Year if such employment terminates prior to the date on which the Account of such Participant is credited pursuant to Section 5.1 hereof with respect to such immediately preceding Plan Year, shall be the last day of the Fiscal Year immediately preceding the Plan Year in which such employment terminates or, if applicable, the prior Plan Year; and

H-9

(c)    If a Participant shall take a Personal Leave of Absence prior to the end of all his Deferral Periods, the Appropriate Committee shall have the right in its sole discretion to require the Participant to become subject to the provisions of paragraph (b) above (to the same extent as a Participant whose employment had terminated) during the period of such Personal Leave of Absence, except that in the event the Participant resumes full-time employment after the first day of a Fiscal Year, all calculations under this Plan with respect to such Fiscal Year shall be made by treating the Participant in the same manner as a full-time employee for the number of full months of such employment during such Fiscal Year and as a Participant whose employment had been terminated for the balance of such Fiscal Year. If the Appropriate Committee shall not take such action the Participant shall continue to be treated under this Plan on the same basis as a Participant who is not on a Personal Leave of Absence; provided, however, that each of the applicable vesting periods shall be extended by the number of months that such Participant was on Personal Leave of Absence.

(d)    In addition, in the event of hardship, actual or prospective change in tax laws, or any other unforeseen or unintended circumstance or event (including, without limitation, if the tax laws of any foreign jurisdiction do not provide for tax consequences to Participants or the Company that are comparable to those provided under United States tax laws), or if desirable to preserve the deductibility for federal income taxes of compensation paid or payable by the Company to any Participant, the Appropriate Committee, in its sole discretion, may accelerate any Termination Date of any Participant (and may accelerate the vesting of such Participant's Total CAP Units) to the last day of any Fiscal Year, in which case the accelerated date determined by the Appropriate Committee shall be the Termination Date for all purposes of this Plan.

6.3    *Change in Control and Parachute Limitation.* Notwithstanding the provisions of Sections 6.1 and 6.2, within sixty (60) days of the occurrence of a Change in Control, the Board Committee in its sole discretion may provide that (a) payment shall be made in respect of each Participant of that number of shares of Common Stock which is equal to all or any portion of the Total CAP Units credited to his Account as of the date of such Change in Control, and/or (b) the Total CAP Units in respect of each Participant shall be fully vested by reason of such Change in Control; *provided, however,* no amount shall be immediately distributable or payable under the Plan if and to the extent that the Appropriate Committee determines that such distribution or payment would subject a Reporting Person to liability under Section 16(b) of the Exchange Act or any rule or regulation thereunder by reason of transactions or events occurring on or prior to the occurrence of the Change in Control. Payment of amounts not distributed by reason of this Section 6.3 shall be made as soon as practicable, consistent with this Section 6.3.

6.4    *Additional Distributions in Certain Cases.* In addition to the amounts provided by Section 6.1, 6.2 or 6.3, if (a) upon making any distribution, the Company determines that the Company or Bear Stearns would realize a tax benefit calculated at its Marginal Tax Rate in the year of such distribution (without giving effect to any carryovers or carrybacks of losses, credits or deductions from any prior or succeeding Fiscal Year) in excess of the amount of Deferred Tax Benefit in respect of its liability to such Participant on account of such distribution, and (b) the number of CAP Units credited to his Account had been reduced in a prior Fiscal Year as a result of the application of Section 5.3, then at the time of the distribution pursuant to this Section 6 the Company also shall pay to such Participant, in shares of Common Stock, an additional amount equal to the lesser of (i) the amount by which the actual tax benefit to be received by the Company or Bear Stearns exceeds such Deferred Tax Benefit and (ii) the amount by which such Participant's Account was so reduced. Notwithstanding the foregoing, no Participant shall be entitled to require that any payment from the Company is made pursuant to this Section 6.4 in respect of any reduction in his in the number of CAP Units credited to his Account for any period commencing with the first day of the month following the month in which his employment by the Company and its Affiliates was terminated.

6.5    *Special Provisions for Reporting Persons.* If required by Rule 16b-3, shares of Common Stock distributed to Participants who are Reporting Persons shall bear an appropriate legend to the effect that such shares of Common Stock may not be transferred for a period of six (6) months after they are credited to the Account of such Participant.

H-10

6.6    *Form of Payments.* Except as otherwise provided herein, all distributions in respect of CAP Units to be made under the Plan shall be made in whole shares of Common Stock. Payment in respect of any fractional CAP Unit shall be made in cash based upon the Fair Market Value of a share of Common Stock on the second Business Day preceding the payment date. Shares of Common Stock distributed hereunder shall be treasury shares, shares of authorized but unissued Common Stock or a combination thereof, and shall be fully paid and nonassessable. If shares of Common Stock are distributed pursuant to Sections 6.1, 6.2(a) or 6.2(b) to any Participant, Beneficiary or Trustee after the record date for any cash dividend occurring after the Termination Date with respect to which such shares are distributed or, in the cases of Sections 6.2(a) or 6.2(b), after the end of the Fiscal Year in which the death or Disability of a Participant occurs, then such Participant (or his estate or Beneficiary) or Trustee shall be entitled to receive from the Company an amount of cash equal to the cash dividends per share payable to holders of record on such record date multiplied by the number of shares of Common Stock so distributed to such Participant after such record date. Where a payment is made under the Plan, the payment may be made at the discretion of the Company either to the Participant or by way of a contribution to any pension plan established by the Company of which the Participant is a member.

6.7    *Registration and Listing of Common Stock.* Prior to the date on which any shares of Common Stock are required to be issued under this Plan without taking into account any acceleration of such distribution date pursuant to the provisions of Section 6.2 of the Plan, the Company shall file a registration statement (a "Registration Statement") on Form S-3 and/or Form S-8 (or any successor form then in effect) under the Securities Act, with respect to all shares of Common Stock which the Company then estimates are distributable under the Plan; *provided, however,* that the Company need not file a Registration Statement hereunder if, prior to such date, the Company receives a written opinion of counsel to the effect that such shares of Common Stock may be sold, transferred or otherwise disposed of under the Securities Act without registration thereunder. The Company shall use its best efforts to have any such Registration Statement declared effective as soon as reasonably practicable after filing and shall use reasonable efforts to keep each such Registration Statement continuously in effect until all shares of Common Stock to which such Registration Statement relates have been so issued, and for a two-year period thereafter. From time to time the Company also shall amend such Registration Statement to cover any additional shares of Common Stock which become distributable under the Plan and otherwise would not be covered by such Registration Statement. In the event that Participants would be precluded from selling any shares of Common Stock distributable hereunder unless such shares were registered or qualified under the securities or "blue sky" laws of any state (or otherwise received the approval of any state governmental or regulatory authority), then the Company shall use its best efforts to cause such shares of Common Stock to be duly registered or qualified (or to receive such approval) as may be required. If the shares of Common Stock distributable hereunder satisfy the criteria for listing on any exchange on which the Common Stock is then listed, then (unless such shares of Common Stock already are listed on such exchange) the Company shall apply for and use its best efforts to obtain a listing of all such shares of Common Stock on such exchange. All costs and expenses incurred by the Company in connection with the satisfaction of its obligations under this Section 6.7 shall be borne by the Company. The Company shall immediately notify each Participant in the event that a Registration Statement which has been filed and remains effective contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading. Upon receipt of such notice, no Participant shall sell or agree to sell any shares of Common Stock pursuant to such Registration Statement unless and until the Company has notified each Participant that such Registration Statement no longer contains such misstatement or omission. In the event that shares of Common Stock are issued to Participants hereunder other than pursuant to a Registration Statement, then, unless the Company shall have obtained the opinion of counsel referred to above, each certificate representing such shares shall bear a legend substantially to the following effect:

*The securities represented by this Certificate have not been registered under the Securities Act of 1933, as amended, or applicable state securities laws, and may not be sold, assigned, transferred, pledged or otherwise disposed of except in compliance with the requirements of such Act.*

By accepting an Award hereunder, each Participant or Trustee shall be deemed to have agreed to the foregoing provisions of this Section 6.7.

H-11

6.8    *Reservation of Shares.* The Company, as soon as practicable after the end of each Fiscal Year prior to the termination of this Plan, shall reserve such number of shares of Common Stock (which may be authorized but unissued shares or treasury shares) as shall be required so that the total of all shares reserved hereunder, including shares reserved pursuant to this Section 6.8 in preceding Fiscal Years, shall be equal to the number of shares of Common Stock which the Company would be obligated to issue in accordance with the terms of the Plan if the Plan were to be terminated at such time.

SECTION 7

Source of Payments

Notwithstanding any other provision of this Plan, the Company shall not be required to establish a special or separate fund or otherwise segregate any assets to assure any payments hereunder. If the Company shall make any investment to aid it in meeting its obligations hereunder, a Participant and his Beneficiary or the Trustee shall have no right, title or interest whatsoever in or to any such investments. Nothing contained in this Plan, and no action taken pursuant to its provisions, including without limitation the acquisition of any shares of Common Stock by the Company, or the crediting of CAP Units to the Accounts of Participants, shall create or be construed to create a trust of any kind between the Company and any Participant, Beneficiary or Trustee, or to create any right, title or interest on the part of any Participant or Beneficiary in or to any asset of the Company. To the extent that any Participant, Beneficiary or Trustee acquires a right to receive payments from the Company hereunder, such right shall be no greater than the right of a general unsecured creditor of the Company.

SECTION 8

Administration of the Plan

8.1    *Authority of Committee.* The Plan shall be administered by the Appropriate Committees, which shall have full power and authority as set forth herein to interpret, to construe and to administer the Plan and to review claims for benefits under the Plan. Each Appropriate Committee's interpretations and constructions of the Plan and actions thereunder, including but not limited to the determination of the amounts to be credited to any Capital Accumulation Account, shall be binding and conclusive on all persons and for all purposes.

8.2    *Duties of Committee.* The Appropriate Committees shall cause the Company to establish and maintain records of the Plan, of each Account and of each sub account thereof established for any Participant hereunder. Either of the Appropriate Committees may engage such certified public accountants, who may be accountants for the Company, as it shall require or may deem advisable for purposes of the Plan, may arrange for the engagement of such legal counsel, who may be counsel for the Company, and may make use of such agents and clerical or other personnel as it shall require or may deem advisable for purposes of the Plan. Each such Committee may rely upon the written opinion of the accountants and counsel engaged by it. Subject to any limitations imposed by applicable law (including Rule 16b-3), either Appropriate Committee may delegate to any agent or to any subcommittee or member of such Committee its authority to perform any act hereunder, including, without limitation, those matters involving the exercise of discretion, provided that such delegation of authority shall be subject to revocation at any time at the discretion of such Committee.

8.3    *Purchase of Common Stock.* The Company intends to purchase shares of Common Stock in the open market or in private transactions or otherwise during the term of the Plan for issuance to Participants in accordance with the terms hereof. Shares of Common Stock shall be purchased for purposes of the Plan on a combined or joint basis without identifying shares so purchased as having been purchased for this Plan. Notwithstanding the foregoing, the Company will specifically designate all such shares at the time they are purchased as having been purchased for the purpose of making determinations under this Plan; *provided, however,* that any shares so purchased shall be the sole property of the Company and no Participant, Beneficiary or Trustee shall have any right, title or interest whatsoever in or to any such shares. All shares of Common Stock purchased by the Company on or after July 1, 1992 and designated by the Company as having been purchased for the CAP Plan shall be considered, notwithstanding such designation, to have been purchased for purposes of this Plan. The acquisition of Common Stock as described above will be subject to the sole discretion of the Board Committee, which shall determine the time and price at which and the manner in which such shares are to be acquired, subject to applicable law.

H-12

8.4    *Plan Expenses.* The Company shall pay the fees and expenses of accountants, counsel, agents and other personnel and all other costs of administration of the Plan.

8.5    *Indemnification.* To the maximum extent permitted by applicable law, no member of any Committee shall be personally liable by reason of any contract or other instrument executed by him or on his behalf in his capacity as a member of such Committee or for any mistake of judgment made in good faith, and the Company shall indemnify and hold harmless, directly from its own assets (including the proceeds of any insurance policy the premiums of which are paid from the Company's own assets), each member of each Committee and each other director, officer, employee or agent of the Company to whom any duty or power relating to the administration or interpretation of the Plan or to the management or control of the assets of the Plan may be delegated or allocated, against any cost or expense (including fees, disbursements and other charges of legal counsel) or liability (including any sum paid in settlement of a claim with the approval of the Company) arising out of any act or omission to act in connection with the Plan, unless arising out of such person's own fraud, willful misconduct or bad faith. The foregoing shall not be deemed to limit the Company's obligation to indemnify any member of any Committee under the Company's Restated Certificate of Incorporation or Bylaws, or under any other agreement between the Company and such member.

8.6    *Maximum Number of Shares.*

(a)    The aggregate number of CAP Units that may be credited to Accounts under the Plan for any Plan Year shall not exceed the equivalent number of shares of Common Stock equal to the sum of 15% of the outstanding shares of Common Stock as of the last day of such Plan Year (the "Base Shares") and the number, if any, by which the sum of the Base Shares in all prior Fiscal Years beginning on or after July 1, 1993 exceeds the number of shares credited to Accounts under this Plan in all such prior Fiscal Years. For purposes of determining the number of shares of Common Stock outstanding as of the last day of any Plan Year, such number shall be calculated as the sum of (i) the number of shares of Common Stock outstanding at such year end, (ii) the number of shares underlying CAP Units credited to Participants' Accounts as of such date and (iii) the number of shares underlying CAP Units to be credited to all such Accounts as a result of making any adjustment to such Accounts required by Sections 5.1 and 5.2 in respect of all Fiscal Years ending on or prior to the date of determination in respect of all Fiscal Years ending on or prior to the date of such determination.

(b)    If there shall be any change in the Common Stock of the Company, through merger, consolidation, reorganization, recapitalization, stock dividend, stock split, spin-off, split up, dividend in kind or other change in the corporate structure or distribution to the stockholders, appropriate adjustments may be made by the Board Committee (or if the Company is not the surviving corporation in any such transaction, the board of directors of the surviving corporation) in the aggregate number and kind of shares subject to the Plan, and the number and kind of shares which may be issued under the Plan. Appropriate adjustments may also be made by the Board Committee in the terms of any awards under the Plan to reflect such changes and to modify any other terms of outstanding awards on an equitable basis as the Board Committee in its discretion determines.

8.7    *Forward Repurchases of Common Stock.* The Company shall have the right, upon authorization of the Board Committee, to enter into forward contracts for the repurchase from one or more Participants, Beneficiaries or Trustees of any or all shares of Common Stock representing vested CAP Units previously credited to Accounts with respect to any Plan Year and distributed on or after the relevant Termination Date of the Deferral Period ending in the then current Fiscal Year, having such terms and conditions as shall be determined by the Board Committee, for a purchase price per share equal to the average of the closing prices of the Common Stock as reported on the New York Stock Exchange Consolidated Tape for each day of trading in the Common Stock during the period from the effective date of the contract to the date of repurchase, provided that such price is within the range defined by the Board Committee, and provided further that a contract may not be entered into more than twelve (12) months prior to the expiration of the applicable Deferral Period and will terminate, and be null and void, unless the Company satisfies performance goals established by the Board Committee in writing, by resolution of the Board Committee or other appropriate action, not later than ninety (90) days after the commencement of the Fiscal Year to which the performance goals relate, and certified by the Board Committee in writing as having been satisfied prior to the relevant Termination Date. The formula for calculating the performance goals shall be based upon one or more of the following criteria, individually or in combination, adjusted in such manner as the Board Committee shall determine, for a period of not less than nine (9) months of the applicable Fiscal Year: (a) pre-tax or after-tax return on equity; (b)

H-13

earnings per share; (c) pre-tax or after-tax net income; (d) business unit or departmental pre-tax or after-tax income; (e) book value per share; (f) market price per share; (g) relative performance to peer group companies; (h) expense management; and (i) total return to stockholders.

SECTION 9

Amendment and Termination

The Plan shall terminate in accordance with the provisions of Section 11.12. The Plan may be amended, suspended or earlier terminated, in whole or in part as to a particular Plan Year, and at any time and from time to time, by the Board Committee, but except as provided below no such action shall retroactively impair or otherwise adversely affect the rights of any person to benefits under the Plan which have accrued prior to the date of such action. Except as provided in the following sentence, if the Plan is terminated prior to the end of any Fiscal Year, (i) the Company shall credit the Accounts of all Participants (other than those whose employment with the Company and its Affiliates had terminated prior to the date the Plan terminates, except a Participant referred to in subparagraph (iii) of Section 6.2(b)) in the manner provided in Section 5.2 in respect of the portion of the Company's Fiscal Year ended on the date of such termination, and (ii) as soon as practicable following the end of the Fiscal Year in which such termination occurs, the Company shall deliver to each Participant, Beneficiary or Trustee the number of shares of Common Stock corresponding to the number of CAP Units credited to his Account which the Participant, Beneficiary or Trustee otherwise would be entitled to receive pursuant to Section 6 as of the designated Termination Date in respect of the Plan Year or Plan Years involved. Notwithstanding the foregoing, if the Company shall determine that the Plan should be terminated immediately, either in its entirety or in part in respect of any Plan Year, no adjustments or credits shall be made to the Accounts of the Participants pursuant to Section 5 in respect of the Fiscal Year in which such termination occurs and each Participant shall be entitled to receive from the Company, as soon as practicable following the date of such termination, shares of Common Stock and/or amounts in cash determined in accordance with Section 6 hereof as if the Termination Date in respect of the Plan Year or Plan Years involved were the last day of the Fiscal Year preceding the Fiscal Year in which such termination occurs.

Upon termination of the Plan in its entirety or with respect to one or more Plan Years, the Board Committee, in its sole and absolute discretion, may accelerate the vesting of all or any portion of the Total CAP Units credited to a Participant's Account, which would not then be vested.

SECTION 10

Designation of Beneficiaries

10.1    *General.* Each Participant may file with the Appropriate Committee a written designation of one or more persons as the Beneficiary who shall be entitled to receive the amount, if any, which the Participant is entitled to receive under the Plan upon his death. A Participant, from time to time, may revoke or change his Beneficiary designation without the consent of any prior Beneficiary by filing a new such designation with the Appropriate Committee. The most recent such designation received by the Appropriate Committee shall be controlling; *provided, however,* that no designation, or change of revocation thereof, shall be effective unless received by the Appropriate Committee prior to the Participant's death, and in no event shall any such designation be effective as of a date prior to such receipt.

10.2    *Lack of Designated Beneficiary.* If no such Beneficiary designation is in effect at the time of a Participant's death, or if no designated Beneficiary survives the Participant, or if such designation conflicts with law, the Participant's estate shall be deemed to have been designated as his Beneficiary and shall receive the payment of the amount, if any, payable under the Plan upon his death. If the Appropriate Committee is in doubt as to the right of any person to receive such amount, the Committee may cause the Company to retain such amount, without liability for any interest thereon, until the rights thereto are determined, or the Appropriate Committee may pay and deliver such amount into any court of appropriate jurisdiction, and such payment shall be a complete discharge of the liability of the Plan and the Company therefore.

H-14

SECTION 11

General Provisions

11.1    *Successors.* The Plan shall be binding upon and inure to the benefit of the Company, its successors and assigns, and each Participant and his Beneficiary or Trustee.

11.2    *No Continued Employment.* Neither the Plan nor any action taken thereunder shall be construed as giving to a Participant the right to be retained in the employ of the Company or any of its Affiliates or as affecting the right of the Company or any of its Affiliates to dismiss any Participant.

11.3    *Withholding.* As a condition to receiving any distribution or payment of amounts hereunder, the Company may require the Participant to make a cash payment to the Company or, in its sole discretion, upon the request of a Participant, may withhold from any amount or amounts payable under the Plan, in either case, in an amount equal to all federal, state, city or other taxes as may be required to be withheld in respect of such payments pursuant to any law or governmental regulation or ruling.

11.4    *Non-alienation of Benefits.* No right to any amount payable at any time under the Plan may be assigned, transferred, pledged or encumbered, either voluntarily or by operation of law, except as expressly provided herein or as may otherwise be required by law. If, by reason of any attempted assignment, transfer, pledge or encumbrance, or any bankruptcy or other event happening at any time, any amount payable under the Plan would be made subject to the debts or liabilities of the Participant, his Beneficiary or Trustee or would otherwise not be enjoyed by him, then the Appropriate Committee, if it so elects, may terminate such person's interest in any such payment and direct that the same be held and applied to or for the benefit of the Participant, his Beneficiary, Trustee or any other person or persons deemed to be the natural objects of his bounty, taking into account the expressed wishes of the Participant (or, in the event of his death, his Beneficiary).

11.5    *Incompetency.* If the Appropriate Committee shall find that any person to whom any amount is or was distributable or payable hereunder is unable to care for his affairs because of illness or accident, or has died, then the Appropriate Committee, if it so elects, may direct that any payment due him or his estate (unless a prior claim therefore has been made by a duly appointed legal representative) or any part thereof be paid or applied for the benefit of such person or to or for the benefit of his spouse, children or other dependents, an institution maintaining or having custody of such person, any guardian or any other person deemed by such Appropriate Committee to be a proper recipient on behalf of such person otherwise entitled to payment, or any of them, in such manner and proportion as such Appropriate Committee may deem proper. Any such payment shall be in complete discharge of the liability therefore of the Company, the Plan, the Committee or any member, officer or employee thereof.

11.6    *Offsets.* To the extent permitted by law, the Company or any of its Affiliates shall have the absolute right to withhold any shares of Common Stock or any amounts otherwise required to be distributed or paid to any Participant, Beneficiary or Trustee under the terms of the Plan, to the extent of any amount owed or which in the sole judgment of the Appropriate Committee may in the future be owed for any reason by such Participant, in the case of a payment to such Participant, or to the extent of any amount owed or which in the sole judgment of the Appropriate Committee may in the future be owed for any reason by the Participant, such Beneficiary, in the case of payment to a Beneficiary or to a Trustee in the case of payment to a Trustee, to the Company or any of its Affiliates, and to set off and apply the amounts so withheld to payment of any such amount ultimately determined by the Appropriate Committee, in its sole discretion, to be owed to the Company or any of its Affiliates, whether or not such amounts shall then be immediately due and payable and in such order or priority as among such amounts owed as the Appropriate Committee, in its sole discretion, shall determine. In determining the amount of a permitted offset under this Section 11.6, any shares of Common Stock required to be distributed to a Participant, Beneficiary or Trustee shall be valued at the Fair Market Value of such Shares on the date of offset.

11.7    *Notices, etc.* All elections, designations, requests, notices, instructions and other communications from a Participant, Beneficiary, Trustee or other person to any Appropriate Committee required or permitted under the Plan shall be in such form as is prescribed from time to time by the Appropriate Committee, shall be mailed by first-class mail or delivered to such location as shall be specified by the Appropriate Committee, and shall be deemed to have been given and delivered only upon actual receipt thereof at such location.

11.8    *Other Benefits.* The benefits, if any, payable under the Plan shall be in addition to any other benefits provided for Participants.

H-15

11.9     *Interpretation, etc.* The captions of the sections and paragraphs of this Plan have been inserted solely as a matter of convenience and in no way define or limit the scope or intent of any provisions of the Plan. References to sections herein are to the specified sections of this Plan unless another reference is specifically stated. The masculine pronoun wherever used herein shall include the feminine pronoun, and a singular number shall be deemed to include the plural unless a different meaning is plainly required by the context.

11.10     *Laws; Severability.* The Plan shall be governed by, and construed in accordance with, the laws of the State of New York, except to the extent preempted by the Employee Retirement Income Security Act of 1974, as amended. If any provision of the Plan shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions shall continue to be effective.

11.11     *Effective Date.* This amendment and restatement of the Plan shall be effective as of July 1, 1999, and shall apply to Awards granted for Plan Years beginning on or after that date. CAP Units credited and attributable to deferrals of compensation made for prior Plan Years shall be subject to the terms of this Plan as in effect on June 30, 1999.

11.12     *Termination of the Plan.* Unless earlier terminated by action of the Board Committee, the Plan will remain in effect until December 31, 2013; provided, however, that each outstanding Award shall remain in full force and effect subject to the terms of the applicable grant until the completion of the applicable Deferral Period in accordance with the provisions of such grant.

H-16

EXHIBIT D

Date:       May 29, 2008
To:         CAP & RSU Plan Participants ---Former Employees
From:       Human Resources
Subject:    Vesting & Distribution Modifications Regarding
            Outstanding CAP & RSU Units

According to our records, you are a holder of outstanding CAP units ("CAP Units") and/or outstanding restricted stock units ("RSUs") awarded under either The Bear Stearns Companies Inc. ("Company") Capital Accumulation Plan for Senior Managing Directors, Amended and Restated November 29, 2000, as subsequently amended ("CAP Plan") or the Company's Restricted Stock Unit Plan ("RSU Plan") and, together with the CAP Plan and CAP Units ( "Plans" and "Units").  As you know, Units are generally settled, at the end of a specified deferral period, for shares of Company common stock.

As of the effective time of the merger between the Company and JPMorgan Chase & Co. ("JPMorgan"), each of your outstanding Units  will be converted into a JPMorgan share unit, on the same terms and conditions as applied to such Units immediately prior to the effective time  that is equal to the number of shares of Company common stock subject to such Unit multiplied by the exchange ratio (.21753) set forth in the merger agreement (rounded to the nearest whole share).

> As an example, if you currently have 1,000 Units of which 50% are vested and 50% are unvested immediately before the effective time of the merger, you will have 218 JPMorgan Units immediately after the effective time, with 109 vested and 109 unvested.

Consistent with the goals and objectives of these plans, the Company and JPMorgan have approved certain amendments to the terms and conditions of your awards, as described below, which will take effect upon the day  following the effective time of the merger:

## 1. Your CAP Units  and/or RSUs will vest following the merger with JPMorgan Chase

JPMorgan and the Company have agreed to amend your award agreements and the Plans to provide that any outstanding Units of former employees  that are subject to continued vesting, such as termination of employment for retirement or job elimination (as may be applicable to you) ,will vest on the day following the closing of the merger with JPMorgan. (Following the merger, dividends equivalents on your Units will be based on any dividends declared by JPMorgan.) The accelerated vesting of these Units will be subject to the requirement that you execute and timely return the attached agreement and release having terms and conditions described below under the heading "Agreement and Release Required".

Please note: The amendment does not reinstate awards of Units that have been previously cancelled or forfeited

## 2. When Your Units Are Distributed

If you received outstanding CAP Units in fiscal 2003 and/or outstanding RSUs in fiscal 2004, you will receive a distribution of JPMorgan common stock underlying such Units at the end of November 2008 (the originally scheduled distribution).

In addition, for outstanding Units not scheduled to be distributed in November, the amendments to the Plans provide that any remaining Units will be distributed on January 31, 2009 or the next following business day in compliance with the transition rules under Section 409A of the Internal Revenue Code, subject to your executing and timely returning the attached agreement and release. (This requirement applies to both Units that vest as a result of the amendment and those previously vested but subject to a deferral period.)

## 3. Agreement and Release Required

As a condition of accelerated vesting and/or distribution described above, you are required to execute the enclosed agreement and release in favor of the Company and its affiliates and return a signed copy by not later than July 15, 2008 to The Bear Stearns Companies Inc., Attention: Dawn Caputo, 383 Madison Avenue, New York, New York 10179. (No agreement and release will be accepted after that date.)

The agreement and release provides

- with certain exceptions, for the release of all employment-related claims and claims associated with your termination of employment and an agreement that reflects certain covenants, obligations and requirements. These include the non-solicitation of employees and clients, confidentiality, advance written notice of your decision to terminate your employment, cooperation and non-disparagement, as well a non-compete to the extent such a covenant was included in your award agreement(s). The non-compete and non-solicitation (both client and employees) covenants apply for 180 days following the termination of your employment. (If your employment terminated more than 180 days ago, those covenants are not applicable.) The non-compete covenant will be waived if your position was eliminated.

- that if you have entered into an agreement providing for additional continuing obligations (or more stringent ones) in favor of the Company or JPMorgan Chase, those obligations are in addition to ones covered in the agreement and release.

- that you agree that if you violate any of the covenants, obligations and requirements, (i) any Units subject to accelerated vesting and/or distribution will be cancelled if they have not been distributed to you, (ii) if already distributed, you will return the value of such Units, and (iii) the Company may seek injunctive relief as well.

Failure to execute and return the attached agreement and release by July 15, 2008 will result in your outstanding Units continuing to vest and being subject to the applicable deferral periods or being cancelled in accordance with the applicable terms and conditions of the Plans and your award agreements.

**Please note:** The agreement and release will become effective only if the merger is consummated. If you were designated a transition employee and have a transition letter, you will not release any claims to compensation to be paid in the future as set forth in that letter.

Before executing the attached agreement and release, you are urged to carefully read it (including the right to revoke your acceptance within 7 days of execution) and to consult with your legal advisor.

Taxes

For Units granted to U.S. based employees in fiscal 2007, you will be required to pay FICA and Medicare withholding taxes on the value of those Units as of the vesting date. You will be billed for this amount, if applicable.

As in the prior year, income taxes must be withheld on the shares of common stock to be distributed to you in November 2008 and January 2009 if applicable. The process at JPMorgan is that the number of shares are delivered to participants net of taxes. Accordingly, the number of shares of JPMorgan common stock to be distributed will be net of any amount required to cover applicable tax withholding.

For more information, please contact Dawn Caputo (212-272-8628), Geoff Parr (212-272-4501) or Lincoln Palmer (212-272-1524).

## AGREEMENT AND RELEASE

### Release of Claims

I, _____, Employee ID #_____, sign this Agreement and Release ("Release") in exchange for accelerated vesting and distribution of my outstanding unit awards, and/or in the case of previously vested unit awards, an accelerated distribution of such outstanding awards, under The Bear Stearns Companies Inc. Restricted Stock Unit Plan ("RSU Plan") and The Bear Stearns Companies Inc. Capital Accumulation Plan for Senior Managing Directors, ("CAP Plan", and with the RSU Plan, "Unit Plans"), as described in a letter or an e-mail to me dated May 29, 2008 which is incorporated herein by reference ("Letter").

I understand that this Release will be binding on me, my heirs, assigns, representatives and estate. I hereby release JPMorgan Chase & Co., The Bear Stearns Companies Inc. (and any predecessor or successor entities thereof), their respective affiliates, subsidiaries, employees, directors, officers, representatives, administrators, agents, assigns, trustees, and any fiduciaries of any employee benefit plan (collectively, the "Company") from all liability for any claims or potential claims relating to my employment with the Company and termination of my employment arising through the date that I sign this Release, subject to the exceptions described below. I understand that "claims" includes claims I know about and claims I do not know about, as well as the continuing effects of anything that happened before I sign below.

The claims covered by this Release include, but are not limited to, the following; to the extent such claims may be waived or released under applicable law:

- any claims under any federal, state or local law, including, but not limited to, the Americans with Disabilities Act, the National Labor Relations Act, the Employee Retirement Income Security Act of 1974 ("ERISA"), including, but not limited to, breach of fiduciary duty and equitable claims arising under §1132(a)(3) of ERISA, Title VII of the Civil Rights Act of 1964, the Vocational Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act of 1990, the Civil Rights Acts of 1866, 1871 and 1991, including Section 1981 of the Civil Rights Act, the Family and Medical Leave Act,

the Worker Adjustment and Retraining Notification Act (all as amended), state or local wage and hour laws, state or local laws against discrimination; and

- any claims under any policy, procedure, practice, contract (whether express, oral, written or implied from any source), tort (including but not limited to claims of defamation, intentional or negligent infliction of emotional distress, tortious interference, wrongful or abusive discharge, conversion, fraud, negligence, loss of consortium), common law or public policy; and

- any claims of retaliation under all federal, state, local or common or other law; and

- any claims related to employment and/or benefits subject to or covered by any arbitration agreements or provisions, and

- any claims related to awards under the Unit Plans that have previously been cancelled or forfeited.

If I am a resident of the State of California, I specifically waive my rights under California Civil Code Section 1542, which states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have mutually affected his settlement with the debtor."

Being aware of this section of the California Civil Code, I hereby expressly waive and relinquish all rights and benefits which I may have under this section as well as any other statutes or common law principles of similar effect.

If I am a resident of the State of West Virginia, I recognized and agree that the claims I am releasing include any rights or claims under the West Virginia Human Rights Act. The toll-free phone number of the West Virginia State Bar Association is 800-642-3617.

The following are claims that I am not releasing:

- any claim under the Fair Labor Standards Act for failure to pay minimum wages or overtime;

- any statutory claims for state unemployment insurance, worker's compensation, or disability insurance benefits (other than discrimination or retaliation claims related to the pursuit of such benefits);

- any legal obligations of the Company to indemnify me under applicable certificates of incorporation, by-laws or binding written agreements with the Company to the extent consistent with applicable law;

- any legal obligations of the Company under the terms of any outstanding award under the Unit Plans, as amended and modified herein and as described by the Letter;

- if I was designated as a transition employee by the Company, any compensation or severance (not previously forfeited ) to be paid to me in the future, as set forth in a transition letter or notice letter delivered to me, and

- any rights or claims (i) that may arise after I sign below, (ii) under the amendments described in the Letter, (iii) under the terms of any Company pension plan or deferred compensation plan for payment of any vested benefits, or (iv) for benefits to which I am entitled under the terms of any Company employee welfare plan in which I participate, all as in effect from time to time.

## Agreement Not to Sue

I agree that I will not file a lawsuit or initiate any other legal proceedings for money or other relief in connection with the claims I am releasing above. However, I understand that nothing in this Release prevents me from filing an administrative charge with the Equal Employment Opportunity Commission or a corresponding state or local agency. I agree that if I do file such a charge, I will not ask for or accept any money based on the charge.

I also understand that even though I am releasing the Company from any claims of age discrimination under the Age Discrimination in Employment Act (ADEA), as amended, this Release does not prevent me from filing a lawsuit to challenge whether I signed this Release knowingly and voluntarily for purposes of ADEA. I further understand that this Release does not prevent me from filing a lawsuit to pursue any claims that by law I cannot waive.

I agree that if a class or collective action is brought against the Company and I could be a participant in such action because of my employment with the Company, I will opt out of the class or collective action, or refrain from opting in.

## Continuing Obligations

By signing below, I agree to the terms of the Letter and to my continuing obligations outlined below.

I understand that I continue to have certain obligations to the Company (including, but not limited to, obligations with regard to the confidentiality of trade secrets and confidential and proprietary information which I received by virtue of my employment with the Company) following the termination of my employment. I also remain bound by certain terms of The Bear Stearns Companies Inc. Code of Business Conduct and Ethics, and if employed following the merger of a subsidiary of JPMorgan Chase & Co. into The Bear Stearns Companies Inc. ("Merger"), the JPMorgan Chase Code of Conduct (the "Codes") following the termination of my employment. I may obtain a copy the Codes from the Company by writing to the address set forth below. Additionally, I have

Page 3 of 7

advised the Company of all facts of which I was aware that I believed may constitute a violation of the Codes or the Company's legal obligations.

I understand that the Company views its relationships with its employees and customers as important and valuable assets and acknowledge that information about the Company's customers, including their identities, preferences and transactions with the Company, as well as information concerning the identity of employees of the Company constitutes proprietary and confidential information belonging to the Company which was assembled and developed over time through the expenditure of significant resources and substantial effort. Accordingly, I understand and agree that for a period of 180 days following the date of termination of employment (or such longer period as may be applicable under a separate agreement), I will not, acting alone or with others, directly or indirectly, whether as an employee, employer, consultant, advisor, or director, or as an owner, investor, partner, stockholder or otherwise (A) solicit or induce any client or customer of the Company for whom I have rendered services while employed by the Company to curtail, cancel, not renew, or not continue his or her or its business with the Company and (B) solicit or hire any employee or person who, within 90 days prior to the date of my termination of employment, was an employee of, or a consultant or independent contractor to, the Company.

I further understand and agree that for a period of 180 days following the date of termination of employment (or such longer period as may be applicable after my employment terminates), I will not to compete with the Company to the extent that my outstanding award agreements under the Unit Plans provide for such non-competition.

For avoidance of doubt, in the absence of a separate agreement providing for a longer period of non-competition or non-solicitation, the foregoing two paragraphs shall have no application if your employment terminated more than 180 days prior to May 30, 2008.

I agree not to make or encourage others to make any public statement or release any information that is intended to, or reasonably could be foreseen to embarrass or criticize the Company or its employees, directors or shareholders as a group. This will not preclude me from reporting to the Company's management or directors or to the government or a regulator conduct I believe to be in violation of the law or responding truthfully to questions or requests from the government, a regulator or in a court of law.

I agree to cooperate fully with and provide full and accurate information to the Company and its counsel with respect to any matter (including any audit, tax proceeding, litigation, investigation or governmental proceeding) with respect to which I may have knowledge or information, subject to reimbursement for actual, appropriate and reasonable costs and expenses.

I agree that in the event I am contacted by any person or entity seeking information or testimony from me in connection with my or others' employment, duties or activities at the Company (including knowledge I came into possession of in connection with my employment at the Company), I shall, prior to providing that information or testimony, to

the extent lawfully permitted, advise the Company in writing sent by facsimile to the Legal Department, Litigation Group at fax number (212) 552-4272, that such information or testimony is sought, and cooperate with the Company and its counsel in connection with the request for such information. Should such request be in the form of a subpoena or other legal process, I shall, in advance of providing any response and within 4 days of receipt of such process, provide written notice sent by facsimile to the Legal Department, Litigation Group at fax number (212) 552-4272 so that the Company may seek to assert its or their rights and interests in connection with such process. Nothing in this Release shall prohibit or restrict me from providing information to or otherwise cooperating with a governmental, law enforcement, or self regulatory organization.

Notwithstanding the foregoing, if I am bound by additional or more stringent continuing obligations to the Company set forth in other agreements that I have with the Company or in its policies, such as the Codes that are applicable to me, all such obligations remain in full force and effect and are not superseded by this Release. These additional or more stringent continuing obligations can relate to such matters as non-solicit of employees and customers, as well as confidentiality.

## Enforcement of Release and Further Modification of Awards

I agree that violating my continuing obligations described in this Release (including the additional or more stringent obligations, if any, included in other agreements or policies) will be considered a material breach of this Release and I agree that in such a case, Company shall have the right to (i) cancel my outstanding awards if they have not been distributed to me, (ii) bring a legal action to recover the value of the awards distributed to me pursuant to the Release, and (iii) in either case, to seek an injunction. I agree that any injunction the Company obtains will be in addition to any money damages.

I agree that to the extent my CAP Plan awards (if any) are entitled to ongoing credits due to the Earnings Adjustment (as defined by the CAP Plan), such awards shall not be credited with such adjustment following the Merger; and in lieu thereof my awards under the CAP Plan shall be credited with dividend equivalents based on dividends declared on JPMorgan Chase & Co. common stock, if any.

I agree that, to the extent not preempted by federal law, this Release and the Letter will be governed by the laws of the State of New York.

I also agree that if any of the provisions contained in this Release and Letter are found to be unenforceable by an arbitrator or a court or other forum of competent jurisdiction, the relevant forum shall change those provisions to the extent necessary to make them enforceable or delete them, but all of the remaining provisions will remain valid and binding upon both parties.

I understand this Release and the amendments described in the Letter will not be effective if the Merger is not consummated.

## Compensation and Leaves

I agree that the Company has paid me all compensation (including without limitation all salary, bonus, incentive and overtime payments) that I have earned on or before the date I sign below, except for any payments to be made in the future to which I am entitled under the terms of a notice letter or a transition letter. I also agree that I have not been denied any paid or unpaid leaves to which I am legally entitled as of the date I sign below.

## Deadline to Return; Knowing and Voluntary Agreement

I understand and agree that I have until July 15, 2008 to sign and return this Release to **The Bear Stearns Companies Inc., Attention: Dawn Caputo, 383 Madison Avenue, New York, New York 10179.** (No agreement and release will be accepted after that date.)

By signing below, I confirm that I have read this Release, understand it, agree to it and sign it knowingly and voluntarily. I agree that I am signing this Release in exchange for benefits to which I would not otherwise be entitled. I am hereby advised to discuss this Release with an attorney of my choosing (at my own expense). I agree that I have been given a reasonable period of time (at least forty-five (45) days) to review, consider and sign this Release. I understand that I may change my mind and revoke this Release within seven (7) days of signing it by delivering my revocation in writing to **The Bear Stearns Companies Inc., Attention: Dawn Caputo, 383 Madison Avenue, New York, New York 10179** via certified mail/return receipt requested (or by overnight courier or facsimile) within that seven day period.

In the event that I do not sign and timely return the Release or I revoke the Release, I understand that my outstanding awards under the Unit Plans will not be subject to accelerated vesting and/or accelerated distribution and will continue to vest or be cancelled and/or distributed in accordance with the terms of the applicable award agreements under the Unit Plans.

If I am a resident of the State of Minnesota, I specifically acknowledge that I have been informed of my right under Minnesota Statutes Section 363.031 Subd. 2 to revoke this Release insofar as it extends to claims arising out of acts or practices under Minnesota Statutes Chapter 363 by written notice by hand or mail to **The Bear Stearns Companies Inc., Attention: Dawn Caputo, 383 Madison Avenue, New York, New York 10179** within 15 calendar days following the signing of the Release.

**Entire Agreement**

I understand that this Release and the Letter set forth the entire agreement and fully supersede any and all prior agreements or understandings between the Company and me regarding the subject matter hereof and thereof. I further understand and agree that this Release and the Letter may not be altered, amended, modified, superseded, canceled or terminated except by an express written agreement signed by both the Company and me that specifically references this Release and the Letter.

Intending to be legally bound, I, _____, hereby sign the foregoing Release this _____ day of _____, 2008.

_____
Name

Executed as a deed by _____ in the presence of:

Name:_____
Signature:_____
Address:_____
Occupation:_____

EXHIBIT E

June 20, 2008 11:53 AM Eastern Daylight Time

## Wolf Haldenstein Adler Freeman & Herz LLP Commences Class Action Lawsuit on Behalf of the Bear Stearns Companies, Inc. Restricted Stock Units and Cap Units Recipients

NEW YORK--(BUSINESS WIRE)--On June 2, 2008, Wolf Haldenstein Adler Freeman & Herz LLP filed a class action lawsuit in the United States District Court, Southern District of New York, on behalf of all current and former employees of The Bear Stearns Companies, Inc. ("Bear Stearns" or the "Company") [NYSE:BSC] whose compensation, in part, was in the form of restricted stock units ("Restricted Stock Units") and/or capital accumulation plan units ("CAP Units"), issued to the current and former Bear Stearns employees pursuant to the Company's Restricted Stock Unit Plan (the "RSU Plan") and Capital Accumulation Plan (the "CAP Plan"), and whose rights to either Restricted Stock Units and/or CAP Units were vested, thus providing them a present entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common stock ("Bear Stearns Stock" or "Company Stock") upon settlement at the end of a deferral period between December 14, 2006 and March 14, 2008, inclusive (the "Class Period"), against the Company and certain officers and directors, alleging fraud pursuant to pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j (b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] (the "Class").

The case name is styled Bransbourg v. The Bear Stearns Companies, Inc., et al. A copy of the complaint filed in this action is available from the Court, or can be viewed on the Wolf Haldenstein Adler Freeman & Herz LLP website at www.whafh.com.

Bear Stearns proudly promoted a culture of circled wagons – "an us against them camaraderie ingrained in the belief that Bear Stearns' employees success was not based on their birthright or pedigree, but a superior work ethic." As part of the effort to unify the employees and mold a particular culture, the Company paid a significant portion of its employees' compensation in Company Stock. Some estimates indicate that nearly one-third of the firm is employee owned (as of March 17, 2008). These same employees suffered at least a $5 billion loss over the last year as the Company's stock plunged and then was acquired by JP Morgan Chase & Co. [NYSE:JPM] at the rock bottom price of $10 per share.

The Complaint alleges that throughout the Class Period, defendants issued numerous positive, but false or misleading press releases, statements and financial reports filed with the SEC that purported to describe Bear Stearns' financial performance and results. These statements were materially false and misleading and, as a result, Bear Stearns stock traded at artificially inflated prices during the Class Period, reaching a high of $171.51 per share in January 2007.

Beginning in late June 2007, however, Bear Stearns' efforts to deceive the investing public began to unravel. In late June, the Wall Street Journal reported that the SEC commenced an inquiry into a Bear Stearns operated hedge fund that invested in credit instruments. That fund, as well as another, ultimately filed for bankruptcy protection.

Bear Stearns nonetheless continued to misrepresent and downplay the seriousness of its problems. On August 3, 2007, the Company issued a press release that tried to put a positive spin on Standard & Poor's decision to change the Company's outlook premised upon concerns with the Company's "BSAM" hedge funds.

On August 5, 2007, the Company announced a management shake-up that included the ouster of defendant Warren Spector.

On January 4, 2008, Reuters reported that the U.S. Attorney's Office for the Eastern District of New York was interviewing investors in the two failed Bear Stearns' hedge funds.

On March 10, 2008, information began to leak into the market about Bear Stearns' liquidity problems, causing Bear Stearns Stock to drop $7.98, to close at $62.30 per share. On the same day, MarketWatch reported on how Bear Stearns' executives began to "spin" the Company's crisis into a non-event that they could control

absent extraordinary measures. Despite defendant Alan Greenberg's efforts, the article went on to discuss how ratings agencies were viewing the situation and how the Company's liquidity position was under pressure.

On March 12, 2008, Bear Stearns' President Alan Schwartz, also a defendant in this action, reaffirmed Bear Stearns' financial position and liquidity by stating that Bear Stearns has more than $17 billion in excess cash on its balance sheet. He also affirmed Bear Stearns' book value of $80 per share and further indicated that analysts' estimates of substantial profits for the most recently ended quarter were accurate.

On March 13, 2008, however, after the market closed news broke that Bear Stearns was forced to seek emergency financing from the Federal Reserve and J.P. Morgan Chase.

On Sunday, March 16, 2008, J.P. Morgan announced that it reached an agreement to purchase Bear Stearns for $2 per share, or about $236 million.

If you received Bear Stearns Restricted Stock Units or CAP Units during the Class Period, you may request that the Court appoint you as lead plaintiff before August 19, 2008. A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation. In order to be appointed lead plaintiff, the Court must determine that the class member's claim is typical of the claims of other class members, and that the class member will adequately represent the class. Under certain circumstances, one or more class members may together serve as "lead plaintiff." Your ability to share in any recovery is not, however, affected by the decision whether or not to serve as a lead plaintiff. You may retain Wolf Haldenstein, or other counsel of your choice, to serve as your counsel in this action.

Wolf Haldenstein has extensive experience in the prosecution of securities class actions and derivative litigation in state and federal trial and appellate courts across the country. The firm has approximately 70 attorneys in various practice areas; and offices in Chicago, New York City, San Diego, and West Palm Beach. The reputation and expertise of this firm in shareholder and other class litigation has been repeatedly recognized by the courts, which have appointed it to major positions in complex securities multi-district and consolidated litigation.

If you wish to discuss this action or have any questions, please contact Wolf Haldenstein Adler Freeman & Herz LLP at 270 Madison Avenue, New York, New York 10016, by telephone at (800) 575-0735 (Daniel W. Krasner, Esq., Gregory M. Nespole, Esq., Malcolm T. Brown, Esq. or Derek Behnke), via e-mail at classmember@whafh.com or visit our website at www.whafh.com. All e-mail correspondence should make reference to Bear Stearns.

**Contacts**

Wolf Haldenstein Adler Freeman & Herz LLP
Daniel W. Krasner, Esq.
Gregory M. Nespole, Esq.
Malcolm T. Brown, Esq.
Derek Behnke
(800) 575-0735
classmember@whafh.com
www.whafh.com



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

EASTSIDE HOLDINGS INC., Individually and   :
on Behalf of All Others Similarly Situated,   :
   :
   :
                   Plaintiff,   :
   : Civil Action No.: 1:08-cv-02793 (RWS)
              v.   :
   :
THE BEAR STEARNS COMPANIES INC.,   :
JAMES E. CAYNE, ALAN D. SCHWARTZ,   :
WARREN J. SPECTOR, SAMUEL L.   :
MOLINARO, JR. and ALAN C. GREENBERG,   :
   :
             Defendants.   :
   :

-------------------------------------------------------------------x

(*Caption continued on following pages*)

## CERTIFICATE OF SERVICE

```
----------------------------------------------------------------x
RAZILL C. BECHER, Individually and on Behalf  :
of All Others Similarly Situated,             :
                                              :
                                              :
                    Plaintiff,                :
                                              :  Civil Action No.: 1:08-cv-02866 (RWS)
             v.                               :
                                              :
THE BEAR STEARNS COMPANIES INC.,              :
JAMES E. CAYNE, ALAN D. SCHWARTZ,             :
WARREN J. SPECTOR, SAMUEL L.                  :
MOLINARO, JR. and ALAN C. GREENBERG,          :
                                              :
                    Defendants.               :
----------------------------------------------------------------x
GREEK ORTHODOX ARCHDIOCESE                    :
FOUNDATION, by and through, GEORGE            :
KERITSIS, TRUSTEE, Individually and on        :
Behalf of All Others Similarly Situated,      :
                                              :
                    Plaintiff,                :
                                              :  Civil Action No.: 1:08-cv-03013 (RWS)
             v.                               :
                                              :
THE BEAR STEARNS COMPANIES INC.,              :
JAMES E. CAYNE, ALAN D. SCHWARTZ,             :
WARREN J. SPECTOR, and SAMUEL L.              :
MOLINARO, JR. and ALAN C. GREENBERG,          :
                                              :
                    Defendants.               :
----------------------------------------------------------------x
FREDERICK S. SCHWARTZ, Individually and       :
on Behalf of All Others Similarly Situated    :
Persons,                                      :
                                              :
                                              :
                    Plaintiff,                :
                                              :  Civil Action No.: 1:08-cv-04972 (RWS)
             v.                               :
                                              :
THE BEAR STEARNS COMPANIES, JAMES             :
E. CAYNE, ALAN D. SCHWARTZ and                :
SAMUEL L. MOLINARO, JR.,                      :
                                              :
                    Defendants.               :
----------------------------------------------------------------x
```

```
-------------------------------------------------------------x
GILLES BRANSBOURG, Individually and          :
on Behalf of All Others Similarly Situated,  :
                                             :
                              Plaintiff,     :
                                             :  Civil Action No.: 1:08-cv-05054 (RWS)
               v.                            :
                                             :
THE BEAR STEARNS COMPANIES INC.,             :
JAMES E. CAYNE, ALAN D. SCHWARTZ,            :
WARREN J. SPECTOR, SAMUEL L.                 :
MOLINARO, JR. and ALAN C. GREENBERG,         :
                                             :
                              Defendants.    :
                                             :
-------------------------------------------------------------x
```

Gregory M. Nespole hereby certifies that, on July 18, 2008, true and correct copies of the

following documents were caused to be electronically filed with the Clerk, United States District

Court, Southern District of New York, using the ECF system:

    A.    Memorandum of Law of Gilles Bransbourg in Opposition to the
          Motion to Consolidate; and

    B.    Declaration of Gregory M. Nespole in Opposition to Motion to
          Consolidate.

The ECF system will deliver notification of filing of the above-referenced documents to the

following counsel:

    tdubbs@labaton.com, jbleichmar@labaton.com, jjohnson@labaton.com,
    jblock@bermanesq.com, pegan@bermanesq.com, sd@lerachlaw.com,
    drosenfeld@csgrr.com, jfruchter@fruchtertwersky.com, jerry@blbglaw.com,
    seidman@bernlieb.com, brower@browerpiven.com, egoldstein@paulweiss.com,
    jhurwitz@paulweiss.com, bkarp@paulweiss.com, dtoal@paulweiss.com,
    christopher.giampapa@srz.com, alan.glickman@srz.com, gary.stein@srz.com,
    dfrankel@kramerlevin.com, jsaks@kramerlevin.com, sinaiko@kramerlevin.com,
    jkasner@skadden.com, ssaltzst@skadden.com.

I also hereby certify that true and correct copies of the foregoing documents were caused

to be served by first class mail, postage pre-paid, upon the following counsel:

William B. Federman
Federman & Sherwood
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73102

David C. Walton
Coughlin, Stoia, Geller, Rudman
 & Robbins, L.L.P.
655 W. Broadway, Suite 1900
San Diego, CA 92101-3301

Abigail R. Romero
Berman De Valerio Pease Tabacco
 Burt & Pucillo
One Liberty Square, 8th Fl.
Boston, MA 02109

Scott E. Schutzman
Law Offices of Scott E. Schutzman
3700 S. Susan Street
Santa Ana, CA 92704

Michael D. Mosher
Law Firm of Michael D. Mosher
The Lovett Building
50 North Main Street
Paris, TX 75460

A. Anderson B. Dogali
Zala L. Forizs
Joel J. Ewusiak
Forizs & Dogali, P.L.
4301 Anchor Plaza Parkway, # 300
Tampa, FL 33634

Debbie R. Gross
The Law Offices of
 Bernard M. Gross, P.C.
1515 Locust Street, 2nd Fl.
Philadelphia, PA 19102

Andrei V. Rado
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

GREGORY MARK NESPOLE (GN 6820)

/515689